**Connell Foley LLP**
One Newark Center
1085 Raymond Boulevard, 19th Floor
Newark, New Jersey 07102
(973) 436-5800
Attorneys for Plaintiff, Days Inns Worldwide, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAYS INNS WORLDWIDE, INC., a Delaware Corporation, | Civil Action No. 19- |
| Plaintiff, | **VERIFIED** |
| v. | **COMPLAINT** |
| KRISHNA Q INVESTMENTS LLC, a Georgia Limited Liability Company; RAMESH BHAGAT, an individual; NIMESH BHAGAT, an individual; and KAUSHAL PATEL, an individual, | |
| Defendants. | |

Plaintiff Days Inns Worldwide, Inc., by its attorneys, Connell Foley LLP, complaining of defendants Krishna Q Investments LLC, Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel says:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Days Inns Worldwide, Inc. ("DIW") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Krishna Q Investments LLC ("Krishna"), on information and belief, is a limited liability company organized and existing under the laws of the State of Georgia, with its principal place of business at 2451 Old National Parkway, College Park, Georgia 30349.

3.      Defendant Ramesh Bhagat, on information and belief, is a member of Krishna and a citizen of the State of California, having an address at 17414 Vinwood Lane, Yorba Linda, California 92886.

4.      Defendant Nimesh Bhagat, on information and belief, is a member of Krishna and a citizen of the State of California, having an address at 17414 Vinwood Lane, Yorba Linda, California 92886.

5.      Defendant Kaushal Patel, on information and belief, is a member of Krishna and a citizen of the State of Georgia, having an address at 2451 Old National Parkway, College Park, Georgia 30349.

6.      Upon information and belief, Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel are the only constituent members of Krishna.

7.      The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Krishna by virtue of, among other things, section 17.6.3 of the September 30, 2011 franchise agreement by and between Krishna and DIW (the "Franchise Agreement"), described in more detail below, pursuant to which Krishna has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

10.     This Court has personal jurisdiction over Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"),

2

described in more detail below, pursuant to which Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel acknowledged that they were personally bound by section 17 of the Franchise Agreement.

11.     Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Krishna of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Days Inn® Marks

12.     DIW is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

13.     DIW owns and has the exclusive right to license the use of the service mark DAYS INN and various related trade names, trademarks and service marks (certain of which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Days Inn® Marks"), as well as the distinctive Days Inn® System, which provides guest lodging services to the public under the Days Inn® name and certain services to its licensees, including a centralized reservation system, advertising, publicity, and training services.

14.     DIW or its predecessors first used the DAYS INN mark in 1970 and the Days Inn® Marks are in full force and effect.  The registered Days Inn® Marks are incontestable pursuant to 15 U.S.C. § 1065.

15.     DIW has given notice to the public of the registration of the Days Inn® Marks as provided in 15 U.S.C. § 1111.

16.     DIW uses or has used the words "Days Inn," among others, as abbreviations of its brand name.

17.     DIW has registered the Days Inn® Marks as service marks with the US Patent and Trademark Office ("USPTO") and owns, among others, the following valid service mark registrations for the Days Inn® Marks:

| MARK | DESIGN | REGISTRATION NO | REGISTRATION DATE | CLASS |
|---|---|---|---|---|
| 1-800-DAYS-INN | | 2071394 | Jun-17-1997 | 42 |
| DAYBREAK | | 1137073 | Jun-17-1980 | 42 |
| | | | | |
| DAYS HOTEL | | 1518523 | Dec-27-1988 | 42 |
| DAYS HOTEL & Design-Color | | 3441523 | Jun-3-2008 | 43 |
| DAYS HOTEL & SUNBURST DESIGN | | 1518524 | Dec-27-1988 | 42 |
| DAYS INN | | 1160430 | Jul-7-1981 | 42 |
| DAYS INN & Design | | 3441519 | Jun-3-2008 | 35, 43 |
| DAYS INN & SUITES & Design/Color | | 3441522 | Jun-3-2008 | 43 |
| DAYS INN & SUNBURST DESIGN | | 1160431 | Jul-7-1981 | 42 |
| DAYS INN & Sunburst Design/Color | | 3441518 | Jun-3-2008 | 35, 43 |

4

| DAYS INN BUSINESS PLACE | | 2459053 | Jun-12-2001 | 42 |
|---|---|---|---|---|
| DAYS SUITES | | 1665307 | Nov-19-1991 | 42 |

18.    The USPTO registrations for the Days Inn® Marks are valid, subsisting and in full force and effect and appear on the Principal Trademark Register of the USPTO.  All of the Days Inn® Marks have achieved incontestable status pursuant to the Lanham Act, 15 U.S.C. § 1065.  Such incontestable federal registrations for the Days Inn® Marks constitute conclusive evidence of the validity of the Days Inn® Marks and DIW's ownership of the Days Inn® Marks and the exclusive right to use the marks nationwide.

19.    Through its franchise system, DIW markets, promotes, and provides services to its guest lodging licensees throughout the United States.  In order to identify the origin of their guest lodging services, DIW allows its licensees to utilize the Days Inn® Marks and to promote the Days Inn® brand name.

20.    DIW has made, over the course of many years, and continues to make, extensive use of the Days Inn® Marks.  It has advertised, marketed and provided services in connection with the Days Inn® Marks to such an extent that consumers know and recognize the Days Inn® Marks and associate them with DIW and the high-value lodging facilities and services it provides to consumers.

21.    DIW has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Days Inn® Marks as distinctly designating DIW guest lodging services as originating with DIW.

5

4902033-1

22.     The value of the goodwill developed in the Days Inn® Marks does not admit of precise monetary calculation, but because DIW is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of DIW's goodwill exceeds hundreds of millions of dollars.

23.     The Days Inn® Marks are indisputably among the most famous in the United States.

### The Agreements Between The Parties

24.     On or about September 30, 2011, DIW entered into the Franchise Agreement with Krishna for the operation of a 123-room Days Inn® guest lodging facility located at 2451 Old National Parkway, College Park, Georgia 30349, designated as Site No. 42013-96319-02 (the "Facility"). A true copy of the Franchise Agreement is attached hereto as Exhibit A.

25.     On or about July 26, 2016, DIW and Krishna entered into a SynXis Subscription Agreement (the "SynXis Agreement") which governed Krishna's access to and use of certain computer programs, applications, features, and services, as well as any and all modifications, corrections, updates, and enhancements to same.  A true copy of the SynXis Agreement is attached hereto as Exhibit B.

26.     Pursuant to section 5 of the Franchise Agreement, Krishna was obligated to operate a Days Inn® guest lodging facility for a fifteen-year term, during which time Krishna was permitted to use the Days Inn® Marks in association with the operation and use of the Facility as part of the Days Inn® franchise system.

27.     Pursuant to section 7, section 18.2, and Schedule C of the Franchise Agreement and section 5 of the SynXis Agreement, Krishna was required to make certain periodic payments

6

to DIW for royalties, system assessments, taxes, interest, reservation system user fees, SynXis fees, and other fees (collectively, "Recurring Fees").

28.    Pursuant to section 7.3 of the Franchise Agreement, Krishna agreed that interest is payable "on any past due amount payable to [DIW] under this [Franchise] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

29.    Pursuant to section 3.6 of the Franchise Agreement, Krishna was required to prepare and submit monthly reports to DIW disclosing, among other things, the amount of gross room revenue earned by Krishna at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to DIW.

30.    Pursuant to section 3.6 of the Franchise Agreement, Krishna agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Krishna agreed to allow DIW to examine, audit, and make copies of the entries in these books, records, and accounts.

31.    Pursuant to section 11.2 of the Franchise Agreement, DIW could terminate the Franchise Agreement, with notice to Krishna, for various reasons, including Krishna's (a) failure to pay any amount due DIW under the Franchise Agreement, (b) failure to remedy any other default of its obligations or warranties under the Franchise Agreement within 30 days after receipt of written notice from DIW specifying one or more defaults under the Franchise Agreement, and/or (c) receipt of two or more notices of default under the Franchise Agreement in any one year period, whether or not the defaults were cured.

7

32.     Pursuant to section 12.1 of the Franchise Agreement, Krishna agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to DIW in accordance with a formula specified in the Franchise Agreement.

33.     Section 18.1 of the Franchise Agreement specifically set liquidated damages for the Facility at the lesser of (i) $1,000.00 for each guest room of the Facility Krishna was authorized to operate at the time of termination, or (ii) the total amount of Recurring Fees generated at the Facility during the twelve full calendar months of operation immediately preceding the month in which termination occurs.

34.     Section 13 of the Franchise Agreement specified Krishna's obligations in the event of a termination of the Franchise Agreement, including its obligation to immediately cease using all of the Days Inn® Marks.

35.     Pursuant to section 17.4 of the Franchise Agreement, Krishna agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

36.     Effective as of the date of the Franchise Agreement, Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel provided DIW with a Guaranty of Krishna's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit C.

37.     Pursuant to the terms of the Guaranty, Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel agreed, among other things, that upon a default under the Franchise Agreement, they would "immediately make each payment and perform or cause [Krishna] to perform, each unpaid or unperformed obligation of [Krishna] under the [Franchise] Agreement."

38.     Pursuant to the terms of the Guaranty, Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by DIW in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

**The Defendants' Defaults and Termination**

39.     Krishna repeatedly failed to timely meet its financial obligations to DIW, in breach of its obligations under the Franchise Agreement.

40.     By letter dated November 10, 2017, a true copy of which is attached hereto as Exhibit D, DIW advised Krishna that (a) it was in breach of the Franchise Agreement because it owed DIW approximately $52,961.80 in outstanding Recurring Fees, (b) it had 10 days within which to cure this monetary default, and (c) if the default was not cured, then the Franchise Agreement might be subject to termination.

41.     By letter dated February 9, 2018, a true copy of which is attached hereto as Exhibit E, DIW advised Krishna that (a) it remained in breach of the Franchise Agreement because it owed DIW approximately $68,093.45 in outstanding Recurring Fees, (b) it had 10 days within which to cure this monetary default, and (c) if the default was not cured, then the Franchise Agreement might be subject to termination.

42.     By letter dated May 10, 2018, a true copy of which is attached hereto as Exhibit F, DIW advised Krishna that (a) it remained in breach of the Franchise Agreement because it owed DIW approximately $84,641.55 in outstanding Recurring Fees, (b) it had 10 days within which to cure this monetary default, and (c) if the default was not cured, then the Franchise Agreement might be subject to termination.

43.     By letter dated August 16, 2018, a true copy of which is attached hereto as Exhibit G, DIW advised Krishna that (a) it remained in breach of the Franchise Agreement

9

because it owed DIW approximately $103,444.58 in outstanding Recurring Fees, (b) it had 10 days within which to cure this monetary default, and (c) if the default was not cured, then the Franchise Agreement might be subject to termination.

44.     By letter dated September 10, 2018, a true copy of which is attached as Exhibit H, DIW terminated the Franchise Agreement, effective October 11, 2018, and advised Krishna that (a) it had to de-identify the Facility within ten days of the October 11, 2018 termination date, (b) it was required to pay to DIW as liquidated damages for premature termination the sum of $39,775.39 as required under the Franchise Agreement, and (c) demand was made for all outstanding Recurring Fees through the date of termination.

45.     The termination of the Franchise Agreement precludes Krishna from any further use of the Days Inn® Marks in or around the Facility.

46.     The termination of the Franchise Agreement precludes Krishna from any further use of the Days Inn® Marks to induce the traveling public to use the Facility in any way.

47.     Since the termination of the Franchise Agreement, Krishna has continued to use the Days Inn® Marks to induce the traveling public to rent guest rooms at the Facility.

48.     Since the termination of the Franchise Agreement, Krishna has used the Days Inn® Marks without authorization to rent rooms through, among other things, failure to remove Days Inn® signage and continuing to identify the Facility as a Days Inn® guest lodging facility.

49.     By letter dated January 15, 2019, a true copy of which is attached as Exhibit I, DIW reiterated Krishna's post-termination obligations under the Franchise Agreement, including the requirement that, upon termination, Krishna completely "de-identify" the Facility as a Days Inn® guest lodging facility.

50.     Krishna has continued to misuse the Days Inn® Marks despite receiving notification from DIW to cease and desist from the misuse of the Days Inn® Marks.

## FIRST COUNT

51.     DIW repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 50 of the Verified Complaint.

52.     Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

53.     Krishna marketed, promoted, and rented, and continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Days Inn® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

54.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods and/or services . . . shall be liable in a civil action . . . ."

55.     The acts of Krishna in marketing, promoting, and renting rooms at the Facility, through and with the Days Inn® Marks, constitute:

11

a) a false designation of origin;

b) a false and misleading description of fact; and

c) a false and misleading representation of fact;

that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of Krishna's Facility with DIW, and to cause confusion, or to cause mistake, or deception, to the effect that DIW sponsors or approves of the guest lodging services that Krishna provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

56.     Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in pertinent part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

57.     Krishna's use of the Days Inn® Marks in connection with goods and services at the Facility, after the Days Inn® Marks became famous, caused and will continue to cause dilution and disparagement of the distinctive quality of the Days Inn® Marks, and lessened and will continue to lessen the capacity of the Days Inn® Marks to identify and distinguish the goods and services of DIW, all in violation of Section 43(c) of the Lanham Act.

58.     Krishna's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

59.     Krishna's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on DIW.

60.     DIW has no adequate remedy at law.

12

61.     No previous injunctive relief has been awarded with respect to this matter in this case or any other case.

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), DIW demands judgment against Krishna:

a)     Preliminarily and permanently restraining and enjoining Krishna, its affiliates, subsidiaries, officers, agents, servants, employees and attorneys, and all those who act in concert or participation with them, from marketing, promoting, or selling guest lodging services at the Facility through and with the Days Inn® Marks; and

b)     Granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

62.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 61 of the Verified Complaint.

63.     Pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Krishna agreed to allow DIW to examine, audit, and make copies of Krishna's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

64.     Krishna has engaged in acts and practices, as described, which amount to infringement of the Days Inn® Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

65.     As a result, Krishna owes restitution and the disgorgement of profits, in an amount unknown to DIW, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Krishna.

4902033-1

**WHEREFORE**, DIW demands judgment ordering that Krishna account to DIW for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Days Inn® Marks.

### THIRD COUNT

66.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 65 of the Verified Complaint.

67.     By letter dated September 10, 2018, DIW terminated the Franchise Agreement, effective October 11, 2018, due to Krishna's repeated failure to meet its financial obligations to DIW, in breach of its obligations under the Franchise Agreement.

68.     Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to action of the Franchisee, Krishna shall pay liquidated damages to DIW within 30 days of termination.

69.     Section 18.1 of the Franchise Agreement specifically set liquidated damages for the Facility at the lesser of (i) $1,000.00 for each guest room of the Facility Krishna was authorized to operate at the time of termination, or (ii) the total amount of Recurring Fees generated at the Facility during the twelve full calendar months of operation immediately preceding the month in which termination occurs.

70.     As a result of the termination of the Franchise Agreement, Krishna is obligated to pay DIW liquidated damages in the amount of $39,775.39, as calculated pursuant to sections 12.1 and 18.1 of the Franchise Agreement.

71.     Notwithstanding DIW's demand for payment, Krishna has failed to pay DIW the liquidated damages as required in sections 12.1 and 18.1 of the Franchise Agreement.

72.     DIW has been damaged by Krishna's failure to pay liquidated damages.

14

4902033-1

**WHEREFORE**, DIW demands judgment against Krishna for liquidated damages in the amount of $39,775.39, together with interest, attorneys' fees, and costs of suit.

**FOURTH COUNT**

73.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 72 of the Verified Complaint.

74.    By virtue of the premature termination of the Franchise Agreement, DIW sustained a loss of future revenue over the remainder of the fifteen-year term of the Franchise Agreement.

75.    If the Court determines that Krishna is not liable to pay DIW liquidated damages as required by sections 12.1 and 18.1 of the Franchise Agreement then, in the alternative, Krishna is liable to DIW for actual damages for the premature termination of the Franchise Agreement.

76.    DIW has been damaged by Krishna's breach of its obligation to operate a Days Inn® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, DIW demands judgment against Krishna for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

**FIFTH COUNT**

77.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 76 of the Verified Complaint.

78.    Pursuant to section 7, section 18.2, and Schedule C of the Franchise Agreement and section 5 of the SynXis Agreement, Krishna was obligated to remit Recurring Fees to DIW.

79.    Despite its obligation to do so, Krishna failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement in the current amount of $140,555.63.

15

80. Krishna's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged DIW.

**WHEREFORE**, DIW demands judgment against Krishna for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $140,555.63, together with interest, attorneys' fees, and costs of suit.

<u>**SIXTH COUNT**</u>

81. DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 80 of the Verified Complaint.

82. At the time of the termination of the Franchise Agreement, Krishna was obligated to pay DIW Recurring Fees.

83. Despite its obligation to do so, Krishna failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement in the current amount of $140,555.63.

84. In addition, Krishna benefited from its wrongful use of the Days Inn® Marks after termination of the Franchise Agreement and paid no royalty or other Recurring Fees to DIW in return for that benefit.

85. Krishna's failure to compensate DIW constitutes unjust enrichment and has damaged DIW.

**WHEREFORE**, DIW demands judgment against Krishna for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $140,555.63, and all royalties and other Recurring Fees that should be paid to compensate DIW for the period during which Krishna misused the Days Inn® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

4902033-1

## SEVENTH COUNT

86.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 85 of the Verified Complaint.

87.     Pursuant to the terms of the Guaranty, Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel agreed, among other things, that upon a default under the Franchise Agreement, they would immediately make each payment and perform each obligation required of Krishna under the Franchise Agreement.

88.     Despite their obligation to do so, Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel have failed to make any payments or perform or cause Krishna to perform each obligation required under the Franchise Agreement.

89.     Pursuant to the Guaranty, Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel are liable to DIW for Krishna's liquidated damages in the amount of $39,775.39, or actual damages in an amount to be determined at trial, Krishna's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $140,555.63, and for those additional Recurring Fees attributable to the period during which Krishna has misused the Days Inn® Marks.

**WHEREFORE**, DIW demands judgment against Ramesh Bhagat, Nimesh Bhagat, and Kaushal Patel for damages in the amount of:

a)     All liquidated damages, or actual damages, and Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit; and

b)     All profits, royalties, and other Recurring Fees that should be paid to compensate DIW for the period during which Krishna misused the Days Inn® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

17

## EIGHTH COUNT

90.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 89 of the Verified Complaint.

91.     By letter dated September 10, 2018, DIW terminated the Franchise Agreement, effective October 11, 2018, due to Krishna's repeated failure to meet its financial obligations to DIW, in breach of its obligations under the Franchise Agreement.

92.     Section 13.2 of the Franchise Agreement provides that, when the Franchise Agreement is terminated, DIW has the right to "without prior notice enter the Facility, and any other parcels, . . . and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that [Krishna has] not removed or obliterated within five days after termination."

93.     Krishna continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Days Inn® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers.

94.     Krishna's unauthorized use of the Days Inn® Marks has inflicted and continues to inflict irreparable harm on DIW.

**WHEREFORE**, DIW demands judgment declaring that DIW, or its authorized agent, has the right, without prior notice to defendants, to enter the property at the Facility and remove any and all exterior signage, exterior items and other exterior materials displaying the Days Inn® Marks.

4902033-1

Connell Foley LLP
Attorneys for Plaintiff,
Days Inns Worldwide, Inc.

By: _____

Bryan P. Couch

Dated: 1/31/19

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action

pending in any court or of any pending arbitration or administrative proceeding.

Connell Foley LLP
Attorneys for Plaintiff,
Days Inns Worldwide, Inc.

By: _____

Bryan P. Couch

Dated: 1/31/19

19

## VERIFICATION

STATE OF NEW JERSEY   )
                      ) ss:
COUNTY OF MORRIS      )

Michael Piccola, of full age, being duly sworn according to law, upon his oath, deposes and says:

I am Senior Vice President of Contracts Administration and Compliance for Days Inns Worldwide, Inc., which is plaintiff in this action.

I have read the foregoing Verified Complaint and all the allegations contained therein. Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Verified Complaint are true based on my personal knowledge, the records of DIW or information available through employees of DIW.

_____
MICHAEL PICCOLA

Sworn and subscribed to before
me this      day of Eb 11ᵗʰ, 2019

_____
NOTARY PUBLIC

KAREN A. BROMM
NOTARY PUBLIC
STATE OF NEW JERSEY
ID # 2283264
MY COMMISSION EXPIRES JAN. 24, 2022

20

4868158-1

# EXHIBIT A

Location: **COLLEGE PARK, GA**
Entity No.: 96319
Unit No.: 42013

## DAYS INNS WORLDWIDE, INC.
### FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated Sep 30, 2011 is between DAYS INNS WORLDWIDE, INC., a Delaware corporation ("we", "our", or "us"), and **KRISHNA Q INVESTMENTS LLC**, a Georgia limited liability company ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. Franchise.** We have the exclusive right to franchise to you the distinctive "Days Inn" System for providing transient guest lodging services. We grant to you and you accept the Franchise, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The Franchise is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Days Inn & Suites." You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Days Inn Franchisee Advisory Association.** You will be eligible to participate in the Days Inn Franchisee Advisory Association, a Delaware corporation that is the organization of Days Inn System franchisees, in accordance with the Bylaws and Certificate of Incorporation of the Association, as amended, so long as you are not in default under this Agreement.

**3. Your Improvement and Operating Obligations.**

**3.1 Pre-Opening Improvements.** You must select, acquire, construct and/or renovate the Facility as provided in Schedule D.

**3.2 Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with all federal, state, and local laws, regulations and ordinances as well as System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. The Facility will follow standard industry practices for safeguarding cardholder information, applicable laws and regulations, and such other requirements as we may include in the System Standards Manual or as we may otherwise communicate from time to time for such purpose.

1

DAY FA CON
246984 Q3/11

You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility. You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is a material breach of this Agreement.

**3.3 Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for franchisees and general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

**3.4 Marketing.**

3.4.1   You will participate in System marketing programs, including the Directory, if any, the Reservation System, and guest loyalty programs. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.4.2   You may participate in any regional marketing, training or management alliance or cooperative of Chain franchisees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you do not participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.4.3   The Facility must participate in all mandatory Internet and distribution marketing activities and programs in accordance with the System Standards Manual, including any arrangements we make with third party distribution channels. You shall provide us with information about the Facility and utilize our approved photographer for taking photographs of the Facility for posting on the Chain Websites. The content you provide us or use yourself for any Internet or distribution marketing activities must be true, correct and accurate, and you will promptly notify us in writing, in accordance with our processes that are then in effect, when any correction to the content becomes necessary. You shall promptly modify at our request the

2

content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet or distribution marketing activities that conflict, in our reasonable discretion, with Chain-wide Internet or distribution marketing activities. You must honor the terms of any participation agreement you sign for Internet or distribution marketing activities. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet or distribution marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis. We may suspend the Facility's participation in Internet and/or distribution marketing activities if you default under this Agreement.

3.4.4   You will participate in the Wyndham Rewards program or any successor guest rewards or loyalty program we determine is appropriate and pay the Loyalty Program Charge associated with the program as set forth in Schedule C. The Wyndham Rewards annual Front Desk Guide sets forth additional system standards, which you agree to follow. The Front Desk Guide, including fees assessed and reimbursements rates, may be revised by us or our affiliates at any time upon 60 days prior notice.

3.5 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.6 **Financial Books & Records; Audits.**

3.6.1   The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.6.2   Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards. We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.6.3    We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.6.2 within 30 days after the date of the initial audit, (ii) you cancel two or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.6, an "Accounting Procedure Notice."  You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.6 as described in Section 4.8, and/or other charges we identify and invoice as a result of the audit.  The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.6.4    You shall, at your expense, prepare and submit to us by the third day of each month, a statement in the form prescribed by us, accurately reflecting for the immediately preceding month all Gross Room Revenues and such other data or information as we may require.  You must submit your statements to us using our on-line reporting and payment tool or through such other technology or means as we may establish from time to time.

**3.7 Inspections.**   You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement.   You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice.   The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection.  If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in the System Standards Manual plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection.  You will also be charged the Reinspection Fee if we must return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Schedule D. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score.  We may publish and disclose the results of quality assurance inspections and guest surveys.  We may, at our discretion, implement a chain-wide quality assurance/mystery shopper inspection program to be performed by a reputable third party.  You must provide free lodging for the inspector(s) when he/she visits your Facility.

4

**3.8 Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name as additional insureds Days Inns Worldwide, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, and their current and former subsidiaries, affiliates, successors and assigns as their interests may appear. All policies must be primary and non-contributory with or excess of any insurance coverage that may be available to an additional insured.

**3.9 Conferences.** You (or your representative with executive authority if you are an entity) will attend each Chain conference and pay the Conference Fee we set for Chain franchisees, if and when we determine to hold a Chain conference. The Chain conference may be held as part of a Wyndham Hotel Group, LLC multi-brand conference with special sessions and programs for our Chain only. Mandatory recurrent training for franchisees and managers described in Section 4.1.4 may be held at a conference. The Fee will be the same for all Chain Facilities that we franchise in the United States. You will receive reasonable notice of a Chain conference. We may invoice and charge you for the Conference Fee even if you do not attend the Chain Conference.

**3.10 Purchasing and Other Services.** You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve. You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

**3.11 Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Days Inn" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You shall use your best efforts to promote usage of other Chain Facilities by members of the public. Except as provided in the System Standards Manual or if you obtain our prior written consent, which we may withhold in our sole discretion, neither your nor the Facility shall promote or advertise any competing business at the Facility including, but not limited to, any other guest lodging facility, time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, unless we or one of our affiliates franchise, manage or own that business.

**3.12 Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

5

3.13   **Courtesy Lodging.**   You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.14   **Minor Renovations.**   Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 90 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.   You will perform the Minor Renovations as and when the Minor Renovation Notice requires.   We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility was no more than 225 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

3.15   **Technology Standards & Communications.**   You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment.   You must purchase the computer system and other equipment and software that we specify.   We may modify System Standards to require new technology at all Chain Facilities.   At our request, you shall participate in any intranet or extranet system developed for use in connection with the System.   Such intranet or extranet system may be combined with that of our affiliates.   You shall agree to such terms and conditions for the use of such intranet or extranet system as we may prescribe, which may include, among other things:   (a) confidentiality requirements for materials transmitted via such system; (b) password protocols and other security precautions; (c) grounds and procedures for our suspension or revocation of access to the system by you and others; and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system.   You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system.

**4.   Our Operating and Service Obligations.**   We will provide you with the following services and assistance:

4.1 **Training.**   We may offer (directly or indirectly by subcontracting with an affiliate or a third party) orientation training, re-certification training, remedial training and supplemental training.

4.1.1   **General Manager Orientation Training.**   We will offer at our corporate offices or at another location we designate, an orientation training program.   The program will not exceed two weeks in duration and will cover such topics as operating a Chain Facility, marketing and sales, financial management and guest services.   We may administer certain diagnostic tests via the Internet to measure the skill set of your general manager and, based in part of his/her score, offer certain Internet-based training as a supplement to the classroom training experience.   Your initial general manager (or other representative who exercises day to day operational authority) for the

6

Facility must complete this program to our satisfaction no later than 90 days after the Opening Date. Any replacement general manager must complete orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition for orientation which is payable as part of the Integration Services Fee set forth on Schedule D. If he/she does not attend orientation within 90 days after the Opening Date, and for any replacement general manager, you must pay a separate tuition at the rate then in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits. We may charge you full or discounted tuition for "refresher" orientation for your general manager or for additional staff members who attend orientation with your general manager. We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager (i) fails to register for and/or attend orientation by the required deadline, (ii) registers, but is a "no show", for orientation, or (iii) fails to notify us at least seven (7) days in advance that he/she will be unable to attend a scheduled program. This is in addition to the tuition you must pay us for your general manager at the then in effect rate when he/she attends orientation. See Section 4.1.5.

4.1.2  **Owner Training.**  If this is your first System franchise, or you have not attended orientation within the last two (2) years, you (or a person with executive authority if you are an entity) must attend orientation by the Opening Date. If we do not offer a place in orientation within this time period, you must attend the next program held at which we offer a place. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend orientation, but may choose to do so at their option. We charge you tuition of $1,500 which is payable by the scheduled date for the program. You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least seven (7) before the start date and schedule attendance at another class to be held within the required period. We may charge you No-Show or Cancellation Fees if you (i) fail to register for and/or attend orientation by the Opening Date, (ii) register, but are a "no show", for any scheduled orientation program, or (iii) fail to give us at least seven (7) days notice of cancellation. In addition to No-Show and Cancellation Fees, if you do not attend orientation within 90 days after the Opening Date, you will still be required to attend orientation and pay tuition at the then in effect rate. See Section 4.1.5.

4.1.3  **Remedial Training.**  We may require you, your general manager and/or your staff to participate in remedial training if the Facility receives a D or F (or equivalent score) on a quality assurance inspection, a D or F +GX score on Medallia electronic guest survey (or equivalent evaluation system), or experiences significant complaints to our customer care department, as determined by us in our sole discretion. This training may be offered at our corporate offices, at a regional location, on-line or at the Facility. The training may be in the form of one or more classes held at different times and locations as we may require. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. In addition, if at the time of your initial post-opening quality assurance inspection, you receive (i) a failure rating on guest room cleanliness and (ii) an average Medallia

7

score of F on cleanliness of guestroom category or cleanliness of bathroom category (based on a minimum of 10 electronic Medallia guest surveys), then we may require you to take a one day remedial class on housekeeping within 60 days after the inspection. The tuition for this class is currently, $ 800, but is subject to increase in the future.

**4.1.4   Supplemental Training.**   You must subscribe to our e-learning modules and other educational resources, accessible by you and your staff via the Internet, and pay us the annual fee for this service. All general managers must complete recertification training at such intervals as we may establish in the System Standards Manual. You must pay us the tuition then in effect for the program.   You must subscribe to our e-learning training program which offers a variety of hospitality courses and videos for general managers and line level staff. We charge you an annual training resource access fee based on the amount our third party content provider charges us, plus a reasonable service fee for administering and marketing the program. The annual training resource fee is currently $50, but is subject to increase in the future. We may offer other mandatory or optional training programs for reasonable tuition or without charge. Recertification and other supplemental training may be offered in our corporate offices or other locations or held in conjunction with a Chain lodging conference. You must pay the then current tuition for the training as well as for your representative's travel, lodging, meals, incidental expenses, compensation and benefits while attending the training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

**4.1.5   No Show and Cancellation Fees.**   If you, your general manager or any other member of your staff you designate, registers for a training program but fails to attend such program as scheduled without notifying us in advance, we may charge you a No-Show Fee of 50% of the tuition for the program. If you, your general manager or any other member of your staff does not register for and attend any required training within the time period set forth in this Section 4.1 or in the System Standards Manual, we may charge you a fee of 100% of the tuition for the program. If you or any member of your staff cancels participation in any training program less than seven (7) days before it is scheduled to be held, we may charge you a Cancellation Fee of 25% of the tuition for the program. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

**4.2 Reservation System.**   We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the System Assessment Fee for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance and support for any software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. During the Term, the Facility will participate in the Reservation System on an exclusive basis, including entering into all related technology agreements and complying with all terms and conditions which we establish from time to time for participation. The Facility may not book any reservations through any other electronic reservation system, booking engine, unapproved third

8

party distribution system or other technology. All information you collect or capture through your property management system shall be jointly owned by you and us. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties.

## 4.3 **Marketing.**

4.3.1   We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research, loyalty marketing and other marketing programs, training programs and related activities. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System franchisees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2   We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3   We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for an additional fee.

4.4 **Purchasing and Other Services.**  We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.**  We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances. We may, in our discretion, change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation where it appears.

4.6 **Consultations and Standards Compliance.**  We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

9

**4.7 System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications which we may make available to you via our Chain intranet, in paper copies or through another medium. We will provide you with access to the System Standards Manual promptly after we sign this Agreement. We will notify you via our Chain intranet or another medium of any System Standards Manual revisions and/or supplements as and when issued as well as any other publications and policy statements in effect for Chain franchisees from time to time.

**4.8 Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.6. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.7. You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.6. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis. Our inspections are solely for the purposes of checking compliance with System Standards.

**5.   Term.** The Term begins on the date that we insert in the preamble of this Agreement after we sign it (the "Effective Date") and expires at the end of the fifteenth (15th) Franchise Year. However, each of us has the right to terminate this Agreement, without cause, and as a matter of right, on the 5th or 10th anniversary of the Opening Date, by giving prior written notice to the other, provided, that if you decide to exercise your right to terminate this Agreement, you must have paid all fees and charges due under this Agreement (and all related agreements, including any promissory notes or other incentive agreements, and any agreements relating to the use of a property management system or Reservation System) as of the date you provide notice of termination and as of the effective date of the termination. The written notice required by this Section 5 shall be given at least 6 months, but not more than twelve (12) months, before the date of the proposed termination. You will pay no Liquidated Damages if you comply with the terms of this Section and you perform the post termination obligations specified in this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

**6.   Initial Fees.**

**6.1 Application and Initial Fees.** You must pay us a non-refundable Application Fee of $1,000.00. If your franchise is for a new construction or conversion Facility, you must pay us an Initial Fee. If you are a transferee of an existing Facility or are renewing an existing franchise, you will pay us a Relicense Fee. The amount of your Initial or Relicense Fee is **$25,000.00** which shall be paid as follows: $13,000 will be due when you sign this agreement; and $12,000.00 will be transferred from site #42013-96319-01.

**7.   Recurring Fees, Taxes and Interest.**

7.1 You will pay us certain "Recurring Fees" each month of the Term payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States). The Royalty and System Assessment Fees described in Section 7.1 are payable three days after the month in which

10

they accrue, without billing or demand. Other Recurring Fees are payable at the times set forth in the System Standards. Recurring Fees include the following:

7.1.1 A "Royalty" equal to five and five-tenths percent (5.5%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 A "System Assessment Fee" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, accrues from the Opening Date until the end of the Term, including during reservation suspension periods. We may use the System Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services. You will also pay or reimburse us as described in Schedule C for "Additional Fees" such as commissions we pay to travel and other agents for certain reservation and marketing services to generate reservations at the Facility plus a reasonable service fee, fees levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Chain Websites and/or other reservation systems, distribution channels and networks, and fees for additional services and programs. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may change, modify, add or delete the System Assessment Fee and/or Additional Fees in accordance with Schedule C.

7.2 You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3 "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

7.5 You will report and pay to us all Recurring Fees and other fees and charges on-line via our self-service Electronic Invoice Presentment and Payment tool ("E.I.P.P") accessible through our Chain intranet. In the E.I.P.P. on-line environment, payments can be made either through the electronic check payment channel or the credit card payment channel. We reserve the right to change, from time to time, the technologies or other means for reporting and paying fees to us by amending the System Standards Manual.

## 8. Indemnifications.

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any

11

transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9.   **Your Assignments, Transfers and Conveyances.**

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your Franchise is subject to termination when the Transfer occurs. The Franchise is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

12

**9.2 Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

**9.3 Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may, in our discretion, require the transferee to place funds in escrow, at its expense, in order to complete all necessary improvements. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the Franchise when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

**9.4 Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5 Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our

13

consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6 Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. <u>Our Assignments</u>.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. <u>Default and Termination.</u>**

11.1   **Default.** In addition to the matters identified in Sections 3.1 and 3.6, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within 10 days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, if you have acted diligently to cure the default but cannot do so, and the default does not relate to health or safety, we may, in our discretion, enter into an improvement agreement with you provided you request such an agreement within 30 days after receiving notice of the failing inspection. If we have entered into an improvement agreement, you must cure the default within the time period specified in the improvement agreement which shall not exceed ninety days after the failed inspection. We may terminate this Agreement and any or all rights granted hereunder if you do not perform that improvement agreement.

11.2   **Termination.** We may terminate this Agreement, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Schedule D due to your failure to perform your Improvement Obligation, (2) you discontinue operating the Facility as a "Days Inn", (3) you do or perform, directly or indirectly, any act or failure to act that in our

14

reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3    **Casualty and Condemnation.**

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3  Any protected territory covenants will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4    **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue reservation referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All System Assessment Fees accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition

15

precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. We may omit the Facility from any paper or electronic directory of Chain Facilities that we issue. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults. Once a termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may cease accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date including or following the termination or expiration of this Agreement.

11.5   **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12. Liquidated Damages.

12.1   **Generally.** If we terminate the Franchise under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination. If Termination occurs during the last two Franchise Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18.1, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7.1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination. You will also pay any applicable Taxes assessed on such payment. Before the last two Franchise Years, Liquidated Damages will be **as set forth in Section 18.1.** If we terminate this Agreement before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable after the Opening Date. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2   **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice

16



period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but you must pay the fees set forth in Section 7 when due until Condemnation is completed.

**13. Your Duties At and After Termination.**    When a Termination occurs for any reason whatsoever:

13.1    **System Usage Ceases.** You must comply with the following "de-identification" obligations. You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual or other brand directives for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility. If you do not strictly comply with all of the de-identification requirements above, in the System Standards Manual and in our other brand directives, you agree to pay us a Royalty equal to $2,000 per day until de-identification is completed to our satisfaction.

13.2    **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours. If you have not completed your de-identification obligations to our satisfaction, we may paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3    **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4    **Survival of Certain Provisions.** Sections 3.6 (as to audits, for 2 years after termination), 3.11, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement.

17

14. **Your Representations and Warranties.** You expressly represent and warrant to us as follows:

14.1   **Quiet Enjoyment and Financing.**   You own, or will own prior to commencing improvement, or lease, the Location and the Facility.   You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility.   You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2   **This Transaction.**   You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement.   You have obtained all necessary approvals of your owners, Board of Directors and lenders.   No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement.   Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application.   You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.   To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3   **No Misrepresentations or Implied Covenants.**   All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

15. **Proprietary Rights.**

15.1   **Marks and System.**   You will not acquire any interest in or right to use the System or Marks except under this Agreement.   You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2   **Inurements.**   All present and future distinguishing characteristics, improvements and

18

additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3   **Other Locations and Systems.**   We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as franchisor or franchisee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4   **Confidential Information.**   You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5   **Litigation.**   You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6   **The Internet and other Distribution Channels.**   You may use the Internet to market the

19

Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark except as otherwise expressly permitted by the System Standards Manual or with our written consent. You will assign to us any such identification at our request without compensation or consideration. You may not purchase any key words for paid search or other electronic marketing that utilizes any Mark without our written consent. You must make available through the Reservation System and the Chain Website all rates you offer directly to the general public or indirectly via Internet marketing arrangements with third parties. You agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet or distribution marketing materials must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16. Relationship of Parties.

16.1    **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2    **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

17.1    **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

DAY FA CON
246984 Q3/11

17.2   **Waivers, Modifications and Approvals.**   If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice.  Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.  All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3   **Notices.**   Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, (iii) by first class, prepaid certified or registered mail, return receipt requested, (iv) by electronic mail, posting of the notice on our Chain intranet site or by a similar technology; or (v) by such other means as to result in actual or constructive receipt by the person or office holder designated below, to the appropriate party at its address stated below or as it may otherwise designated by notice.  You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

DAYS INNS WORLDWIDE, INC.:
Our address:  22 Sylvan Way, P.O.  Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
Fax No.  (973) 753-8311

Your name:  **KRISHNA Q INVESTMENTS LLC**
Your address:  **17414 Vinwood Lane, Yorba Linda, CA 92886**
Attention:  **Ramesh Bhagat**
Your fax No.:  **n/a**
Your e-mail address:  _____

17.4   **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5   **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

17.6   **Choice of Law; Venue; Dispute Resolution.**

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.   Either party may request mediation through the National Franchise

21

Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4 WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.6.5 Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action. You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action.

**17.7    Special Acknowledgments. You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1 You received our Franchise Disclosure Document ("FDD") for prospective franchisees at least 14 days before signing this Agreement or paying any fee to us.**

**17.7.2 Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or in the FDD. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or in the FDD.**

**17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the Franchise other than those set forth in the FDD.**

**17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the FDD or in a writing that is attached to this Agreement.**

**17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

22

17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

17.8    Force Majeure.  Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from: (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes; (b) fires, strikes, embargoes, war, acts of terrorism or riot; (c) legal restrictions that prohibit or prevent performance; or (d) any other similar event or cause beyond the control of the party affected.  Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments.

17.9    Protected Territory.  We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect.  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory.  While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate franchises the facility, and/or (ii) any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility.  You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities.  This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminates or is not renewed.  The Protected Territory fairly represents the Facility's trading area, and you acknowledge that.  There are no express or implied territorial rights or agreements between the parties except as stated in this Section.  You irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility, or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance.  The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.  The Protected Territory means all the area within a circle created by a two (2) mile radius whose centerpoint is the front door of the Facility

18.     Special Stipulations.  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually

23

agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

**18.1  Liquidated Damages.**  Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two License Years will be the lesser of (i) $1,000 for each guest room of the Facility you are authorized to operate at the time of Termination or (ii) the total amount of Recurring Fees generated at the Facility during the twelve full calendar months of operation immediately preceding the month in which Termination occurs.

**18.2.  Combined Fees.**  Notwithstanding Section 7.1, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement,** you will pay a Combined Fee consisting of the Royalty and System Assessment Fee at the rates set forth in this Section. The Combined Fee excludes commissions and related service charges, guest complaint assessments, Internet and GDS Fees, the Loyalty Program Charge and other similar fees and charges described on Schedule C which must be paid as stated in this Agreement. The discount from the Royalty and System Assessment Fees set forth in Section 7 that the Combined Fee represents (the "Discount Amount") shall first be applied to any applicable reservation fee and any remaining Discount Amount shall be applied evenly between the Royalty and System Assessment Fee.

18.2.1  The Combined Fee shall be seven and one-half percent (7.5%) of Gross Room Revenues accruing during the first, second and third Franchise Years; and

18.2.2  The Combined Fee shall be eight and three-tenths percent (8.3%) of Gross Room Revenues accruing during the fourth and fifth Franchise Years; and

18.3.3  The Royalty and System Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the fifth Franchise Year.

18.2.4  The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty and System Assessment Fees shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) ~~after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 200 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 200 in a re-inspection to be performed not less than 60 days after the initial inspection~~ **(intentionally stricken).**

**18.3  Reduced Relicense Fee.**  If (i) you are not then in default under this Agreement, and (ii) we receive your proposed transferee's Franchise Application and Application Fee before you Transfer the Facility, then the Relicense Fee for a Transfer will be **$2,500** if we receive the proposed transferee's Franchise Application before the end of the FIRST Franchise Year, and **$5,000** if we receive the proposed transferee's Franchise Application after the FIRST Franchise Year and before the end of the FIFTH Franchise Year, and **$10,000** if we receive the proposed transferee's Franchise Application after the FIFTH Franchise Year and before the end of the TENTH Franchise Year. If the conditions are not satisfied, and after the TENTH Franchise Year, the Relicense Fee will be as

24

specified in Section 7.4.

**Remainder of page intentionally left blank**

25

IN WITNESS WHEREOF, the parties have executed this Agreement on this 30th day of
Sopt. , 2011 and agree to be bound by the terms and conditions of this Agreement as
of the Effective Date.


WE:
DAYS INNS WORLDWIDE, INC.:


By:_____
        Vice President


YOU, as franchisee:
KRISHNA Q INVESTMENTS LLC



By:_____
        (Managing) Member

25

## APPENDIX A

DEFINITIONS

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Schedule D.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Chain Websites means any current or future consumer or business websites, mobile websites or mobile applications that we or our affiliates develop for booking reservations for and/or providing information about Chain Facilities, and any future equivalent technology.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence.   Confidential Information includes all other system standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the property management system software and other applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

26

<u>Directory</u> means any general purpose directory we issue, whether printed, web-based, or issued in another medium, which may list the names and addresses of Chain Facilities in the United States, and at our discretion, other System facilities located outside the United States, Canada and Mexico.

<u>Effective Date</u> means the date we insert in the Preamble of this Agreement after we sign it.

<u>Equity Interests</u> shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

<u>Equity Transfer</u> means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those owners disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does <u>not</u> occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

<u>Facility</u> means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the Effective Date.

<u>FF&E</u> means furniture, fixtures and equipment.

<u>FF&E Standards</u> means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

<u>Food and Beverage</u> means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

<u>Franchise</u> means the non-exclusive franchise to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

DAY FA CON
246984  Q3/11

Franchise Year means:

      (i) *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

      (ii) *If the Opening Date does not occur on the first day of a month*: the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest (sleeping) rooms at the Facility, including all credit transactions, whether or not collected, guaranteed no-show revenue net of chargebacks from credit card issuers, and any proceeds from any business interruption or similar insurance applicable to the loss of revenues due to the non-availability of guest rooms. Excluded from Gross Room Revenues are separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment (including Internet fees and commissions); vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Schedule D.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6, if the Agreement is for a new construction or conversion franchise.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **2451 Old National Parkway, College Park, GA 30349**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

28

<u>Maintenance Standards</u> means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

<u>Marks</u> means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Days Inn" and other marks (U.S. Reg. Nos.: 1,160,430; 1,160,431; 1,420,612; 1,469,518; and 1,003,834) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

<u>Marks Standards</u> means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

<u>Minor Renovation</u> means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.14.

<u>Minor Renovation Ceiling Amount</u> means $3,000.00 per guest room.

<u>Minor Renovation Notice</u> means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.14.

<u>Opening Date</u> has the meaning specified in Schedule D.

<u>Operations Standards</u> means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

<u>Permitted Transferee</u> means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee  or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

<u>Prototype Plans</u> has the meaning specified in Schedule D for New Construction Facilities.

<u>Punch List</u> means the list of upgrades and improvements attached as part of Schedule D, which you are required to complete under Section 3.1 and Schedule D.

<u>Recurring Fees</u> means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

<u>Relicense Fee</u> means the fee your transferee pays to us when a Transfer occurs or the fee you pay to

29

us if you are renewing an existing franchise.

Reinspection Fee means the fee you must pay to us under Section 3.7 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

Reservation System or "Central Reservation System" means the back end technology platform and applications used by us to accept, store and/or communicate reservations for Chain Facilities. The Reservation System is separate from, but enables, the booking of reservations for Chain Facilities through various distribution channels such as the Chain Websites, the GDS and other distribution channels.
Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7(a). "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fees means the fees you pay to us under Section 7 and Schedule C for marketing, advertising, training, the Reservation System and other services.

System Standards means the standards for participating in the System published in the System Standards Manual or elsewhere, including but not limited to design standards, FF&E standards, Marks standards, marketing standards, operations standards, technology standards and maintenance standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual or written directive or other communication we issue or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain

30

Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility.  A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Days Inns Worldwide, Inc., a Delaware corporation, its successors and assigns.

31.

## SCHEDULE A

(Legal Description of Facility)

32

Deed Book 41374 Pg. 519
Filed and Recorded Nov-21-2005 02:15pm
2005-0411902
Real Estate Transfer Tax $3,075.00
Juanita Hicks
Clerk of Superior Court
Fulton County, Georgia

After recording return to:
Calloway Title & Escrow, LLC
**Attn: David Dudley** ↄ-ᒥᒫꞮꞮ
4800 Ashford-Dunwoody Rd. Ste. 240
Atlanta, Georgia 30338

**RETURN TO:**
**SMITH, WELCH & BRITTAIN**
**1239 EAGLE'S LANDING PARKWAY**
**STOCKBRIDGE, GEORGIA 30281**

<u>**WARRANTY DEED**</u>

**STATE OF GEORGIA, HENRY COUNTY.**

IN CONSIDERATION OF THE SUM OF ONE DOLLAR AND OTHER VALUABLE

CONSIDERATION to it paid Grantor, KARUNA HOSPITALITY, LLC, A

GEORGIA LIMITED LIABILITY COMPANY does hereby sell and convey

unto **KRISHNA Q INVESTMENTS LLC, A GEORGIA LIMITED LIABILITY**

**COMPANY**, its heirs and assigns, a tract or parcel of land, which

is described as follows:

All that tract or parcel of land lying and being in Land Lot 61 of the 13th District of Fulton
County, Georgia and being 2.398 acres designates as the western portion of Lot 110 of Old
National Square, as shown on a plat of survey made of Fairfield Inn for Koruna Hospitality, LLC
by Michael F. Lawler of Alta Surveying, Inc, Ga. R.L.S. #1945, dated 11/27/1996, which said
plat is recorded in Plat Book 133, Page 95 of Fulton County Records, and being more particularly
described as follows:

TO FIND THE TRUE POINT OF BEGINNING, commence at intersection of the Eastern right-
of-way of Old National Highway (100' R/W) and the Northern right-of-way of Old National Place
(70' R/W); thence running along the Northern right-of-way of Old National Place in an Easterly

(Client: MERIDETH   Matter:   Doc: 00172611.DOC)
Client: 0000501   Matter:   Doc: 00020931.WPD

Deed Book 41374 Pg  520

direction for 233.5 feet to a point at the Southeastern corner of Lot 105; thence continuing along the Northern right-of-way of Old National Place in an Easterly direction for 259.7 feet to a point at the Southeastern corner of Lot 108; thence continuing along said right-of-way in a Southerly direction for 20.40 feet to a point at the southwestern corner of Lot 109; thence continuing along said Right-of-Way following the curvature to the right arc distance of 165.30 feet to an iron pin set at the Southeastern corner of Lot 10 and the POINT OF BEGINNING; thence departing said right-of-way and running along the East line of Lot 109 North 16 degrees 2 minutes 16 seconds East for a distance of 410.70 feet to an iron pin found; thence continuing along the East line of Lot 109, North 00 degrees 28 minutes 16 seconds East for a distance of 115.06 feet to an iron pin found, said iron pin being located on the Southern right-of-way of Interstate Highway I-285/85; thence running South 88 degrees 20 minutes 33 seconds East along the Southern right-of-way of said highway for 10.43 feet to a concrete right-of-way Monument found; thence continuing along said right-of-way South 83 degrees 27 minutes 38 seconds East for 180.58 feet to an iron pin set; thence departing said right-of-way and running South 00 degrees 28 minutes 16 seconds West for a distance of 121.73 feet to an iron pin set; thence running South 16 degrees 02 minutes 16 seconds for a distance of 452.02 feet to an iron pin set on the Northern right-of-way of Old National Place ( 70' R/W); thence running along said Northern right-of-way of Old National Place North 69 degrees 20 minutes 35 seconds West a distance of 190.62 feet to an iron pin set and the TRUE POINT OF BEGINNING.


TO HAVE AND TO HOLD said land and appurtenances unto said

KRISHNA Q INVESTMENTS LLC, A GEORGIA LIMITED LIABILITY COMPANY,

its heirs, executors, administrators, and assigns, in fee simple.

Grantor warrants the title to said land against the lawful

claims of all persons.


(Client: MERIDETH    Matter:   Doc: 00172611.DOC)
Client: 0000501    Matter:   Doc: 00020931.WPD

## SCHEDULE B

PART I:     YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|------|---------------------|-------------------------|---------------------|
| Ramesh Bhagat | 60% | member | |
| Kaushal Patel | 30% | member | |
| Nimesh Bhagat | 10% | member | |

PART II:     THE FACILITY:

Primary designation of Facility: Days Inn & Suites

Number of approved guest rooms: 123.

Parking facilities (number of spaces, description): at least 123

Other amenities, services and facilities:

Initial

34 33

DAY FA CON
246024 Q3/11

# DAYS INNS WORLDWIDE, INC.

## SCHEDULE C
### April 2011

## I.   System Assessment Fees

The System Assessment Fee is equal to 3.8% of Gross Room Revenues. We reserve the right, in our sole discretion, to increase or modify the System Assessment Fees for all Chain Facilities from time to time to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs but with at least 30 days prior written notice and after consultation with the Board of Directors of the Days Inns Franchisee Advisory Association.

## II.   Additional Fees

### A.   Loyalty Program Charge

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program. The Loyalty Program Charge is up to 5% of the Gross Room Revenues accruing from each "Qualifying Stay" at the Facility as defined in the Front Desk Guide or any other program rules, which are System Standards. We will proactively match and award members with points or other program currency they earn on Qualifying Stays even if they do not present their Wyndham Rewards membership card upon check–in. You will be billed monthly in arrears for points or other program currency awarded to members during the preceding month.

### B.   Customer Care Fee

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. We may also contact you, at our discretion, if we become aware of any other complaints about the Facility including complaints which are posted on third-party travel websites, distribution channels, blogs and social networks, or other forums,. If you do not respond to and resolve any complaint to the satisfaction of the guest within three business days after we refer it to you, we will charge you a "Customer Care Fee" of $160.00, plus the costs we incur to settle the matter with the guest. The Customer Care Fee is intended only to reimburse us for the costs of complaint handling and is not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

### C.   Best Available Rate Program

You must (i) make available through the Central Reservation System and the Chain Websites room rates equivalent to those you offer to the general public directly or indirectly via third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. If a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through any of the Chain Websites or the Central Reservation System

34

for the same date and accommodations and the guest meets all Program requirements, you must provide the applicable night(s) to the guest at 10% less than the lower rate offered on the Internet. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $60 to reimburse us for our administrative charges of handling the complaint.

D.      **Service Interruption Fee**

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us the Service Interruption Fee set forth in the System Standards Manual before we restore service.

E.      **GDS and other Distribution Channel Fees**

We will charge you either a GDS Fee or a Distribution Channel Fee, as applicable, for qualified reservations for your Facility processed through the global distribution systems ("GDS") or through another distribution channel, including an on-line travel agency, our Chain Websites or our direct connections to other electronic channels.. GDS Fees are assessed for qualified reservations processed through any GDS or through any Internet website or other booking source powered by a GDS. Distribution Channel Fees are assessed for qualified reservations originated through all other on-line distribution channels. If a guest cancels a GDS -originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable GDS Fee. This does not apply to reservations originated and canceled through other distribution channels. GDS and Distribution Channel -originated reservations may also incur l "Agent" and similar commissions. We will establish the amount of the GDS and Distribution Channel Fees from time to time based on a weighted average of the fees these channels charge us and/or our own costs (including overhead) for t providing these services. Distribution Channel Fees may vary by distribution channel.

F.      **Agent Commissions and Other Charges**

You must pay and/or reimburse us up to 15% of the Gross Room Revenues from qualified reservations booked by "Agents" or other qualifying originators, plus our service charge of .75% of commissionable revenue. "Agents" include, but are not limited to, travel agents, on-line travel and referral websites, travel consortia, travel management companies, global sales agents and other third party distribution channels. These payments may be allocated to commissions charged by the Agents or to paid search and/or other marketing activities conducted or to be conducted by or through these Agents on a going forward basis.

We or an affiliate may charge you a sales commission of up to 15% of the Gross Room Revenues generated from qualified reservations consumed by members of affinity groups and organizations participating in our Member Benefits Program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits Program to its members and distributes the remaining portion to our Global Sales Organization to offset its administrative and overhead costs for supporting the Member Benefit Program and other programs for generating room nights at Chain Facilities.

35

Under our G.O. Leads Plus Referral Program, our Global Sales Organization refers leads for reservations from groups, government, business travelers, specialty markets, travel management companies and consortia, and other sources to Chain Facilities. One source of reservations are leads from other Chain Facilities. For this business, we or an affiliate charge you a sales commission of 10% of the Gross Room Revenues on qualifying reservations. We or our affiliate pays 7% of the sales commission to the referring Chain Facility and distributes the remainder to our Global Sales Organization to offset its administrative and overhead costs for supporting the G.O. Leads Plus Referral Program and other programs for generating room nights at Chain Facilities.

We will offer you the opportunity to participate in certain Internet and distribution channel marketing and reservation activity with third parties. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet and distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates, but a commission of up to 15% may be charged on consumed room nights.

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services, programs and distribution channels at any time upon not less than 30 days written notice.

36

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

This Addendum applies if you are converting an existing guest lodging facility to a Days Inn Facility.

## 1.  YOUR IMPROVEMENT OBLIGATION:

1.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and the renovations specified on any Punch List attached to this Schedule D is ninety (90) days after the Effective Date. All renovations will comply with System Standards, any Approved Plans, and the Punch List. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List before we consider the Facility to be ready to open under the System. You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires. We may, in our discretion, require you to place funds in escrow, at your expense, in order to complete all necessary improvements. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 1.3 below and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension. You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date. You must also pay us the Reinspection Fee described in Section 3.7 if you fail to complete any Improvement Obligation by the deadline established in the Punch List and our representatives must return to the Facility to inspect it. We may grant you an extension of time to complete the items on your Punch List in our sole discretion. The grant of an extension to perform your Improvement Obligation will not waive any other default existing at the time the extension is granted.

1.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 1.1 of this Schedule D (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors or compliance with federal, state or local laws, regulations or code requirements. We will not be

37

liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. We may offer to provide you or your architect with interior design or other prototypes. If you decline to utilize such prototype(s) in developing the Facility, we may charge you a fee for reviewing your custom plans and designs. We may offer other optional architectural and design services for a separate fee. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

1.3 **Pre-Opening**. You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Section 1.1 of this Schedule D and Sections 11.2 and 11.4 of the Agreement, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

**Integration Services**. We will provide the following "Integration Services" to assist you in opening the Facility. We will provide training through various on-line courses on subjects such as Quality Assurance/Medallia, Wyndham Resources, housekeeping, preventative maintenance, customer service, and the RFP process. A member of our field team will also visit the Facility to provide on-site training in various operational issues including, but not limited to, the System Standards, using the Chain's intranet site, and revenue management principles. We will deliver to you an initial supply, as determined by us in our reasonable discretion, of certain Mark-bearing guest room products. **We will digitally master current photographs of the Facility in accordance with System Standards which will be suitable for posting on our Chain Website and third party travel websites and will be owned by us.** If we allow you to open the Facility before your installation of permanent signage, we will arrange for one of our approved suppliers to provide temporary signage for the Facility in the form of a Mark-bearing bag to cover your primary free standing sign. If you install permanent signage from an approved supplier for the Facility on or before the Opening Date, or if within thirty (30) days of the Opening Date, you sign a quote and pay the required deposit for permanent signage from the vendor assigned to provide temporary signage for the Facility, we shall issue you a credit of $1,000 against the Integration Services Fee. We will provide orientation training for your general manager as set forth in Section 4.1 of the Agreement if he/she attends the training by the deadline set forth in Section 4.1.

1.4 **Integration Services Fee**. You will pay a non-refundable "Integration Services Fee" of **$1,850.00** on or before the Opening Date.

## 2.  DEFINITIONS:

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

**[Punch List Attached]**

39

Days Inns Worldwide, Inc.
Punchlist for Conversion
"Schedule B part III"
July 28, 2011
Revised on September 21 ,2011



Brand:     Days
Tier:      Inn & Suites

| OWNER APPLICANT | |
|---|---|
| Property Name: | Baymont Inn & Suites #42013 |
| Property Address: | 2451 Old national Parkway |
| City: | College Park |
| St: | GA |
| Zip: | 30349 |
| Country: | United States |
| Opportunity Name: | DAY College Park GA 123 |
| Account Name: | GA College Park Baymont Inn CV DAY |
| Owner/Applicant | Nimesh Patel |
| Owner Phone: | 310-350-0919 |
| Franchise Retention: | Joe Cua |
| Phone: | 404-308-4040 |
| Nearest City & State | Atlanta, Georgia |

| INSPECTION INFORMATION | |
|---|---|
| Conversion Consultant: | Brian Smith |
| Number of Buildings Punched: | 1 |
| Number of Rooms Inspected: | 6 |
| Rooms Inspected: | 137, 217, 222, 230, 341, 348 |

| PROPERTY INFORMATION | |
|---|---|
| Age of Property: | 20 years |
| Total Number of Floors: | 2 |
| Single/Double Loaded: | Double Loaded |
| Exterior/Interior Corridor: | Both |
| Construction: | Wood Frame with Vinyl Siding |
| Competition: | Travelodge, Quality Inn, Comfort Inn |
| Clientele: | 50% Leisure/50% Airport |
| Total Licensed Guestrooms: | 123 |
| | |
| Total Meeting Rooms | 1 |
| Total Restaurants | 0 |
| Total Lounges | 0 |



The Punchlist identifies specific items which we inspected at the Facility which were not in compliance with brand standards and need to be corrected. In addition, you are responsible for ensuring that the Facility is constructed, improved, maintained and operated in compliance with all applicable federal, state and local laws, codes, ordinances and regulations, including but not limited to, the Americans with Disabilities Act and its Accessibility Guidelines.  This Punchlist was based on a random sample inspection of the Facility on the date specified. You may need to take additional actions to meet brand standards or comply with law or, at our discretion, if the condition of the Facility changes materially since the inspection date or if the brand standards change.

All items in this punchlist are required to be completed no later than the timeframes noted. Time extensions in no way imply a waiver. Failure to comply with specified deadlines for completing items may result in default under your license or franchise agreement and reservation service suspension.  All items will continue to be evaluated on condition, appearance and adherence to brand standards through periodic quality assurance inspections.  Any items on a future quality assurance inspection that do not meet brand standards will be required to be remedied.  Failure to maintain acceptable levels of condition and appearance and adherence to brand standards may be grounds for default under the Franchise or License Agreement.

Please submit all design plans and specifications to the Wyndham Hotel Group Property Development Support Department for review and approval prior to purchasing or starting renovations.  All renovations must meet Brand Standards, any items purchased or renovated without approval may need replacement if they do not meet brand design standards.

The Brand Standards reference provided within this punchlist is to help guide you in finding the details of the standards you are required to comply with as part of this punchlist.  The reference provided is in no way complete instructions on the work required to fulfill the punchlist requirements.  Prior to the commencement of all work you are required to ensure you are complying with the most current standards. Please consult your Development Director or noted department with specific questions to comply with the requirements contained in the punchlist.

By signing this punchlist, I acknowledge and agree that select pieces of this punchlist may be provided to our approved vendors for the purpose of their offering you products and services that are required to complete this punchlist. Only information necessary for the vendor to offer their products and services will be provided, including contact information, property address, number of rooms, brand converting to, and a list of items related to necessary or required products and services.

*ONLY THE FRANCHISOR MAY REVISE THIS PUNCHLIST.  THE PUNCHLIST IS VOID 180 DAYS AFTER THE INSPECTION DATE UNLESS THE FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE*

**The Franchise Review Committee may in its discretion revise this Punchlist as a condition of approving your application. You should not consider this Punchlist to be final until we sign the License or Franchise Agreement.**

Signed: _R-CBhaget_       Date: _9-27-11_

Print Name: _RAMESH BHAGAT_

**Revisions- All Previous Copies are Invalid**

**9/21/2011 sg/Tier change**

---

**BRAND STANDARD VARIANCES**

The existing shower package consisting of curved shower rods, hookless shower curtains with windows and multi-function showerheads will be acceptable provided condition is maintained.

---

The non-compliant items on the punchlist are separated by area of work (exterior, public areas, food and beverage, and guestrooms) and fall into three categories:

1) CTO (Critical To Open Brand standards)- These brand standards are key in affiliating yourself with the brand and are critical to open your facility.  Each of the items listed must be completed prior to opening your facility unless otherwise noted.

2) ST (Brand Standards)- These standards are required to affiliate yourself with the brand.  All items noted with an ST must be completed within the required timeframe.

3) COND (Condition)- These items reviewed did not meet brand quality standards. These items have a negative impact to the guest experience and must be corrected within the noted timeframes and if applicable comply with current brand standards.  We recommend all franchisees implement and adhere to an ongoing self inspection and preventative maintenance program.

| % | Area of work | Subject of Work | CTO ST COND | Scope of Work | Complete By | Brand Standard Reference |
|---|---|---|---|---|---|---|
| 100% | General | Cleanliness | CTO | The Property must be maintained in a clean and neat condition. This requirement pertains to all areas of the property, including, but not limited to: grounds, curb appeal, building, equipment, decor, furniture, fixtures and equipment, vehicles, signs, linens and supplies.  To help ensure the property maintains housekeeping at the highest levels, property will be subject to recurring quality assurance evaluations.  Properties not meeting cleanliness standards may be required to complete housekeeping training. | Prior to open | 1016.0 |
| 100% | Exterior | Signs | CTO | Provide Company approved signage per Brand graphic standard specifications.  A fully executed prepaid contract with an approved sign vendor must be provided prior to commencement. Please contact a property openings manager at 800-343-7639 for approved sign vendor information. | Prior to open | 800.0/804.0 |
| 100% | Exterior | Signs | CTO | Immediate concealment and de-identification of  Baymont Inn & Suites signage or non-compliant signage is required. Concealment of signage should be with professionally installed, opaque covers. | Immediate compliance | 1014.1 |
| 100% | Exterior | Façade | COND | Pressure wash building façade to remove surface dirt, stains and cobwebs. | Prior to open | 511.1/1016.0 E |
| 35% | Exterior | Lighting | COND | Replace walkway/building light fixtures where damaged or missing lenses.  Ensure fixtures are uniform in style. | Prior to open | 509.0 |
| 10% | Exterior | Windows / Doors | COND | Replace windows where seals are broken (fogged appearance). | Prior to open | 511.3 |
| 100% | Exterior | Porte Cochere / Canopy | COND | Paint Porte cochere roof to eliminate faded appearance. | Prior to open | 511.1/1016.0 E |
| 100% | Exterior | Walkways / Steps / Patio | COND | Pressure wash walkways to eliminate stains. | Prior to open | 508.4 |
| 100% | Exterior | Paving / Curbing / Striping | COND | Hot-patch, reseal and stripe parking lot. Resurface badly cracked and damaged areas. Paint parking lot curbing where peeling paint. | Prior to open | 508.2 |
| 100% | Exterior | Pool- Deck / Markings / Landscaping | COND | Pressure wash swimming pool deck. Eliminate weeds in the deck surface. | Prior to open | 508.6 |
| 75% | Exterior | Landscaping | COND | Upgrade landscaping throughout the property by eliminating weeds and overgrowth and by adding  shrubs, seasonal flowers, mulch, bark or rock in bare areas to enhance curb appeal. | Prior to open | 510.0 |
| 100% | Public Areas | Training / Orientation | ST | Property manager is required to be Wyndham Rewards certified and property must fully comply with all Wyndham Rewards requirements. | 1 Month after opening | 902.0 |
| 100% | Public Areas | Lobby (FF&E / Other) | COND | Provide lobby window dressings in the lobby/breakfast areas per brand standard. | Prior to open | 601.0/1016.0 E |
| 100% | Public Areas | Public Restrooms (FF&E / Other) | ST | Install vanity mirror in public restrooms as per brand standards. | Prior to open | 602.0 G |
| 100% | Public Areas | Public Restrooms (Finishes) | ST | Replace toilet seat/lid units in public restrooms with seat only units. Lids are not acceptable in public restrooms. | Prior to open | 602.0 E |
| 100% | Public Areas | Exercise Room (Finishes) | COND | Professionally clean carpet in exercise room to eliminate stains.  If stains remain, replacement will be required. Remove TV armoire and relocate TV to a corner mounted wall device. | Prior to open | 601.0 E |

| % | Area of work | Subject of Work | CTO ST COND | Scope of Work | Complete By | Brand Standard Reference |
|---|---|---|---|---|---|---|
| 100% | Public Areas | Continental Breakfast | CTO | *Provide a Continental breakfast per Brand Standards.* | *Prior to open* | 300.0 |
| 25% | Public Areas | Breakfast Area (FF&E / Other) | ST | Replace/provide breakfast area seating package (chairs and tables) per Brand Standards.  At a minimum, seating for 25 is required. | Prior to open | 300.0 |
| 100% | Guestrooms | Guestrooms (Operational) | ST | Provide all suite FF&E and supplies as per Brand Standards. | 1 Year after opening | 201.0 B/207.0 |
| 75% | Guestrooms | Guestrooms (Operational) | ST | Provide 75% of non-smoking rooms per Brand Standards. | Prior to open | 201.0 A |
| 10% | Guestrooms | Guestrooms (Operational) | ST | Days Inn & Suites requires that 10% of the room inventory be allocated as suites per Brand specifications. | Prior to open | 207.0 |
| 15% | Guestrooms | Lamps / Lamp Shades | ST | Provide lamp package where mismatched. Lamps must be of same style, color and design. | Prior to open | 203.0 |
| 100% | Guestrooms | Linen (Towels & Sheets) | ST | Provide a complete inventory of linen to include sheets, pillows, pillowcases, blankets, mattress pads and complete inventory of terry stock to include washcloths, bath mats and bath and hand towels per Brand Standards. | Prior to open | 204.0 |
| 100% | Guestrooms | Guestroom / Bath Amenities | CTO | Provide bath amenities package per Brand Standards. | Prior to open | 205.0 |

## GUARANTY

To induce DAYS INNS WORLDWIDE, INC., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

Name: Ramesh Bhagat
Address: 17414 Vinwood Lane, Yorba Linda, CA 92886


Name: Kaushal Patel
Address: Brea, CA


Name: Nimesh Bhagat
Address: 17414 Vinwood Lane, Yorba Linda, CA 92886

DAY FA CON
246984 Q3/11

1

## GUARANTY

To induce DAYS INNS WORLDWIDE, INC., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

_____
Name: Ramesh Bhagat
Address: 17414 Vinwood Lane, Yorba Linda, CA 92886

_____
Name: Kaushal Patel
Address: Brea, CA

_____
Name: Nimesh Bhagat
Address: 17414 Vinwood Lane, Yorba Linda, CA 92886

1

DAY FA CON
246984 Q3/11

## ADDENDUM TO THE FRANCHISE AGREEMENT PURSUANT TO THE CALIFORNIA FRANCHISE INVESTMENT LAW

This Addendum to the Franchise Agreement by and between DAYS INNS WORLDWIDE, INC. ("we", "our" or "us") and **KRISHNA Q INVESTMENTS LLC** ("you") is dated Sept. 30 , 2011.

Notwithstanding anything to the contrary set forth in the Franchise Agreement, the following provisions shall supersede and apply:

1. Our right to terminate the Franchise under Section 11.2 if you commence a bankruptcy proceeding may not be enforceable under federal bankruptcy law.

2. Under Section 1671 of the California Civil Code, certain liquidated damages clauses are unenforceable.

3. California law may not enforce the choice of New Jersey law in Section 17.6.1 to govern the Franchise Agreement.

4. California Corporations Code, Section 31125, requires us to give you a disclosure document, approved by the Department of Corporations, prior to solicitation of a proposed material modification of an existing franchise.

5. California Business and Professions Code, Sections 2000 through 20043 provide rights to the franchisee concerning termination and non-renewal of the franchise. If the Franchise Agreement is inconsistent with the law, the law will control.

6. If the Franchise Agreement requires you to execute a general release of claims upon renewal or transfer of the Franchise Agreement, California Corporations Code Section 31512 provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of that law or any rule or order thereunder is void. Section 31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code Section 31000-31516). California Business and Professions Code Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 2000-20043).

7. All other rights, obligations, and provisions of the Franchise Agreement shall remain in full force and effect. Only the Sections specifically added to or amended by this Addendum shall be affected. This Addendum is incorporated in and made a part of the Franchise Agreement for the State of California.

1

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

WE:
DAYS INNS WORLDWIDE, INC.

By: _____
                    Vice President

YOU, as franchisee:
KRISHNA Q INVESTMENTS LLC

By: _____
        (Managing) Member

2

# EXHIBIT B

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

Location:   COLLEGE PARK, GA
Site No.:   42013
Entity No.: 96319

## SynXis Subscription Agreement

This SynXis Subscription Agreement ("**Agreement**"), effective as of __July__      __26__ , 20 16 (the "**Effective Date**"), by and between Days Inns Worldwide, Inc. – Delaware corporation        , ("**Franchisor**"), and KRISHNA Q INVESTMENTS, LLC                      ("**Franchisee**"), governs Franchisee's access to and use of the SaaS Solution and Services as described herein. Franchisor and Franchisee shall each be referred to herein as a "**Party**" and together as the "**Parties**" to this Agreement.

For and in consideration of the mutual covenants, representations and promises hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the foregoing and as follows:

1.   **GENERAL**

   **1.1   Definitions.**  Capitalized terms used herein shall have the meanings ascribed to them in this Agreement or in any Schedules attached hereto, which may be updated or supplemented by Franchisor from time to time, or as defined in Schedule 1.1.  All other capitalized terms used but not defined herein shall have the meanings ascribed to them in the Franchise Agreement and are incorporated herein by reference.

   **1.2   Conflicts in Interpretation.**  The following order of precedence shall be followed in resolving any inconsistencies between the terms of this Agreement and the terms of any Schedules attached hereto: (a) first, the terms contained in the body of this Agreement; and (b) second, the terms of the Schedules attached to this Agreement, provided that no order of precedence shall be applied among such Schedules.

2.   **DESCRIPTION OF SAAS SOLUTION**

   **2.1   The SaaS Solution.**  The "SaaS Solution" means the computer program, applications, features and services expressly identified on Schedule 2.1 and any and all modifications, corrections, updates and enhancements to such SaaS Solution, including any Franchisor may from time to time make available to Franchisee.  The SaaS Solution does not include any Non-SaaS Solution Services as specified in Section 7.

   **2.2   Elavon Hosting Services Agreement.**  In order to access and use the SaaS Solution pursuant to this Agreement, on or before ten (10) days following the Effective Date, Franchisee shall execute that certain Hosted Services Agreement for Hosted Gateway Services directly with Elavon Inc., or a substantially similar agreement with an alternate vendor designated by Franchisor, ("**Elavon Agreement**").  The Elavon Agreement exclusively covers the offering provided thereunder (the "**Elavon Non-SaaS Solution Services**").

   **2.3   Implementation Services.**  On a date after which Franchisee has signed both the Elavon Agreement and this Agreement, Franchisor shall use reasonable efforts to implement the SaaS Solution as described in Schedule 2.3 attached hereto (the "**Implementation Services**") and Franchisee shall follow all of Franchisor's instructions for preparing the Facility, at Franchisee's sole expense, for implementation of the SaaS Solution.  The SaaS Solution shall be deemed accepted by Franchisee ("**Acceptance**") immediately upon implementation of the SaaS Solution by Franchisor (the "**Acceptance Date**").

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

3.   **GRANT OF RIGHTS**

      **3.1   License.**  Subject to payment of all applicable fees, Franchisor hereby grants to Franchisee a limited, non-transferable, non-exclusive license, to access, use and display the SaaS Solution during the Term solely for the Permitted Use and solely by End Users in accordance with the terms and conditions set forth in this Agreement.

      **3.2   Limitations.**  Except as provided in Section 3.1, all rights, title and interests in and to the SaaS Solution are reserved to Franchisor or to any Third Party who licenses the SaaS Solution to Franchisor or to Franchisor's Affiliates.

      **3.3   Title.**  Title to and ownership of the SaaS Solution, including all Intellectual Property rights therein, is and shall remain with Franchisor, its Affiliates or any Third Party who licenses it to Franchisor. Franchisee shall at all times protect and defend, at Franchisee's own cost and expense, Franchisor's rights, title and interests in and to the SaaS Solution against all claims, liens and legal processes of Franchisee's creditors.

      **3.4   Restrictions.**  Franchisee shall not: (a) permit any unauthorized Third Party to access or use the SaaS Solution; (b) create or attempt to create any derivate works based on the SaaS Solution; (c) copy, frame or mirror any part or content of the SaaS Solution; (d) disassemble, decompile, reverse engineer or otherwise attempt to recreate the SaaS Solution; or (e) access, use or otherwise manipulate the SaaS Solution in order to create a competitive product or service or to copy any features, functions or graphics of the SaaS Solution. Franchisor may, at its sole discretion and without prior notice to Franchisee, conduct audits of Franchisee's Hardware, computer systems and applications, including audits by electronic and remote means, to verify conformance with this Agreement.

      **3.5   Suggestions.**  Any suggestions and feedback relating to the SaaS Solution or Services or relating to any desired or recommended additional features, enhancements or modifications to the SaaS Solution or Services that are provided by or through Franchisee or its Affiliates to Franchisor shall be the exclusive property of Franchisor as of the date it is offered to Franchisor and Franchisee and its Affiliates hereby assign all rights and interests in and to such suggestions and feedback to Franchisor as of the date it is offered to Franchisor.

4.   **SERVICES**

      **4.1   Additional Services.**  Franchisor may perform additional services agreed to in writing by the parties from time to time, which may include additional fees to be agreed to by the Parties (the "**Additional Services**").

      **4.2   Revenue Management Services.**  From time to time, Franchisor may provide services to Franchisee under Franchisor's Central Rate and Inventory Support Program (the "**CRISP Services**") consistent with Schedule 4.2 attached hereto, which may be updated or supplemented by Franchisor from time to time.

      **4.3   Maintenance and Support Services.**  Subject to Franchisee performing all Franchisee Responsibilities identified in Schedule 4.3 ("**Franchisee Responsibilities**"), Franchisor shall provide maintenance and support services as set forth on Schedule 4.3 attached hereto ("**Maintenance and Support Services**").

      **4.4   Access Credentials.**  Franchisor, directly or indirectly, shall provide Access Credentials to Franchisee. Franchisor may, from time to time and in its sole discretion, change or require Franchisee to change Franchisee's Access Credentials. Franchisee must follow all security procedures and

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

protocols that Franchisor may from time to time establish or modify. Franchisee shall not permit the SaaS Solution to be accessed in violation of the security procedures and protocols as set forth herein. Franchisee shall safeguard any Access Credentials that Franchisor provides to Franchisee as a trade secret, and shall reveal such information only to its End Users on a need to know basis. Franchisee shall immediately inform Franchisor if Franchisee has knowledge or a reasonable basis to believe that its Access Credentials have been lost, stolen, misappropriated or compromised in any way or manner, and Franchisee shall strictly follow Franchisor's instructions regarding any replacement Access Credentials. Franchisee shall be responsible for all access or use through its Access Credentials.

**4.5   Permitted Uses.**   Franchisee shall use the SaaS Solution only for the Permitted Uses with respect to the business and operations of Franchisee as contemplated in the Franchise Agreement. Franchisee shall not load, store or otherwise use any software on or with the SaaS Solution, without Franchisor's prior written consent, as the use of such software may adversely affect the operation and functionality of the SaaS Solution and the Services. If Franchisee violates this Section, the warranties set forth in this Agreement shall be void, and Franchisee shall be solely responsible for the cost of repair or replacement of the SaaS Solution, if any.

**4.6   Franchisor's Responsibilities.**   Franchisor shall: (a) use commercially reasonable efforts to make the SaaS Solution available twenty-four (24) hours a day, seven (7) days a week, except for: (i) planned downtime, or (ii) any unavailability caused by circumstances beyond Franchisor's reasonable control, including without limitation, acts of nature, acts of government, floods, fires, earthquakes, civil unrest, acts of terror, labor strikes, Internet service provider failures or delays, or denial of service attacks; and (b) provide the SaaS Solution only in accordance with applicable laws and government regulations that govern the implementation of the SaaS Solution.

**4.7   Franchisee's Responsibilities.**   Franchisee shall: (a) be fully responsible for its End Users' compliance with this Agreement; (b) be responsible for the accuracy, quality and legality of Guest Information, to the extent collected by Franchisee or its employees, agents or representatives, and for the means by which Franchisee or its employees, agents or representatives acquires Guest Information; (c) prevent unauthorized access to or use of the SaaS Solution, and notify Franchisor promptly of any such unauthorized access or use; and (d) use the SaaS Solution only in accordance with this Agreement and applicable laws and government regulations. Franchisee shall not: (i) make the SaaS Solution available to anyone other than authorized End Users; (ii) sell, resell, rent or lease the SaaS Solution; (iii) use the SaaS Solution to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of the privacy rights of any Third Party; (iv) use the SaaS Solution to store or transmit software viruses, malicious code or other harmful files; (v) interfere with or disrupt the integrity or performance of the SaaS Solution or the data of any Third Party contained therein; or (vi) attempt to gain unauthorized access to the SaaS Solution or any related networks.

## 5.   FEES AND PAYMENTS

**5.1   Fees.**   Franchisee shall pay all fee amounts specified in <u>Schedule 5.1</u> to this Agreement for the SaaS Solution and the Services ("**Fees**"), for at least the period beginning on the Acceptance Date through the end of the Commitment Period and continuing for the duration of the Term.   If Franchisee's franchise involves the transfer of an existing Chain Facility to Franchisee or changing affiliation of the Facility from one Wyndham Hotel Group-owned franchise system to another, Franchisee will be charged a transfer fee ("**Transfer Fee**"). Franchisee may also request additional training services, which Franchisor may provide to Franchisee for an additional fee. Franchisor may charge an additional fee for services under Section 5.4, if acceleration is at Franchisee's request.

**5.2   Payments.**   Franchisor may apply any amounts received to any outstanding invoices in any order. If Franchisee does not make all payments of Fees to Franchisor when due, then, upon written notice to Franchisee, Franchisor may withhold implementation, suspend the SaaS Solution (subject to

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

Section 5.4 below) or terminate this Agreement. All amounts due hereunder are due upon receipt of the invoice. Franchisor may increase the ongoing Fees on an annual basis by no more than five percent (5%) above the fees paid by Franchisee during the immediately preceding twelve (12) month period; provided, however, that Franchisor shall notify Franchisee no less than thirty (30) days prior to any such increase taking effect. In the event that a Commitment Period applies, Franchisor will not increase such Fees during the Commitment Period.

**5.3   Overdue Charges.**  If any charges are not received from Franchisee by the due date, then, at Franchisor's sole discretion, (a) such charges may accrue late interest at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by law, whichever is lower, from the date such payment was due until the date paid, and/or (b) Franchisor may condition future subscription renewals on payment terms shorter than those specified in Section 5.1 above (Fees).

**5.4   Suspension of Service and Acceleration.**  If any Fees owing by Franchisee under this Agreement for the SaaS Solution and Services is thirty (30) or more days overdue, Franchisor may, without limiting any other rights and remedies it may have, accelerate Franchisee's unpaid fee obligations under this Agreement so that all such obligations become immediately due and payable, and suspend the SaaS Solution and Services to Franchisee until such amounts are paid in full. Franchisor shall give Franchisee at least seven (7) days' prior written notice that Franchisee's account is overdue, in accordance with Section 17.1 (Notices), before suspending the SaaS Solution and Services to Franchisee.

**5.5   Taxes.**  Unless otherwise stated, Franchisor's Fees do not include any taxes, levies, duties or similar governmental assessments of any nature, including but not limited to value-added, sales, use or withholding taxes, assessable by any local, state, provincial, federal or foreign jurisdiction (collectively, "**Taxes**"). Franchisee is responsible for paying all Taxes associated with its purchases hereunder. If Franchisor has the legal obligation to pay or collect Taxes for which Franchisee is responsible under this section, the appropriate amount shall be invoiced to and paid by Franchisee, unless Franchisee provides Franchisor with a valid tax exemption certificate authorized by the appropriate taxing authority. For clarity, Franchisor is solely responsible for taxes assessable based on Franchisor's income, property and employees.

**6.   TECHNICAL SPECIFICATION REQUIREMENTS**

**6.1   Minimum Technical Requirements.**  To access and use the SaaS Solution, Franchisee must use Hardware and subscribe to Communication Services that meet Franchisor's technical specification requirements set forth on Schedule 6.1. If any service provider(s) (including without limitation, any service provider made available by Franchisor), at Franchisee's request, attempts to integrate Hardware with the SaaS Solution or Services, Franchisor shall not be liable for any injury or damage to either the Hardware or the SaaS Solution unless such injury or damage is due to Franchisor's gross negligence or willful misconduct. For the avoidance of doubt, the warranties and support described in this Agreement do not apply to any Hardware or Communication Services.

**7.   NON-SAAS SOLUTION SERVICES PROVIDERS**

**7.1   Acquisition of Non-SaaS Solution Services.**  Franchisor or a Third Party may from time to time make available to Franchisee offerings designed to interoperate with the SaaS Solution ("**Non-SaaS Solution Services**"). Any acquisition by Franchisee of such Non-SaaS Solution Services, and any exchange of data between Franchisee and any Non-SaaS Solution Services provider, is solely between Franchisee and the Third Party that provides the applicable Non-SaaS Solution Services.

**7.2   No Representation or Warranty.**  Franchisor does not warrant or support any Non-SaaS Solution Services. Any Non-SaaS Solution Services shall be governed exclusively by any agreement entered into between Franchisee and the Third Party that offers the applicable Non-SaaS Solution

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

Services. If the provider of any Non-SaaS Solution Services ceases to make such Non-SaaS Solution Services available for interoperation with the SaaS Solution on reasonable terms, Franchisor may, in its sole discretion, cease providing access to such Non-SaaS Solution Services without entitling Franchisee to any refund, credit, or other compensation.

## 8.   CONFIDENTIALITY

**8.1   Definition of Confidential Information.** As used herein, **"Confidential Information"** means all confidential information disclosed by a Party (**"Disclosing Party"**) to the other Party (**"Receiving Party"**), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Franchisor's Confidential Information shall include the SaaS Solution and Services. Confidential Information of each Party shall include the terms and conditions of this Agreement, as well as business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such Party. However, Confidential Information shall not include any information that: (a) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (b) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (c) is received from a Third Party without breach of any obligation owed to the Disclosing Party; or (d) was independently developed by the Receiving Party.

**8.2   Protection of Confidential Information.** The Receiving Party shall: (a) use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but in no event less than reasonable care); (b) not use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement; and (c) except as otherwise authorized by the Disclosing Party in writing, limit access to Confidential Information of the Disclosing Party to those of its and its Affiliates' employees, contractors and agents who need such access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections no less stringent than those herein. Neither Party shall disclose the terms of this Agreement to any Third Party other than its Affiliates and their legal counsel and accountants without the other Party's prior written consent.

**8.3   Compelled Disclosure.** The Receiving Party may disclose Confidential Information of the Disclosing Party if it is compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to such Confidential Information.

## 9.   DATA PRIVACY

**9.1   Data Policies.** Franchisee shall comply with and abide by Franchisor's data policies and procedures which Franchisor may, at its sole discretion and without prior notice, update from time to time (the **"Data Policies"**). If there is a conflict between the Data Policies and applicable law, Franchisee should comply with applicable law and immediately notify Franchisor in writing of such conflict.

**9.2   Guest Information.** Franchisor and/or its Affiliate shall own all Guest Information that is within the possession of Franchisor and/or Franchisor's Affiliate or any service provider holding such information on Franchisor's or a Franchisor Affiliate's behalf, and Franchisee shall own all Guest Information that is within the possession of Franchisee or any Franchisee service provider holding such information on Franchisee's behalf. To the extent that Franchisor (including its Affiliates) and

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

Franchisee both possess identical Guest Information, Franchisor's (including its Affiliates') and Franchisee's respective ownership rights with regard to such Guest Information shall be separate and independent from one another. Franchisee acknowledges and agrees that: (a) Franchisee shall take all commercially reasonable steps to assure the timely and accurate collection, recording, processing and transmittal of the Guest Information to the SaaS Solution at all times; and (b) with respect to Franchisee's use of the Guest Information, Franchisee shall comply with all applicable laws, Franchisor's Data Policies and any contract or promise Franchisee makes with or to any of its guests.

**9.3    Non-Owned Information.**  Other than the Guest Information, Franchisee shall not use any information it obtains from the SaaS Solution, including but not limited to any information that Franchisor appends to the Guest Information ("**Non-Owned Information**"), for the benefit of any business, enterprise or activity other than the business of the Facility, and in accordance with all applicable laws and Franchisor's Data Policies. Franchisee shall not disclose, copy, assign, transfer, lease, rent, sell, donate, disseminate or otherwise commercialize any Non-Owned Information for any other purpose without Franchisor's prior written consent, which Franchisor may withhold at its sole discretion.

**9.4    Dummy Information.**  Any information provided to Franchisee from the SaaS Solution may contain "dummy" information, special codes or other devices to assure compliance with this Agreement and monitor possible unauthorized use of SaaS Solution. Franchisee shall be conclusively presumed to have violated this Agreement if Franchisor discovers any unauthorized mail or contacts from information provided only to Franchisee or the Facility.

**9.5    Improper Access.**  If Franchisee should obtain access to Non-Owned Information in violation of the Data Policies or this Agreement, Franchisee shall be a trustee of that information and must act in a fiduciary capacity to protect the information from further unauthorized use or disclosure, and take all commercially reasonable efforts to return the information to Franchisor as soon as possible.

## 10.  WARRANTY AND SUPPORT

**10.1    General.**  Franchisor warrants that following the Acceptance Date and for a period of sixty (60) days thereafter, the SaaS Solution will perform the functions and operations in a good workmanlike manner provided that Franchisee: (a) follows Franchisor's instructions, updates and modifications; (b) makes corrections, as directed; (c) pays all applicable Fees when due; and (d) is not otherwise in default under this Agreement or the Franchise Agreement. Franchisor's sole obligation under this warranty shall be to use reasonable efforts to remedy any nonperformance of the SaaS Solution within a reasonable time after Franchisee reports such nonperformance to Franchisor.

**10.2    Intellectual Property.**  Franchisor has the right to provide Franchisee with the rights granted hereunder, and, to the best of Franchisor's knowledge, the SaaS Solution does not infringe any Intellectual Property rights of any Third Party.

**10.3    Support.**  Franchisor or its Affiliates will provide a toll-free telephone number for reporting any nonperformance of the SaaS Solution, and Franchisor or its Affiliates will use reasonable efforts to diagnose and remedy such nonperformance within a reasonable time after Franchisee reports such nonperformance to Franchisor. Franchisee must perform all user-required maintenance specified by the vendor of any Hardware or Communication Services, and obtain required maintenance only from an authorized service provider.

**10.4    DISCLAIMER.**  THE ABOVE WARRANTIES SHALL BE RENDERED NULL AND VOID IF THE SAAS SOLUTION IS SUBJECTED TO ABUSE, MISUSE, IMPROPER INSTALLATION AT THE FACILITY OR MAINTENANCE BY UNAUTHORIZED SERVICE PERSONNEL, OR IF THE SAAS SOLUTION IS ALTERED WITHOUT FRANCHISOR'S EXPRESS CONSENT OR DIRECTION, OR USED FOR A PURPOSE NOT AUTHORIZED UNDER THIS AGREEMENT,

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

OR IF THE SAAS SOLUTION IS DAMAGED OR DESTROYED DUE TO ACTS OF NATURE, WAR, TERRORISM, CIVIL UNREST, FIRES, NATURAL DISASTERS, OR OTHER EVENTS BEYOND FRANCHISOR'S CONTROL. EXCEPT AS PROVIDED IN THIS SECTION 10, FRANCHISOR MAKES NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY WARRANTY ABOUT THE SAAS SOLUTION OR ANY SERVICES, THEIR MERCHANTABILITY OR THEIR FITNESS FOR ANY PARTICULAR PURPOSE. FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER REGARDING THE VOLUME OF RESERVATIONS OR AMOUNT OF REVENUES THAT THE FACILITY MAY ATTAIN THROUGH THE USE OF THE SAAS SOLUTION OR IN CONNECTION WITH THE RECEIPT OF ANY SERVICES OR THAT FRANCHISEE'S RESERVATIONS OR REVENUE WILL INCREASE. FRANCHISEE, ON BEHALF OF ITSELF, ITS SUCCESSORS AND ASSIGNS, HEREBY WAIVES, RELEASES AND RENOUNCES ANY AND ALL CLAIMS OR CAUSES OF ACTION IT MAY HAVE AGAINST FRANCHISOR, FRANCHISOR'S AFFILIATES, OR FRANCHISOR'S OR THEIR OFFICERS, DIRECTORS OR AGENTS, ARISING OUT OF THE SAAS SOLUTION, UNLESS DUE TO FRANCHISOR'S WILLFUL MISCONDUCT.

## 11.   INDEMNIFICATION

**11.1 Indemnification.**   Franchisee shall indemnify, defend and hold harmless Franchisor, Franchisor's Affiliates, its licensors and their successors and assigns and each of the respective directors, officers and employees associated with them against all claims, actions or proceedings, arising out of or related to Franchisee's operation, use or non-use of the SaaS Solution, including any use of the Guest Information or any Third Party data or system security breaches and any Non-SaaS Solution Services or agreements therefor. Franchisor shall not be liable to Franchisee or any Third Party for personal injury or property loss, including but not limited to, damage to the Facility, as a result of Franchisee's operation, use or non-use of the SaaS Solution, Franchisee's receipt of Services hereunder, and/or any Third Party data or system security breaches or any Non-SaaS Solution Services or agreements therefor. Franchisee is not obligated to indemnify Franchisor for Franchisor's own gross negligence or intentional misconduct arising out of the operation, use or non-use of the SaaS Solution.

## 12.   NO LIABILITY FOR INFORMATION

**12.1 No Liability.**   FRANCHISOR SHALL NOT BE LIABLE FOR ANY CLAIMS OR DAMAGES RESULTING FROM ANY INCORRECT INFORMATION GIVEN TO FRANCHISOR OR INPUT INTO THE SAAS SOLUTION BY ANY PERSON THAT IS NOT FRANCHISOR. SUPPORT OR SERVICES HEREUNDER NECESSITATED BY COMPUTER VIRUSES, OR BY ANY FAILURE OR BREACH OF FRANCHISEE'S SECURITY FOR ITS SYSTEMS OR DATA, INCLUDING, WITHOUT LIMITATION, DAMAGE CAUSED BY PERSONS LACKING AUTHORIZED ACCESS, ARE NOT COVERED UNDER THIS AGREEMENT. FRANCHISEE WAIVES ANY CLAIMS HEREUNDER AGAINST FRANCHISOR TO THE EXTENT ARISING FROM FRANCHISEE'S FAILURE TO HAVE OR MAINTAIN CURRENT VIRUS PROTECTION, OR TO THE EXTENT ARISING FROM A FAILURE OR BREACH OF FRANCHISEE'S SECURITY FOR ITS SYSTEMS OR DATA, OR AS A RESULT OF ANY UNAUTHORIZED ACCESS TO FRANCHISEE'S SYSTEMS.

## 13.   DAMAGE LIMITATION

**13.1** NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, NEITHER FRANCHISOR NOR FRANCHISOR'S AFFILIATES SHALL BE LIABLE TO FRANCHISEE FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOST REVENUE (COLLECTIVELY REFERRED TO AS "**INDIRECT DAMAGES**") IN

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

CONNECTION WITH THE SAAS SOLUTION OR THIS AGREEMENT, EVEN IF FRANCHISOR HAD BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE REASONABLY FORESEEN SUCH DAMAGES. IN ADDITION, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, FOR DIRECT DAMAGES CAUSED BY FRANCHISOR (AND ANY INDIRECT DAMAGES TO THE EXTENT THAT THE ABOVE LIMITATION IS NOT RECOGNIZED BY A COURT OR OTHER AUTHORITY) ANY CLAIM SHALL BE LIMITED TO THE TOTAL AMOUNT PREVIOUSLY PAID BY FRANCHISEE TO FRANCHISOR FOR THE PREVIOUS TWELVE (12) MONTH PERIOD. THE ABOVE LIMITATIONS ON LIABILITY APPLY REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, OR OTHERWISE.

## 14.   TERM AND TERMINATION

**14.1  Term.**  This Agreement shall be effective as of the Effective Date and shall continue in full force and effect until termination of the Franchise Agreement, unless earlier terminated in accordance with the terms and conditions of this Agreement ("**Term**").

**14.2  Breach.**  If any one of the following events occurs, then to the extent permitted by applicable law, Franchisor shall have the right to immediately terminate this Agreement: (a) Franchisee fails to make any payment when due under this Agreement or the Franchise Agreement and such failure continues uncured for a period of thirty (30) days (provided that Franchisor shall provide Franchisee with at least seven (7) days' prior notice of such overdue amount); (b) Franchisee violates the privacy, security or confidentiality obligations set forth in this Agreement; (c) Franchisee breaches any other covenant, warranty or agreement under this Agreement, the Franchise Agreement or any other agreement between Franchisee and Franchisor or Franchisor's Affiliate and such failure continues uncured for a period of thirty (30) days after Franchisee is given written notice of such failure; (d) the SaaS Solution becomes inoperable by Franchisee's act or omission; or (e) Franchisee's Franchise Agreement expires or terminates for any reason.

**14.3  Suspension.**   In addition to the right to terminate this Agreement, Franchisor may suspend Franchisee's access to the SaaS Solution upon the occurrence of any of the events described in Section 14.2 until Franchisee's violation is cured and Franchisee has agreed in writing to engage in no conduct that will cause a repeat violation to occur. If Franchisee violates such a restoration agreement, Franchisor may suspend or terminate Franchisee's access to the SaaS Solution permanently or for an indefinite period. Because Franchisor still incurs costs on Franchisee's behalf, Franchisee must continue to pay all fees associated with services under the Franchise Agreement during any such suspension period.

**14.4  Termination For Convenience By Franchisee.**   Following the Commitment Period, Franchisee may terminate this Agreement for convenience at any time by providing Franchisor with not less than sixty (60) days' advance written notice.

**14.5  Termination For Convenience By Franchisor.**  Franchisor may terminate this Agreement for convenience at any time provided that: (a) Franchisor shall provide Franchisee with no less than six (6) months' advance notice; and (b) if the effective date of such termination occurs during the Commitment Period, Franchisee will not be required to pay for the SaaS Solution and Services that it has not yet used or received for the remainder of the Commitment Period.

**14.6  Upon Termination.**  Upon termination of this Agreement: (a) Franchisee's license granted under this Agreement ends and Franchisee shall immediately cease using the SaaS Solution; (b) Franchisee shall immediately cease using the Access Credentials that Franchisee was provided to access and use the SaaS Solution; and (c) Franchisee shall return the originals and all copies of non-owned Guest Information and other Confidential Information unencumbered to Franchisor within thirty (30) days after termination and certify to Franchisor in writing that the original and all copies have been

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

returned. FRANCHISEE EXPRESSLY WAIVES ANY RIGHT TO NOTICE OF OR ANY HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY FRANCHISOR'S AGENTS OR REPRESENTATIVES OR ANY PREMISES WHERE THE SAAS SOLUTION MAY BE LOCATED AND REMOVING IT WITHOUT JUDICIAL PROCESS. If Franchisee fails or refuses to permit the peaceable entry by Franchisor's agents to take possession of the SaaS Solution, Franchisee shall be liable for rental of the SaaS Solution at the rate of $500.00 per week from the date that Franchisor first attempts to retake the SaaS Solution. Franchisor may, in its sole discretion, embed within the SaaS Solution various security devices that will render the SaaS Solution unusable and the data stored by the Hardware or the SaaS Solution inaccessible if this Agreement terminates.

## 15. NOTICES

**15.1 General.** All notices and other communications in connection with this Agreement shall be in writing and shall be sent to the respective Parties at the addresses set forth below or to such other addresses as may be designated by each Party in writing from time to time in accordance with this section. All notices and other communications shall be sent by registered or certified air mail, postage prepaid, or by express courier service, service fee prepaid. All notices and other communications shall be deemed received: (a) immediately upon delivery, if hand delivered; (b) five business days after depositing in the mail, if delivered by mail; or (c) the next business day after delivery to express courier service, if delivered by express courier service.

| If to Franchisor: | If to Franchisee: |
|---|---|
| Days Inns Worldwide, Inc. | KRISHNA Q INVESTMENTS, LLC |
| 22 Sylvan Way | 2451 Old National Parkway |
| Parsippany, NJ 07054 | KRISHNA Q INVESTMENTS, LLC |
| Attn: SVP, Contracts Administration | |
| | |
| **With a copy to:** | |
| Wyndham Hotel Group, LLC | Nimesh Bhagat |
| 22 Sylvan Way | 17414 Vinwood Ln |
| Parsippany, NJ 07054 | Yorba Linda, CA 92886 |
| Attn: General Counsel | |

## 16. MISCELLANEOUS

**16.1 Force Majeure.** If performance by either Party is delayed or prevented (excluding the obligation to make payments under this Agreement) because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or communications systems, restrictive governmental laws or regulations, weather conditions, or other reasons beyond the reasonable control of the Party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay.

**16.2 Entire Agreement.** This Agreement and any attachments hereto, constitutes the entire, final and exclusive agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous statements, representations, negotiations, discussions, understandings and agreements, whether oral or written, with respect to the subject matter of this Agreement.

**16.3 Franchisee's Forms.** Franchisor is not bound by any terms of Franchisee's purchase order forms or notices of acceptance which attempt to impose any conditions at variance with the terms and conditions of this Agreement or with Franchisor's invoices, standards manuals or technical specifications. Franchisor's failure to object to any provision contained in Franchisee's printed form is

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

not a waiver of any provision of this Agreement.

**16.4  No Third Party Beneficiary.**  The Agreement is intended for the sole benefit and protection of the named Parties, their successors and permitted assigns, and no Third Party shall have any cause of action or right to payments made or received herein except for any owners of any software who have licensed or authorized Franchisor to sublicense the same to Franchisee.

**16.5  Prevailing Party Attorneys' Fees.**  In the event of an alleged breach of this Agreement, the prevailing Party shall be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys' fees, incurred in connection with such dispute, claim or litigation, including any appeal therefrom.  For purposes of this Section, the determination of which Party is to be considered the prevailing Party shall be decided by the court of competent jurisdiction that resolves such dispute, claim or litigation.

**16.6  Other Relief.**  Franchisor may obtain the remedy of injunctive relief without the posting of a bond if Franchisee violates its obligations regarding confidentiality, non-disclosure, transfer or limitations on the SaaS Solution use under this Agreement. Notwithstanding anything contained in this Agreement to the contrary, each Party shall be entitled to seek injunctive or other equitable relief whenever the facts or circumstances would permit such Party to seek such equitable relief in a court of competent jurisdiction.

**16.7  Modifications.**  This Agreement may not be amended, modified or rescinded except in writing, signed by both Parties, and any attempt to do so shall be void and of no effect. This Agreement may be modified or amended only pursuant to a separate writing mutually agreed upon and signed by both Parties. The Parties expressly disclaim the right to claim the enforceability or effectiveness of: (a) any oral modifications to this Agreement; and (b) any other amendments that are based on course of dealing, waiver, reliance, estoppel or other similar legal theory. The Parties expressly disclaim the right to enforce any rule of law that is contrary to the terms of this Section.

**16.8  Governing Law; Exclusive Jurisdiction.**  The validity, construction and performance of this Agreement, and the legal relations among and any disputes between the Parties to this Agreement, shall be governed by and construed in accordance with the laws of the State of New Jersey, excluding that body of law applicable to conflicts of law that would apply the substantive law of another jurisdiction. Any suit or proceeding relating to this Agreement shall be brought only in the state and federal courts located in the State of New Jersey. The Parties hereby expressly consent to the exclusive personal jurisdiction of the New Jersey state courts situated in Morris County, New Jersey, and the United States District Court for the District of New Jersey. Each Party hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue with respect to any suit or proceeding brought under this Agreement.

**16.9  Waiver.**  If either Party fails to exercise any right or option at any time under this Agreement, such failure will not be deemed a waiver of the exercise of such right or option at any other time or the waiver of a different right or option. Termination of this Agreement by either Party will not waive Franchisee's obligation to make any payments to Franchisor under this Agreement.

**16.10 Headings.**  The division of this Agreement into sections and the use of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "Agreement," "herein," "hereof," "hereunder" and similar expressions refer to this Agreement and not to any particular section or other portion hereof and include any Schedules or agreements supplemental hereto. Unless something in the subject matter or context is inconsistent therewith, references herein to sections are to sections of this Agreement.

**16.11 No Construction Against Drafter.**  The Parties agree that any principle of construction or rule of law that provides that an agreement shall be construed against the drafter of the agreement in the

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

event of any inconsistency or ambiguity in such agreement shall not apply to the terms and conditions of this Agreement.

**16.12 Counterparts.** This Agreement may be executed in one (1) or more duplicate originals, all of which together shall be deemed one and the same instrument.

**16.13 Severability.** If any provision of this Agreement is determined to be void or unenforceable, the provision shall be deemed severed from the Agreement and the remainder of this Agreement shall continue in full force and effect.

**16.14 Successors and Assigns.** This Agreement shall inure to the benefit of and be binding upon the Parties, their successors and permitted assigns. Notwithstanding the above, Franchisee may not assign this Agreement without Franchisor's express written consent.

**16.15 Mediation.** The Parties agree that all disputes arising under this Agreement or associated with the SaaS Solution may be submitted to non-binding mediation under the National Franchise Mediation Program supervised by the Center for Public Resources (CPR) Institute for Dispute Resolution, 366 Madison Ave., New York, NY 10017; email: info@cpradr.org.

**16.16 Survival.** The provisions of this Agreement that due to their content should have continuing life shall survive the termination of this Agreement.

**16.17 Treatment of Prior Agreements.** In the event Franchisee has an existing WynGuest Agreement ("**Existing Agreement**") or Beta Test Program Agreement ("**Beta Agreement**") with Franchisor or one of Franchisor's Affiliates, such Existing Agreement or Beta Agreement shall automatically terminate on the Acceptance Date. The subject matter of any Existing Agreement or Beta Agreement, including any rights and obligations thereunder, shall be subject to and exclusively governed by such Existing Agreement or Beta Agreement. No provision, term, condition, right or obligation contained in any Existing Agreement or Beta Agreement, regardless of whether such provision, term, condition, right or obligation survives the termination of such Existing Agreement or Beta Agreement, shall apply to or otherwise affect this Agreement or the subject matter hereof.

**16.18 Release of All Claims by Franchisee.** Franchisee, for itself and its Affiliates, hereby irrevocably releases and forever discharges Franchisor and its Affiliates of and from any and all claims, causes of action or damages, whether legal or equitable, arising from or under or related to its Existing Agreement or Beta Agreement, if any, with Franchisor or its Affiliates. Franchisee shall indemnify, defend and hold harmless Franchisor and its Affiliates from and against any claims or causes of action made against Franchisor or its Affiliates by Franchisee, its Affiliates or any Third Party which arise under or relate to its Existing Agreement or Beta Agreement, if any. Franchisee acknowledges, understands and agrees that the foregoing release is expressly intended to cover and include, without limitation, all claims, past or present, known or unknown, suspected or unsuspected, accrued or unaccrued, asserted or unasserted, which can or may ever be asserted by assignees, successors or otherwise, as the result of the matters herein released, or the effects or consequences thereof based upon acts or omissions from the beginning of time through the Acceptance Date. Franchisee hereby irrevocably and forever waives all rights it may have arising under any statute or common law principle with respect to a general release of unknown or unsuspected claims, causes of action or damages, and Franchisee agrees to expressly waive any rights it may have under any such statute or common law principle.

*[Signature Page Follows]*

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

**IN WITNESS WHEREOF**, the Parties hereto have executed, or caused to be executed by their duly authorized representatives, this Agreement as of the Effective Date.

| Franchisor | Franchisee |
|---|---|
| By: *Michael Piccola* | By: *Nick Bhagat* |
| 62CC98F453C8404... | 691393252348470... |
| Name:   Michael Piccola | Name:   Nick Bhagat |
| Title:   Senior Vice President, Contracts Administration | Title:   (Vice) President / Managing Member / Authorized Signatory |

- 12 -

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

## SCHEDULE 1.1

### Definitions

"**Access Credentials**" means any user name, identification number, password, license or security key, security token, PIN or other security code, method, technology or device used, alone or in combination, to verify End Users' identity and authorization to access and use the SaaS Solution.

"**Affiliate**" means any and all subsidiaries, affiliates, corporations, limited liability companies, partnerships, firms, associations, businesses, organizations, and/or other entities that directly or indirectly (either presently or in the future and/or through one or more intermediaries) control, are controlled by, or are under common control with, the subject entity (with respect to Franchisor, including Franchisor's parent company, Wyndham Worldwide Corporation) and/or such entities.

"**Commitment Period**" means the Commitment Period identified in the Existing Agreement (if applicable), or if no Existing Agreement exists, five (5) years following the Acceptance Date.

"**Communication Services**" means the Internet connectivity services Franchisee uses for purposes of accessing and using the SaaS Solution.

"**End User**" means a person who is authorized by Franchisor, or who is otherwise permitted under this Agreement, to access and use the SaaS Solution, including without limitation, Franchisee.

"**Facility**" means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the effective date of the Franchisee Agreement.

"**Franchise Agreement**" means the License or Franchise Agreement between Franchisee and Franchisor granting to Franchisee the non-exclusive right to operate the Facility under the System.

"**Guest Information**" means any names, e-mail addresses, phone numbers, mailing addresses and other information about guests and customers of the Facility, including, without limitation, stay information, that either Franchisor or Franchisee or a person acting on behalf of one or both of them receives from or on behalf of the other or any guest or customer of the Facility or any other Third Party.

"**Hardware**" means the computer hardware, peripheral equipment, ancillary equipment, the operating system software and related documentation that Franchisee uses for purposes of accessing and using the SaaS Solution.

"**Intellectual Property**" means any and all rights existing from time to time under patent law, copyright law, trademark law, trade secret law, and any other proprietary rights laws and regulations as well as any related applications, reissuances, continuations, continuations-in-part, divisionals, renewals, extensions, and restorations thereof, now or hereafter in force and effect anywhere in the world.

"**Permitted Use**" means use of the SaaS Solution by End Users for the benefit of Franchisee solely in or for Franchisee's business operations as contemplated for and in accordance with the Franchise Agreement.

"**Services**" shall mean Additional Services, CRISP Services and Maintenance and Support Services.

"**System**" means the comprehensive system for providing guest lodging facility services under the Marks as Franchisor specifies which, at present, includes only the following: (a) the Marks; (b) other intellectual property including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity, and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

"**Third Party**" means persons and entities other than Franchisor and Franchisee.

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

**"WynGuest Agreement"** means an agreement between Franchisor and certain franchisees which governs such franchisees' access to and use of the WynGuest property management system.

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

## SCHEDULE 2.1

### The SaaS Solution

The SaaS Solution means the SynXis Property Management System, which as of the Effective Date includes the following features and functionality:

- — Web-based solution, which may include a local smart client
- — Community model hosting by Sabre Hospitality Solutions, or an affiliate thereof
- — Beginning 60-90 days from the Acceptance Date, interface with Infor's EzLITE automated revenue management system, which analyzes all PMS data to create property-specific, unconstrained demand models
  - • The EzLITE system will offer daily recommendations regarding Best Available Rate ("**BAR**") and stay control.
    - • Recommendations are based on 6 BAR rates entered by Franchisee.
    - • Franchisee must accept or override recommendations daily between specified hours, otherwise recommendations will be automatically uploaded into the SynXis Property Management System.
- — In-system training materials

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

## SCHEDULE 2.3

### Implementation Services

Franchisor will offer Implementation Services consisting of assistance in installation/implementation of the SaaS Solution including the following:

– Assistance with setup of two (2) Elavon tokenization terminals (to be provided in connection with execution of Elavon Agreement)

– Installation of SaaS Solution for Facility's front desk (Hardware to be provided by Franchisee)

– Training modules regarding features and functionality of SaaS Solution, including video demonstrations and tutorials

– Remote and optional on-site resources including training of Facility's staff

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

## SCHEDULE 4.2
### CRISP Services

**Terms of CRISP Services**

Franchisee agrees to establish the best available rate "**BAR**"; provided, however that Franchisee acknowledges and agrees that it will retain ultimate control over all revenue management decisions.  Subject to the foregoing, Franchisee explicitly authorizes Franchisor to make adjustments to the Facility's rates, inventory and restrictions in order to comply with the Required Policies and Practices without advance notice to Franchisee.  Franchisor shall not, however, change the BAR without authorization from Franchisee.  In addition, Franchisee may modify or reverse any change Franchisor may make by notifying Franchisor, provided that such modification or reversal is consistent with the Required Policies and Practices.  Franchisee's general manager shall be its primary representative who shall have the authority to make revenue management decisions for the Facility, unless Franchisee designates another Facility representative in writing to Franchisor.  Franchisor may communicate with Franchisee's representative by telephone, e-mail or in another manner, and Franchisor may rely on any communication which Franchisor believes, in good faith, is from Franchisee's representative. Any know-how, algorithms, formulae, data, recommendations, documentation, software, or other materials or information that Franchisor furnishes to Franchisee in connection with the CRISP Services shall be deemed "Confidential Information" as defined in the Franchise Agreement and shall be subject to all prohibitions on disclosure, copying or use of Confidential Information under the Franchise Agreement.

**Overview of CRISP Services**

Property Audit & Setup

In consultation with the Facility representative, simplify rates and room type structures by:
- – Verifying that all required rate plans are loaded correctly in the SaaS Solution;
- – Verifying that local rates are available for sale in the distribution channels selected by the Facility;
- – Verifying that all brand standard rate plans are available for sale; and
- – Verifying that all hotel specific data is accurate and up to date in all systems.

Rate & Inventory Management

Review inventory/rate visibility and consistency across all distribution channels.  Key services include:
- – Monitoring Facility inventory and rate settings in the SaaS Solution;
- – Identifying and advising Franchisee of erroneous rate plans;
- – Monitoring rates across distribution channels and checking for accuracy in third party channels; and
- – Coordinating participation in key corporate accounts and marketing programs.

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

## SCHEDULE 4.3

### Maintenance and Support Services

**First Level of Support**

Franchisor will provide first-level support for the SaaS Solution, which shall include:

- SynXis Property Management System;
- Infor's EzLITZE automated revenue management system; and
- Any additional interfaces included in the SaaS Solution.

Additionally, Franchisor shall field initial inquiries related to the Elavon Non-SaaS Solution Services though support therefor shall be provided as set forth in the Elavon Agreement.

**Second Level of Support**

In the event first level support fails to resolve any maintenance or support issues for the SaaS Solution, Franchisor will provide second level support by putting Franchisee in contact with the appropriate Third Party provider of the SaaS Solution.

**Franchisee Obligations**

Franchisee shall perform all user-required maintenance procedures specified by the vendor of the specific Hardware components, and obtain required maintenance only from an authorized service provider.

.

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

## SCHEDULE 5.1

### Fees

| | |
|---|---|
| **With up to Three Interfaces*** | $565 per month** |
| **One-Time Start-Up Fee** | $1,400** |
| **One-Time Transfer Fee (if applicable)** | $500 |

* **"Interface"** means any interface you may choose to include, which may be necessary for features relating to, for example, voicemail, call accounting, etc.  The Elavon tokenized credit card interface and Infor EzLITE interface are included in the monthly price listed above.

** Franchisees with Existing Agreements shall pay modified Fees as follows:

(1)    the One-Time Start-Up Fee shall not apply; and

(2)    (a)    Franchisees with an Existing Master Subscription Agreement or an Existing WynGuest Agreement – Subscription Model shall pay the monthly fee paid under the Existing Agreement in the month immediately preceding the month in which the Acceptance Date occurs through the second anniversary of the Acceptance Date; or

(b)    Franchisees with an Existing Software and Services Agreements or an Existing WynGuest Agreement – Upfront Model shall pay the monthly fee paid under the Existing Agreement in the month immediately preceding the month in which the Acceptance Date occurs through the later of:

(i)    the second anniversary of the Acceptance Date; or

(ii)    the fourth anniversary of the Acceptance Date under the Existing Agreement.

For the avoidance of doubt, the type of Existing Agreement, amount of Existing Monthly Fee, and Acceptance Date of Existing Agreement that shall be applicable to this Agreement are set forth in the chart below.

| **Existing Agreement** | **Existing Monthly Fee** | **Acceptance Date of Existing Agreement** |
|---|---|---|
| WG Upfront | 566.99 | 3/24/2011 |

DocuSign Envelope ID: A285BC53-BB9D-4D0A-AF51-8CB381FF9CF3

## SCHEDULE 6.1

### Minimum Technical Specification Requirements

1. Windows 7 or higher

2. 4GB+ of RAM

3. 2GHz processor (32 or 64 bit) or greater

4. 1GB+ Available Disk Space

5. The Microsoft .NET Framework Version 4.0

6. Internet Explorer 9 or Firefox 4.0 must be set as the default browser on the SaaS Solution

7. Screen resolution should be set to at least 1024x768

8. To save/view reports Acrobat 9 or higher is required (or compatible pdf reader)

9. Elavon Fusebox connectivity from two way interface

10. Elavon imaged Ingenico Swipe devices with outbound access to Fusebox

11. Elavon Webapp access (manual processing pop-up window)

# EXHIBIT C

## GUARANTY

To induce DAYS INNS WORLDWIDE, INC., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we", "our" or "us"), irrevocably and unconditionally (i) warrant to you that  Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that  Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement.  Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee.  We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

Name: Ramesh Bhagat
Address: 17414 Vinwood Lane, Yorba Linda, CA 92886


Name: Kaushal Patel
Address: Brea, CA

Name: Nimesh Bhagat
Address: 17414 Vinwood Lane, Yorba Linda, CA 92886

1

## GUARANTY

To induce DAYS INNS WORLDWIDE, INC., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**


_____
Name: Ramesh Bhagat
Address: 17414 Vinwood Lane, Yorba Linda, CA 92886


_____
Name: Kaushal Patel
Address: Brea, CA


_____
Name: Nimesh Bhagat
Address: 17414 Vinwood Lane, Yorba Linda, CA 92886

1

DAY FA CON
246984  Q3/11

# EXHIBIT D



**HOTEL GROUP**

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

November 10, 2017

**VIA 2 DAY DELIVERY METHOD**

Mr. Nimesh Bhagat
Krishna Q Investments, LLC
17414 Vinwood Lane
Yorba Linda, CA 92886

Re:   **NOTICE OF MONETARY DEFAULT relating to Days Inn® Unit #42013-96319-2 located in College Park, GA (the "Facility")**

Dear Mr. Bhagat:

I write on behalf of Days Inns Worldwide, Inc., ("we," "us," or "our") regarding the Franchise Agreement dated September 30, 2011, between Krishna Q Investments, LLC, ("you" or "your") and us (the "Agreement"). We write to give you formal notice that you are in default under the Agreement.

The Agreement requires you to timely pay us the Recurring Fees and other charges relating to your operation of the Facility under the System. Our Financial Services Department advises us that as of November 8, 2017, your account is past due in the amount of **$52,961.80**. We have enclosed an itemized statement detailing the fees past due. Under the Agreement, you have ten (10) days to pay this amount to us in order to cure your default. If you do not pay this amount within the time permitted, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Days Inn System.

This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default. By copy of this Notice, we are also informing your Guarantors of your default with which we have an agreement regarding the Facility.

















Mr. Nimesh Bhagat
November 10, 2017
Page Two


We hope you will take this opportunity to resolve your monetary default.  If you have any questions regarding your default or how it can be timely cured, please contact Operations Support Desk at (888) 575-4822.

Sincerely yours,

Joe Maida
Director
Contracts Compliance

Enclosure

cc:   Ramesh Bhagat (Guarantor)
      Kaushal Patel (Guarantor)
      Patrick Breen
      Dianna Bayas
      Michael Piccola
      Suzanne Fenimore

# ITEMIZED STATEMENT

Report Date: 08-Nov-2017

**Days Inn**

| As of Date (DD-MMM-YYYY) | : | 08-Nov-2017 |
|---|---|---|
| Customer No | : | 42013-96319-02-DAY |
| Category Set | : | |
| Category Group | : | |
| Group No | : | |
| Bankruptcy | : | No Bankruptcy Sites |
| Disputed | : | No |
| Finance Charges Included | : | Yes |

| Customer No | : | 42013-96319-02-DAY |
|---|---|---|
| Address | : | 2451 Old National Parkway,College Park,GA,30349,US |
| As of Date | : | 08-Nov-2017 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| FEB-2017 | 43785894 | 02/28/2017 | Actual-1000A-ROYALTY FEE | | 105.98 | 0.00 | 133.71 | 239.69 |
| | | | Sub Total: | | 105.98 | 0.00 | 133.71 | 239.69 |
| MAR-2017 | 113065 | 03/31/2017 | RETRAINFEE-MAR2017-5 | | 250.00 | 0.00 | 20.39 | 270.39 |
| | 21547179 | 03/22/2017 | WYNREWARDS 5% | | 188.78 | 0.00 | 16.21 | 204.99 |
| | 21548368 | 03/22/2017 | WR FREE ENROLLMENTS | | -7.00 | 0.00 | 0.00 | -7.00 |
| | 43796229 | 03/31/2017 | 5718A-HughesNet VPN | | 105.00 | 7.35 | 9.16 | 121.51 |
| | 43799609 | 03/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 40.88 | 50.93 | 675.81 |
| | 43812258 | 03/31/2017 | Actual-1800A-RESERVATION FEE | | 1,465.20 | 0.00 | 119.21 | 1,584.41 |
| | 43812259 | 03/31/2017 | Actual-1210A-MARKETING FEE | | 955.56 | 0.00 | 77.74 | 1,033.30 |
| | 43812260 | 03/31/2017 | Actual-1000A-ROYALTY FEE | | 3,503.73 | 0.00 | 285.08 | 3,788.81 |
| | | | Sub Total: | | 7,045.27 | 48.23 | 578.72 | 7,672.22 |
| APR-2017 | 113569 | 04/30/2017 | RETRAINFEE-APR2017-3 | | 250.00 | 0.00 | 16.64 | 266.64 |
| | 21555326 | 04/22/2017 | WR FREE ENROLLMENTS | | -49.00 | 0.00 | 0.00 | -49.00 |
| | 21555850 | 04/22/2017 | WYNREWARDS 5% | | 159.49 | 0.00 | 11.24 | 170.73 |
| | 31281544 | 04/11/2017 | WYNREWARDS ADMINFEE | | 100.00 | 0.00 | 7.60 | 107.60 |
| | 31285537 | 04/12/2017 | OMEGA PROGRAM | | 5.00 | 0.00 | 0.39 | 5.39 |
| | 31292843 | 04/30/2017 | Reinspection | | 2,100.00 | 0.00 | 139.65 | 2,239.65 |
| | 43822243 | 04/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 41.84 | 671.10 |
| | 43822442 | 04/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 7.52 | 120.65 |
| | 43830877 | 04/30/2017 | Actual-1800A-RESERVATION FEE | | 1,306.95 | 0.00 | 86.91 | 1,393.86 |
| | 43830878 | 04/30/2017 | Actual-1210A-MARKETING FEE | | 852.36 | 0.00 | 56.69 | 909.05 |
| | 43830879 | 04/30/2017 | Actual-1000A-ROYALTY FEE | | 3,125.31 | 0.00 | 207.83 | 3,333.14 |
| | | | Sub Total: | | 8,539.11 | 53.39 | 576.31 | 9,168.81 |
| MAY-2017 | 10945827 | 05/04/2017 | GUEST SATISFACTION | | 116.12 | 0.00 | 7.49 | 123.61 |
| | 114601 | 05/31/2017 | RETRAINFEE-MAY2017-2 | | 250.00 | 0.00 | 10.88 | 260.88 |
| | 21559923 | 05/22/2017 | WYNREWARDS GOFREECR | | -36.75 | 0.00 | 0.00 | -36.75 |

Page 1 of 4

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 21564756 | 05/22/2017 | WR FREE ENROLLMENTS | | -6.32 | 0.00 | 0.00 | -6.32 |
| | 21564757 | 05/22/2017 | WYNREWARDS 5% | | 287.59 | 0.00 | 15.96 | 303.55 |
| | 21565908 | 05/22/2017 | WYNREWARDS BONUS | | 40.00 | 0.00 | 2.22 | 42.22 |
| | 31300008 | 05/25/2017 | WYNREWARDS ADMINFEE | | 100.00 | 0.00 | 5.40 | 105.40 |
| | 31304395 | 05/31/2017 | AUDIT ROYALTY | | 1,195.95 | 0.00 | 61.00 | 1,256.95 |
| | 31304396 | 05/31/2017 | AUDIT MKTG FEE | | 326.17 | 0.00 | 16.63 | 342.80 |
| | 31304397 | 05/31/2017 | AUDIT RESERVATION | | 166.34 | 0.00 | 8.49 | 174.83 |
| | 31304398 | 05/31/2017 | AUDIT INTEREST FEE | | 900.98 | 0.00 | 45.95 | 946.93 |
| | 31304399 | 05/31/2017 | LIMITED AUDIT | | 1,000.00 | 0.00 | 51.00 | 1,051.00 |
| | 43848302 | 05/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 5.77 | 118.90 |
| | 43843572 | 05/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 32.09 | 661.35 |
| | 43653250 | 05/31/2017 | Accrual-1800A-RESERVATION FEE | • | 1,086.01 | 0.00 | 55.38 | 1,141.39 |
| | 43863254 | 05/31/2017 | Accrual-1210A-MARKETING FEE | • | 708.27 | 0.00 | 36.12 | 744.39 |
| | 43863406 | 05/31/2017 | Accrual-1000A-ROYALTY FEE | • | 2,596.99 | 0.00 | 132.43 | 2,729.42 |
| | | | Sub Total: | | 9,420.35 | 53.39 | 486.81 | 9,960.55 |
| JUN-2017 | 10952906 | 06/08/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 6.32 | 166.32 |
| | 10952920 | 06/08/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 6.32 | 166.32 |
| | 10953284 | 06/08/2017 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 2.28 | 59.97 |
| | 10953435 | 06/08/2017 | WR GUEST SATISFACTION | | 34.62 | 0.00 | 1.37 | 35.99 |
| | 114749 | 06/30/2017 | RETRAINFEE-JUN2017-0 | | 250.00 | 0.00 | 7.13 | 257.13 |
| | 1723252 | 06/09/2017 | GDS & INTERNET BKGS | | 24.45 | 0.00 | 0.96 | 25.41 |
| | 21574742 | 06/22/2017 | WR FREE ENROLLMENTS | | -8.00 | 0.00 | 0.00 | -8.00 |
| | 21574743 | 06/22/2017 | WYNREWARDS 5% | | 158.82 | 0.00 | 5.16 | 163.98 |
| | 21574740B | 06/22/2017 | WYNREWARDS BONUS | | 5.00 | 0.00 | 0.17 | 5.17 |
| | 43872523 | 06/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 4.07 | 117.20 |
| | 43873327 | 06/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 22.65 | 651.91 |
| | 43885588 | 06/30/2017 | Accrual-1800A-RESERVATION FEE | • | 1,042.36 | 0.00 | 37.53 | 1,079.89 |
| | 43885763 | 06/30/2017 | Accrual-1210A-MARKETING FEE | • | 679.80 | 0.00 | 24.48 | 704.28 |
| | 43885766 | 06/30/2017 | Accrual-1000A-ROYALTY FEE | • | 2,492.60 | 0.00 | 89.74 | 2,582.34 |
| | TA0723252 | 06/09/2017 | T/A COMMISSIONS | | 7.20 | 0.00 | 0.28 | 7.48 |
| | TC0723252 | 06/09/2017 | T/A COMM SERVICE CHG | | 3.48 | 0.00 | 0.13 | 3.61 |
| | TM0723252 | 06/09/2017 | MEMBER BENEFIT COMM | | 16.00 | 0.00 | 0.63 | 16.63 |
| | TR0723252 | 06/09/2017 | TMC / CONSORTIA | | 2.52 | 0.00 | 0.10 | 2.62 |
| | | | Sub Total: | | 5,775.54 | 53.39 | 209.32 | 6,038.25 |
| JUL-2017 | 115453 | 07/31/2017 | RETRAINFEE-JUL2017-0 | | 250.00 | 0.00 | 3.25 | 253.25 |
| | 1729966 | 07/18/2017 | GDS & INTERNET BKGS | | 8.55 | 0.00 | 0.17 | 8.72 |
| | 21577911 | 07/22/2017 | WYNREWARDS 5% | | 77.30 | 0.00 | 1.35 | 78.65 |
| | 43899330 | 07/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 12.90 | 642.16 |
| | 43899384 | 07/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 2.32 | 115.45 |
| | 43911099 | 07/31/2017 | Accrual-1800A-RESERVATION FEE | • | 987.44 | 0.00 | 20.24 | 1,007.68 |
| | 43912210 | 07/31/2017 | Accrual-1210A-MARKETING FEE | • | 643.98 | 0.00 | 13.20 | 657.18 |
| | 43912357 | 07/31/2017 | Accrual-1000A-ROYALTY FEE | • | 2,361.26 | 0.00 | 48.41 | 2,409.67 |
| | TA0729966 | 07/18/2017 | T/A COMMISSIONS | | 12.23 | 0.00 | 0.24 | 12.47 |
| | TC0729966 | 07/18/2017 | T/A COMM SERVICE CHG | | 4.75 | 0.00 | 0.09 | 4.84 |
| | TM0729966 | 07/18/2017 | MEMBER BENEFIT COMM | | 19.40 | 0.00 | 0.38 | 19.78 |
| | TV0729966 | 07/18/2017 | GOVERNMENT FEES | | 2.05 | 0.00 | 0.04 | 2.09 |
| | | | Sub Total: | | 5,055.96 | 53.39 | 102.59 | 5,211.94 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2017 | 10957069 | 08/03/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 1.84 | 161.84 |
| | 10967503 | 08/03/2017 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 0.13 | 11.67 |
| | 10972159 | 08/17/2017 | GUEST SATISFACTION | | 54.01 | 0.00 | 0.24 | 54.25 |
| | 10972986 | 08/17/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 0.72 | 160.72 |
| | 115864 | 08/31/2017 | RETRAINFEE-AUG2017-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 1736233 | 08/16/2017 | GDS & INTERNET BKGS | | 6.05 | 0.00 | 0.03 | 6.08 |
| | 21592350 | 08/22/2017 | WYNREWARDS 5% | | 43.54 | 0.00 | 0.09 | 43.63 |
| | 43923056 | 08/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.57 | 113.70 |
| | 43924383 | 08/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 3.15 | 632.41 |
| | 43935524 | 08/31/2017 | Accrual-1000A-ROYALTY FEE | • | 1,170.24 | 0.00 | 5.85 | 1,176.09 |
| | 43935444 | 08/31/2017 | Accrual-1800A-RESERVATION FEE | • | 489.37 | 0.00 | 2.45 | 491.82 |
| | 43935445 | 08/31/2017 | Accrual-1210A-MARKETING FEE | • | 319.16 | 0.00 | 1.60 | 320.76 |
| | | | **Sub Total:** | | 3,352.91 | 53.39 | 16.67 | 3,422.97 |
| SEP-2017 | 10977846 | 09/07/2017 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 0.00 | 11.54 |
| | 10978514 | 09/07/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 116393 | 09/30/2017 | RETRAINFEE-SEP2017-1 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21601079 | 09/22/2017 | WYNREWARDS 5% | | 61.80 | 0.00 | 0.00 | 61.80 |
| | 31336591 | 09/07/2017 | 2018 DAYS ALLIANCE DUES | | 1,107.00 | 0.00 | 0.00 | 1,107.00 |
| | 43949333 | 09/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 0.00 | 629.26 |
| | 43950611 | 09/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.00 | 113.13 |
| | 43966317 | 09/30/2017 | Accrual-1800A-RESERVATION FEE | • | 1,056.80 | 0.00 | 0.00 | 1,056.80 |
| | 43966318 | 09/30/2017 | Accrual-1210A-MARKETING FEE | • | 689.22 | 0.00 | 0.00 | 689.22 |
| | 43966319 | 09/30/2017 | Accrual-1000A-ROYALTY FEE | • | 2,527.14 | 0.00 | 0.00 | 2,527.14 |
| | | | **Sub Total:** | | 6,552.50 | 53.39 | 0.00 | 6,605.89 |
| OCT-2017 | 117001 | 10/31/2017 | RETRAINFEE-OCT2017-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 1758050 | 10/20/2017 | GDS & INTERNET BKGS | | 6.05 | 0.00 | 0.00 | 6.05 |
| | 21609720 | 10/22/2017 | WR FREE ENROLLMENTS | | -10.00 | 0.00 | 0.00 | -10.00 |
| | 21610333 | 10/22/2017 | WYNREWARDS 5% | | 34.69 | 0.00 | 0.00 | 34.69 |
| | 31355297 | 10/04/2017 | TRAINING ACCESS FEE | | 60.00 | 0.00 | 0.00 | 60.00 |
| | 31376199 | 10/31/2017 | GLOBAL CONFERENCE | | 1,149.00 | 0.00 | 0.00 | 1,149.00 |
| | 43974399 | 10/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 0.00 | 629.26 |
| | 43975732 | 10/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.00 | 113.13 |
| | 43988336 | 10/31/2017 | Accrual-1800A-RESERVATION FEE | • | 595.17 | 0.00 | 0.00 | 595.17 |
| | 43988446 | 10/31/2017 | Accrual-1210A-MARKETING FEE | • | 388.16 | 0.00 | 0.00 | 388.16 |
| | 43988447 | 10/31/2017 | Accrual-1000A-ROYALTY FEE | • | 1,423.24 | 0.00 | 0.00 | 1,423.24 |
| | TG0756050 | 10/20/2017 | GSA FEES | | 2.78 | 0.00 | 0.00 | 2.78 |
| | | | **Sub Total:** | | 4,588.09 | 53.39 | 0.00 | 4,641.48 |
| | | | **Grand Total:** | | 50,435.71 | 421.96 | 2,104.13 | 52,961.80 |

Page 3 of 4

Requested By: Yelena Danishevsky

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.

# UPS Shipment Receipt

| | |
|---|---|
| **Transaction Date:** 09 Nov 2017 | **Tracking Number:** 1Z22445X0290721404 |

## ① ADDRESS INFORMATION

**Ship To:**
Krishna G Investment, LLC
Nimesh Bhagat
17414 Vinwood Lane
YORBA LINDA CA 928861877
Residential

**Ship From:**
Wyndham Hotel Group - 22
Sylvan
Elena Darashevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7236
email:elena.darashevsky@wyn
com

**Return Address:**
Wyndham Hotel Group - 22 Sylvan
Elena Darashevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7236 email:elena.darashevsky@wyn.com

## ② PACKAGE INFORMATION

| | WEIGHT | DIMENSIONS / PACKAGING | DECLARED VALUE | REFERENCE NUMBERS |
|---|---|---|---|---|
| 1. | Letter (Letter billable) | UPS Letter | | Reference # 1 - 006-1696 |

## ③ UPS SHIPPING SERVICE AND SHIPPING OPTIONS

**Service:** UPS 2nd Day Air
**Guaranteed By:** End of Day Monday, Nov 13, 2017
**Shipping Fees Subtotal:** 31.20 USD

| | |
|---|---|
| Transportation | 25.45 USD |
| Fuel Surcharge | 1.77 USD |
| Residential Surcharge | 4.00 USD |

## ④ PAYMENT INFORMATION

**Bill Shipping Charges to:** Shipper's Account 77445X

| | |
|---|---|
| **Shipping Charges:** | 31.20 USD |
| A discount has been applied to the Daily rates for this shipment | |
| **Negotiated Charges:** | 11.14 USD |
| **Subtotal Shipping Charges:** | 11.14 USD |
| **Total Charges:** | 11.14 USD |

Note: This document is not an invoice. Your final invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide ({0}). To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# EXHIBIT E



# WYNDHAM
## HOTEL GROUP

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445

February 9, 2018

<u>**VIA 2 DAY DELIVERY METHOD**</u>

Mr. Nimesh Bhagat
Krishna Q Investments, LLC
17414 Vinwood Lane
Yorba Linda, CA 92886

Re:     NOTICE OF CONTINUING MONETARY DEFAULT relating to Days Inn® Unit
        #42013-96319-2 located in College Park, GA (the "Facility")

Dear Mr. Bhagat:

I write on behalf of Days Inns Worldwide, Inc., ("we," "us," or "our") regarding the Franchise
Agreement dated September 30, 2011, between Krishna Q Investments, LLC, ("you" or "your")
and us (the "Agreement"). You will recall that, on November 10, 2017, we sent you a default
notice because of your failure to meet your financial obligations to us. That notice required you
to cure the default within ten (10) days. However, you did not cure your default within the time
permitted.

Your failure to cure your default within the time permitted also allows us to terminate the
Agreement immediately upon written notice to you. We would prefer, however, to keep our
affiliation with you. Accordingly, we will allow you an additional period of ten (10) days from
the date of this letter to cure your default. Please be advised that as of February 7, 2018, your
account is now past due in the amount of **$68,093.45**. We have enclosed an itemized statement
detailing the fees past due. Please understand that we are not waiving this default or any other
default under the Agreement by extending your cure period. We are simply giving you a final
opportunity to avoid termination.

By copy of this Notice, we are also informing your Guarantors of your default with which we
have an Agreement regarding the Facility.




















Mr. Nimesh Bhagat
February 9, 2018
Page Two


We hope you will take this opportunity to resolve your monetary default.  If you have any questions regarding your default or how it can be timely cured, please contact Operations Support Desk at (888) 575-4822.

Sincerely yours,

Joe Mejia
Director
Contracts Compliance

Enclosure

cc:     Ramesh Bhagat (Guarantor)
        Kaushal Patel (Guarantor)
        Patrick Breen
        Edvin Kolakovic
        Michael Piccola
        Suzanne Fenimore

## ITEMIZED STATEMENT

Report Date: 07-Feb-2018

| | | |
|---|---|---|
| As of Date (DD-MMM-YYYY) | : | 07-Feb-2018 |
| Customer No | : | 42013-96319-02-DAY |
| Category Set | : | |
| Category Group | : | |
| Group No | : | |
| Bankruptcy | : | No Bankruptcy Sites |
| Disputed | : | No |
| Finance Charges Included | : | Yes |

| | | |
|---|---|---|
| Customer No | : | 42013-96319-02-DAY |
| Address | : | 2451 Old National Parkway,College Park,GA,30349,US |
| As of Date | : | 07-Feb-2018 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| FEB-2017 | 43785894 | 02/28/2017 | Actual-1000A-ROYALTY FEE | | 105.98 | 0.00 | 133.71 | 239.69 |
| | | | Sub Total: | | 105.98 | 0.00 | 133.71 | 239.69 |
| MAR-2017 | 113065 | 03/31/2017 | RETRAINFEE-MAR2017-5 | | 250.00 | 0.00 | 31.90 | 281.90 |
| | 21547179 | 03/22/2017 | WYNREWARDS 5% | | 188.78 | 0.00 | 23.30 | 212.08 |
| | 21548368 | 03/22/2017 | WR FREE ENROLLMENTS | | -7.00 | 0.00 | 0.00 | -7.00 |
| | 43796229 | 03/31/2017 | 5718A-HughesNet VPN | | 105.00 | 7.35 | 14.33 | 126.68 |
| | 43799609 | 03/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 40.88 | 79.68 | 704.56 |
| | 43812258 | 03/31/2017 | Actual-1800A-RESERVATION FEE | | 1,465.20 | 0.00 | 186.61 | 1,651.81 |
| | 43812259 | 03/31/2017 | Actual-1210A-MARKETING FEE | | 955.56 | 0.00 | 121.69 | 1,077.25 |
| | 43812260 | 03/31/2017 | Actual-1000A-ROYALTY FEE | | 3,503.73 | 0.00 | 446.26 | 3,949.99 |
| | | | Sub Total: | | 7,045.27 | 48.23 | 903.77 | 7,997.27 |
| APR-2017 | 113569 | 04/30/2017 | RETRAINFEE-APR2017-3 | | 250.00 | 0.00 | 28.15 | 278.15 |
| | 21553326 | 04/22/2017 | WR FREE ENROLLMENTS | | -49.00 | 0.00 | 0.00 | -49.00 |
| | 21555650 | 04/22/2017 | WYNREWARDS 5% | | 159.49 | 0.00 | 18.57 | 178.06 |
| | 31281544 | 04/11/2017 | WYNREWARDS ADMINFEE | | 100.00 | 0.00 | 12.20 | 112.20 |
| | 31285537 | 04/12/2017 | OMEGA PROGRAM | | 5.00 | 0.00 | 0.63 | 5.63 |
| | 31292843 | 04/30/2017 | Reinspection | | 2,100.00 | 0.00 | 236.25 | 2,336.25 |
| | 43822243 | 04/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 70.78 | 700.04 |
| | 43822442 | 04/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 12.72 | 125.85 |
| | 43830877 | 04/30/2017 | Actual-1800A-RESERVATION FEE | | 1,306.95 | 0.00 | 147.03 | 1,453.98 |
| | 43830878 | 04/30/2017 | Actual-1210A-MARKETING FEE | | 852.36 | 0.00 | 95.90 | 948.26 |
| | 43830879 | 04/30/2017 | Actual-1000A-ROYALTY FEE | | 3,125.31 | 0.00 | 351.59 | 3,476.90 |
| | | | Sub Total: | | 8,539.11 | 53.39 | 973.82 | 9,566.32 |
| MAY-2017 | 10945827 | 05/04/2017 | GUEST SATISFACTION | | 116.12 | 0.00 | 12.83 | 128.95 |
| | 114601 | 05/31/2017 | RETRAINFEE-MAY2017-2 | | 250.00 | 0.00 | 22.39 | 272.39 |
| | 21559923 | 05/22/2017 | WYNREWARDS GOFREECR | | -36.75 | 0.00 | 0.00 | -36.75 |

Page 1 of 4

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 21564756 | 05/22/2017 | WR FREE ENROLLMENTS | | -6.32 | 0.00 | 0.00 | -6.32 |
| | 21564757 | 05/22/2017 | WYNREWARDS 5% | | 287.59 | 0.00 | 29.19 | 316.78 |
| | 21565908 | 05/22/2017 | WYNREWARDS BONUS | | 40.00 | 0.00 | 4.06 | 44.06 |
| | 31300008 | 05/25/2017 | WYNREWARDS ADMINFEE | | 100.00 | 0.00 | 10.00 | 110.00 |
| | 31304395 | 05/31/2017 | AUDIT ROYALTY | | 1,195.95 | 0.00 | 116.02 | 1,311.97 |
| | 31304396 | 05/31/2017 | AUDIT MKTG FEE | | 326.17 | 0.00 | 31.64 | 357.81 |
| | 31304397 | 05/31/2017 | AUDIT RESERVATION | | 166.34 | 0.00 | 16.15 | 182.49 |
| | 31304398 | 05/31/2017 | AUDIT INTEREST FEE | | 900.98 | 0.00 | 87.40 | 988.38 |
| | 31304399 | 05/31/2017 | LIMITED AUDIT | | 1,000.00 | 0.00 | 97.00 | 1,097.00 |
| | 43848302 | 05/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 10.97 | 124.10 |
| | 43845572 | 05/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 61.03 | 690.29 |
| | 43653250 | 05/31/2017 | Actual-1800A-RESERVATION FEE | | 1,068.99 | 0.00 | 105.07 | 1,174.06 |
| | 43653254 | 05/31/2017 | Actual-1210A-MARKETING FEE | | 697.17 | 0.00 | 68.53 | 765.70 |
| | 43653408 | 05/31/2017 | Actual-1000A-ROYALTY FEE | | 2,556.28 | 0.00 | 251.25 | 2,807.53 |
| | | | | Sub Total: | 9,351.52 | 53.39 | 923.53 | 10,328.44 |
| JUN-2017 | 10952906 | 06/08/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 13.68 | 173.68 |
| | 10952920 | 06/08/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 13.68 | 173.68 |
| | 10953284 | 06/08/2017 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 4.93 | 62.62 |
| | 10953436 | 06/08/2017 | WR GUEST SATISFACTION | | 34.62 | 0.00 | 2.97 | 37.59 |
| | 114749 | 06/30/2017 | RETRAINFEE-JUN2017-0 | | 250.00 | 0.00 | 18.64 | 268.64 |
| | 1723252 | 06/09/2017 | GDS & INTERNET BKGS | | 24.45 | 0.00 | 2.09 | 26.54 |
| | 21574742 | 06/22/2017 | WR FREE ENROLLMENTS | | -8.00 | 0.00 | 0.00 | -8.00 |
| | 21574743 | 06/22/2017 | WYNREWARDS 5% | | 158.82 | 0.00 | 12.46 | 171.28 |
| | 21577406 | 06/22/2017 | WYNREWARDS BONUS | | 5.00 | 0.00 | 0.41 | 5.41 |
| | 43872523 | 06/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 9.27 | 122.40 |
| | 43873327 | 06/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 51.59 | 680.85 |
| | 43885588 | 06/30/2017 | Actual-1800A-RESERVATION FEE | | 1,044.25 | 0.00 | 85.52 | 1,129.77 |
| | 43885763 | 06/30/2017 | Actual-1210A-MARKETING FEE | | 681.03 | 0.00 | 55.78 | 736.81 |
| | 43885766 | 06/30/2017 | Actual-1000A-ROYALTY FEE | | 2,497.12 | 0.00 | 204.48 | 2,701.60 |
| | TA0723252 | 06/09/2017 | T/A COMMISSIONS | | 7.20 | 0.00 | 0.61 | 7.81 |
| | TC0723252 | 06/09/2017 | T/A COMM SERVICE CHG | | 3.48 | 0.00 | 0.28 | 3.76 |
| | TM0723252 | 06/09/2017 | MEMBER BENEFIT COMM | | 16.00 | 0.00 | 1.37 | 17.37 |
| | TR0723252 | 06/09/2017 | TMC / CONSORTIA | | 2.52 | 0.00 | 0.22 | 2.74 |
| | | | | Sub Total: | 5,783.18 | 53.39 | 477.98 | 6,314.55 |
| JUL-2017 | 115453 | 07/31/2017 | RETRAINFEE-JUL2017-0 | | 250.00 | 0.00 | 14.76 | 264.76 |
| | 1729966 | 07/18/2017 | GDS & INTERNET BKGS | | 8.55 | 0.00 | 0.56 | 9.11 |
| | 21577911 | 07/22/2017 | WYNREWARDS 5% | | 77.30 | 0.00 | 4.91 | 82.21 |
| | 43899330 | 07/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 41.84 | 671.10 |
| | 43899384 | 07/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 7.52 | 120.65 |
| | 43911099 | 07/31/2017 | Actual-1800A-RESERVATION FEE | | 971.07 | 0.00 | 65.41 | 1,036.48 |
| | 43912210 | 07/31/2017 | Actual-1210A-MARKETING FEE | | 633.31 | 0.00 | 42.66 | 675.97 |
| | 43912357 | 07/31/2017 | Actual-1000A-ROYALTY FEE | | 2,322.13 | 0.00 | 156.42 | 2,478.55 |
| | TA0729966 | 07/18/2017 | T/A COMMISSIONS | | 12.23 | 0.00 | 0.80 | 13.03 |
| | TC0729966 | 07/18/2017 | T/A COMM SERVICE CHG | | 4.75 | 0.00 | 0.30 | 5.05 |
| | TM0729966 | 07/18/2017 | MEMBER BENEFIT COMM | | 19.40 | 0.00 | 1.27 | 20.67 |
| | TV0729966 | 07/18/2017 | GOVERNMENT FEES | | 2.05 | 0.00 | 0.13 | 2.18 |
| | | | | Sub Total: | 4,989.79 | 53.39 | 336.58 | 5,379.76 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2017 | 10967069 | 08/03/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 9.20 | 169.20 |
| | 10967503 | 08/03/2017 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 0.66 | 12.20 |
| | 10972159 | 08/17/2017 | GUEST SATISFACTION | | 54.01 | 0.00 | 2.73 | 56.74 |
| | 10972988 | 08/17/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 8.08 | 168.08 |
| | 115864 | 08/31/2017 | RETRAINFEE-AUG2017-0 | | 250.00 | 0.00 | 10.88 | 260.88 |
| | 1736233 | 08/16/2017 | GDS & INTERNET BKGS | | 6.05 | 0.00 | 0.30 | 6.35 |
| | 21592350 | 08/22/2017 | WYNREWARDS 5% | | 43.54 | 0.00 | 2.08 | 45.62 |
| | 43923056 | 08/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 5.77 | 118.90 |
| | 43924383 | 08/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 32.09 | 661.35 |
| | 43935224 | 08/31/2017 | Actual-1000A-ROYALTY FEE | | 1,192.48 | 0.00 | 60.02 | 1,252.50 |
| | 43935444 | 08/31/2017 | Actual-1800A-RESERVATION FEE | | 498.67 | 0.00 | 25.11 | 523.78 |
| | 43935445 | 08/31/2017 | Actual-1210A-MARKETING FEE | | 325.22 | 0.00 | 16.38 | 341.60 |
| | | | | Sub Total: | 3,390.51 | 53.39 | 173.30 | 3,617.20 |
| SEP-2017 | 10977846 | 09/07/2017 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 0.46 | 12.00 |
| | 10978514 | 09/07/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 6.40 | 166.40 |
| | 116393 | 09/30/2017 | RETRAINFEE-SEP2017-1 | | 250.00 | 0.00 | 7.13 | 257.13 |
| | 21601079 | 09/22/2017 | WYNREWARDS 5% | | 61.80 | 0.00 | 2.01 | 63.81 |
| | 31336591 | 09/07/2017 | 2018 DAYS ALLIANCE DUES | | 1,107.00 | 0.00 | 0.00 | 1,107.00 |
| | 43949333 | 09/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 22.65 | 651.91 |
| | 43950011 | 09/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 4.07 | 117.20 |
| | 43966317 | 09/30/2017 | Actual-1800A-RESERVATION FEE | | 1,062.67 | 0.00 | 38.13 | 1,100.80 |
| | 43966318 | 09/30/2017 | Actual-1210A-MARKETING FEE | | 693.04 | 0.00 | 24.87 | 717.91 |
| | 43966319 | 09/30/2017 | Actual-1000A-ROYALTY FEE | | 2,541.16 | 0.00 | 91.20 | 2,632.36 |
| | | | | Sub Total: | 6,576.21 | 53.39 | 196.92 | 6,826.52 |
| OCT-2017 | 117001 | 10/31/2017 | RETRAINFEE-OCT2017-0 | | 250.00 | 0.00 | 3.25 | 253.25 |
| | 1756050 | 10/20/2017 | GDS & INTERNET BKGS | | 6.05 | 0.00 | 0.11 | 6.16 |
| | 21609720 | 10/22/2017 | WR FREE ENROLLMENTS | | -10.00 | 0.00 | 0.00 | -10.00 |
| | 21610333 | 10/22/2017 | WYNREWARDS 5% | | 34.69 | 0.00 | 0.61 | 35.30 |
| | 31355297 | 10/04/2017 | TRAINING ACCESS FEE | | 60.00 | 0.00 | 2.04 | 62.04 |
| | 31376199 | 10/31/2017 | GLOBAL CONFERENCE | | 1,149.00 | 0.00 | 0.00 | 1,149.00 |
| | 43974399 | 10/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 12.90 | 642.16 |
| | 43975732 | 10/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 2.32 | 115.45 |
| | 43988336 | 10/31/2017 | Actual-1800A-RESERVATION FEE | | 595.69 | 0.00 | 12.21 | 607.90 |
| | 43988446 | 10/31/2017 | Actual-1210A-MARKETING FEE | | 388.49 | 0.00 | 7.96 | 396.45 |
| | 43988447 | 10/31/2017 | Actual-1000A-ROYALTY FEE | | 1,424.48 | 0.00 | 29.20 | 1,453.68 |
| | TG0756050 | 10/20/2017 | GSA FEES | | 2.78 | 0.00 | 0.05 | 2.83 |
| | | | | Sub Total: | 4,590.18 | 53.39 | 70.65 | 4,714.22 |
| NOV-2017 | 117641 | 11/30/2017 | RETRAINFEE-NOV2017-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21614881 | 11/22/2017 | WYNREWARDS 5% | | 76.22 | 0.00 | 0.15 | 76.37 |
| | 43998941 | 11/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.62 | 113.75 |
| | 43999277 | 11/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 3.46 | 632.72 |
| | 44012787 | 11/30/2017 | Actual-1800A-RESERVATION FEE | | 537.53 | 0.00 | 2.96 | 540.49 |

Page 3 of 4

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 44014483 | 11/30/2017 | Actual-1210A-MARKETING FEE | | 350.57 | 0.00 | 1.93 | 352.50 |
| | 44014484 | 11/30/2017 | Actual-1000A-ROYALTY FEE | | 1,285.41 | 0.00 | 7.07 | 1,292.48 |
| | TM0766903 | 11/09/2017 | MEMBER BENEFIT COMM | | 6.40 | 0.00 | 0.05 | 6.45 |
| | | | Sub Total: | | 3,195.13 | 53.39 | 16.24 | 3,264.76 |
| DEC-2017 | 118385 | 12/31/2017 | RETRAINFEE-DEC2017-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 2162534I | 12/22/2017 | WR FREE ENROLLMENTS | | -70.00 | 0.00 | 0.00 | -70.00 |
| | 2162534Z | 12/22/2017 | WYNREWARDS 5% | | 256.04 | 0.00 | 0.00 | 256.04 |
| | 44025212 | 12/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.00 | 113.13 |
| | 44027736 | 12/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 0.00 | 629.26 |
| | 44039904 | 12/31/2017 | Actual-1800A-RESERVATION FEE | | 929.52 | 0.00 | 0.00 | 929.52 |
| | 44039905 | 12/31/2017 | Actual-1210A-MARKETING FEE | | 606.21 | 0.00 | 0.00 | 606.21 |
| | 44040032 | 12/31/2017 | Actual-1000A-ROYALTY FEE | | 2,222.77 | 0.00 | 0.00 | 2,222.77 |
| | | | Sub Total: | | 4,883.54 | 53.39 | 0.00 | 4,936.93 |
| JAN-2018 | 119462 | 01/31/2018 | RETRAINFEE-JAN2018-1 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21626719 | 01/22/2018 | WR FREE ENROLLMENTS | | -7.00 | 0.00 | 0.00 | -7.00 |
| | 21626720 | 01/22/2018 | WYNREWARDS 5% | | 7.52 | 0.00 | 0.00 | 7.52 |
| | 31411369 | 01/05/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 0.00 | 50.00 |
| | 44051810 | 01/31/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 0.00 | 629.26 |
| | 44053839 | 01/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.00 | 113.13 |
| | 44070167 | 01/31/2018 | Accrual-1800A-RESERVATION FEE | • | 877.68 | 0.00 | 0.00 | 877.68 |
| | 44070168 | 01/31/2018 | Accrual-1210A-MARKETING FEE | • | 572.40 | 0.00 | 0.00 | 572.40 |
| | 44070169 | 01/31/2018 | Accrual-1000A-ROYALTY FEE | • | 2,098.80 | 0.00 | 0.00 | 2,098.80 |
| | | | Sub Total: | | 4,608.40 | 53.39 | 0.00 | 4,661.79 |
| FEB-2018 | 31426740 | 02/06/2018 | AHLA FEE | | 246.00 | 0.00 | 0.00 | 246.00 |
| | | | Sub Total: | | 246.00 | 0.00 | 0.00 | 246.00 |
| | | | Grand Total: | | 63,304.82 | 582.13 | 4,206.50 | 68,093.45 |

Requested By: Yelena Danishevsky

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.

UPS CampusShip                                                                                    Page 1 of 1

## ![UPS] Shipment Receipt

- **Transaction Date:** 09 Feb 2018                    **Tracking Number:**        1Z22445X0293833458

---

### ① ADDRESS INFORMATION

**Ship To:**
Krishna Q Investments, LLC
Naresh Bhagat
17414 Vanwood Lane
YORBA LINDA CA 928861877
Residential

**Ship From:**
Wyndham Hotel Group - 22
Sylvan
Elena Danishevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7256
email elena.danishevsky@wyndc
om

**Return Address:**
Wyndham Hotel Group - 22 Sylvan
Elena Danishevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7256 email elena.danishevsky@wyn om

---

### ② PACKAGE INFORMATION

|    | WEIGHT | DIMENSIONS / PACKAGING | DECLARED VALUE | REFERENCE NUMBERS |
|----|--------|------------------------|----------------|-------------------|
| 1. | Letter (Letter billable) | UPS Letter |  | Reference # 1 - 006-1696 |

---

### ③ UPS SHIPPING SERVICE AND SHIPPING OPTIONS

**Service:**              UPS 2nd Day Air
**Guaranteed By:**        End of Day Tuesday, Feb 13, 2018
**Shipping Fees Subtotal:**  33.57 USD

   Transportation        27.08 USD
   Fuel Surcharge        2.34 USD
   Residential Surcharge  4.15 USD

---

### ④ PAYMENT INFORMATION

**Bill Shipping Charges to:**           Shipper's Account 22445X

| | |
|---|---|
| **Shipping Charges:** | 33.57 USD |
| A discount has been applied to the Daily rates for this shipment **Negotiated Charges:** | 11.73 USD |
| **Subtotal Shipping Charges:** | 11.73 USD |
| **Total Charges:** | 11.73 USD |

---

**Note:** This document is not an invoice. Your final invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide ({0}). To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# EXHIBIT F



# WYNDHAM

### HOTEL GROUP

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 • fax (800) 880-9445

May 10, 2018

**VIA 2 DAY DELIVERY METHOD**

Mr. Nimesh Bhagat
Krishna Q Investments, LLC
17414 Vinwood Lane
Yorba Linda, CA 92886

Re:   NOTICE OF CONTINUING MONETARY DEFAULT relating to Days Inn® Unit
      #42013-96319-2 located in College Park, GA (the "Facility")

Dear Mr. Bhagat:

I write on behalf of Days Inns Worldwide, Inc., ("we," "us," or "our") regarding the Franchise
Agreement dated September 30, 2011, between Krishna Q Investments, LLC, ("you" or "your")
and us (the "Agreement"). You will recall that, on November 10, 2017 and February 9, 2018, we
sent you default notices because of your failure to meet your financial obligations to us.
The notices required you to cure the default within ten (10) days. However, you did not cure
your default within the time permitted.

Your failure to cure your default within the time permitted also allows us to terminate the
Agreement immediately upon written notice to you. We would prefer, however, to keep our
affiliation with you. Accordingly, we will allow you an additional period of ten (10) days from
the date of this letter to cure your default. Please be advised that as of May 7, 2018, your
account is now past due in the amount of **$84,641.55**. We have enclosed an itemized statement
detailing the fees past due. Please understand that we are not waiving this default or any other
default under the Agreement by extending your cure period. We are simply giving you a final
opportunity to avoid termination.

By copy of this Notice, we are also informing your Guarantors of your default with which we
have an Agreement regarding the Facility.

        

         

Mr. Nimesh Bhagat
May 10, 2018
Page Two


We hope you will take this opportunity to resolve your monetary default.  If you have any questions regarding your default or how it can be timely cured, please contact Operations Support Desk at (888) 575-4822.

Sincerely yours,



Joe Maida
Director
Contracts Compliance

Enclosure

cc:     Ramesh Bhagat (Guarantor)
        Kaushal Patel (Guarantor)
        Patrick Breen
        Edvin Kolakovic
        Michael Piccola
        Suzanne Fenimore

# ITEMIZED STATEMENT

Report Date: 07-May-2018

| | |
|---|---|
| As of Data (DD-MMM-YYYY) | : 07-May-2018 |
| Customer No | : 42013-96319-02-DAY |
| Category Set | : |
| Category Group | : |
| Group No | : |
| Bankruptcy | : No Bankruptcy Sites |
| Disputed | : No |
| Finance Charges Included | : Yes |
| | |
| Customer No | : 42013-96319-02-DAY |
| Address | : 2451 Old National Parkway,College Park,GA,30349,US |
| As of Date | : 07-May-2018 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| FEB-2017 | 43785894 | 02/28/2017 | Actual-1000A-ROYALTY FEE | | 105.98 | 0.00 | 133.71 | 239.69 |
| | | | Sub Total: | | 105.98 | 0.00 | 133.71 | 239.69 |
| MAR-2017 | 113065 | 03/31/2017 | RETRAINFEE-MAR2017-5 | | 250.00 | 0.00 | 43.16 | 293.16 |
| | 21547179 | 03/22/2017 | WYNREWARDS 5% | | 188.78 | 0.00 | 27.83 | 216.61 |
| | 21548368 | 03/22/2017 | WR FREE ENROLLMENTS | | -7.00 | 0.00 | 0.00 | -7.00 |
| | 43796229 | 03/31/2017 | 5718A-HughesNet VPN | | 105.00 | 7.35 | 19.38 | 131.73 |
| | 43799609 | 03/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 40.88 | 107.81 | 732.69 |
| | 43812258 | 03/31/2017 | Actual-1800A-RESERVATION FEE | | 1,465.20 | 0.00 | 252.54 | 1,717.74 |
| | 43812259 | 03/31/2017 | Actual-1210A-MARKETING FEE | | 955.56 | 0.00 | 164.69 | 1,120.25 |
| | 43812260 | 03/31/2017 | Actual-1000A-ROYALTY FEE | | 3,503.73 | 0.00 | 603.93 | 4,107.66 |
| | | | Sub Total: | | 7,045.27 | 48.23 | 1,219.34 | 8,312.84 |
| APR-2017 | 113569 | 04/30/2017 | RETRAINFEE-APR2017-3 | | 250.00 | 0.00 | 39.41 | 289.41 |
| | 21555326 | 04/22/2017 | WR FREE ENROLLMENTS | | -49.00 | 0.00 | 0.00 | -49.00 |
| | 21555850 | 04/22/2017 | WYNREWARDS 5% | | 159.49 | 0.00 | 25.74 | 185.23 |
| | 31281544 | 04/11/2017 | WYNREWARDS ADMINFEE | | 100.00 | 0.00 | 16.70 | 116.70 |
| | 31285537 | 04/12/2017 | OMEGA PROGRAM | | 5.00 | 0.00 | 0.86 | 5.86 |
| | 31292843 | 04/30/2017 | Reinspection | | 2,100.00 | 0.00 | 330.75 | 2,430.75 |
| | 43822243 | 04/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 99.09 | 728.35 |
| | 43822442 | 04/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 17.80 | 130.93 |
| | 43830877 | 04/30/2017 | Actual-1800A-RESERVATION FEE | | 1,306.95 | 0.00 | 205.85 | 1,512.80 |
| | 43830878 | 04/30/2017 | Actual-1210A-MARKETING FEE | | 852.36 | 0.00 | 134.25 | 986.61 |
| | 43830879 | 04/30/2017 | Actual-1000A-ROYALTY FEE | | 3,125.31 | 0.00 | 492.22 | 3,617.53 |
| | | | Sub Total: | | 8,539.11 | 53.39 | 1,382.67 | 9,955.17 |
| MAY-2017 | 10945827 | 05/04/2017 | GUEST SATISFACTION | | 116.12 | 0.00 | 18.06 | 134.18 |
| | 114601 | 05/31/2017 | RETRAINFEE-MAY2017-2 | | 250.00 | 0.00 | 33.65 | 283.65 |
| | 21559923 | 05/22/2017 | WYNREWARDS GOFREECR | | -36.75 | 0.00 | 0.00 | -36.75 |

Page 1 of 5

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 21564756 | 05/22/2017 | WR FREE ENROLLMENTS | | -6.32 | 0.00 | 0.00 | -6.32 |
| | 21564757 | 05/22/2017 | WYNREWARDS 5% | | 287.59 | 0.00 | 42.14 | 329.73 |
| | 21565908 | 05/22/2017 | WYNREWARDS BONUS | | 40.00 | 0.00 | 5.86 | 45.86 |
| | 31300008 | 05/25/2017 | WYNREWARDS ADMINFEE | | 100.00 | 0.00 | 14.50 | 114.50 |
| | 31304395 | 05/31/2017 | AUDIT ROYALTY | | 1,195.95 | 0.00 | 169.84 | 1,365.79 |
| | 31304396 | 05/31/2017 | AUDIT MKTG FEE | | 326.17 | 0.00 | 46.33 | 372.50 |
| | 31304397 | 05/31/2017 | AUDIT RESERVATION FEE | | 166.34 | 0.00 | 23.64 | 189.98 |
| | 31304398 | 05/31/2017 | AUDIT INTEREST FEE | | 900.98 | 0.00 | 127.95 | 1,028.93 |
| | 31304399 | 05/31/2017 | LIMITED AUDIT | | 1,000.00 | 0.00 | 142.00 | 1,142.00 |
| | 43848302 | 05/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 16.05 | 129.18 |
| | 43848572 | 05/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 89.34 | 718.60 |
| | 43863250 | 05/31/2017 | Actual-1800A-RESERVATION FEE | | 1,068.99 | 0.00 | 153.18 | 1,222.17 |
| | 43863254 | 05/31/2017 | Actual-1210A-MARKETING FEE | | 697.17 | 0.00 | 99.91 | 797.08 |
| | 43863406 | 05/31/2017 | Actual-1000A-ROYALTY FEE | | 2,556.28 | 0.00 | 366.28 | 2,922.56 |
| | | | | Sub Total: | 9,351.52 | 53.39 | 1,348.73 | 10,753.64 |
| JUN-2017 | 10952906 | 06/08/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 20.88 | 180.88 |
| | 10952920 | 06/08/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 20.88 | 180.88 |
| | 10953284 | 06/08/2017 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 7.52 | 65.21 |
| | 10953436 | 06/08/2017 | WR GUEST SATISFACTION | | 34.62 | 0.00 | 4.53 | 39.15 |
| | 144749 | 06/30/2017 | RETRAINFEE-JUN2017-0 | | 250.00 | 0.00 | 29.90 | 279.90 |
| | 1723252 | 06/09/2017 | GDS & INTERNET BKGS | | 24.45 | 0.00 | 3.19 | 27.64 |
| | 21574742 | 06/22/2017 | WR FREE ENROLLMENTS | | -8.00 | 0.00 | 0.00 | -8.00 |
| | 21574743 | 06/22/2017 | WYNREWARDS 5% | | 158.82 | 0.00 | 19.60 | 178.42 |
| | 21577406 | 06/22/2017 | WYNREWARDS BONUS | | 5.00 | 0.00 | 0.64 | 5.64 |
| | 43877263 | 06/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 14.35 | 127.48 |
| | 43873327 | 06/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 79.90 | 709.16 |
| | 43885588 | 06/30/2017 | Actual-1800A-RESERVATION FEE | | 1,044.25 | 0.00 | 132.52 | 1,176.77 |
| | 43885763 | 06/30/2017 | Actual-1210A-MARKETING FEE | | 681.03 | 0.00 | 86.43 | 767.46 |
| | 43885766 | 06/30/2017 | Actual-1000A-ROYALTY FEE | | 2,497.12 | 0.00 | 316.86 | 2,813.98 |
| | TA0723252 | 06/09/2017 | T/A COMMISSIONS | | 7.20 | 0.00 | 0.93 | 8.13 |
| | TC0723252 | 06/09/2017 | T/A COMM SERVICE CHG | | 3.48 | 0.00 | 0.43 | 3.91 |
| | TM0723252 | 06/09/2017 | MEMBER BENEFIT COMM | | 16.00 | 0.00 | 2.09 | 18.09 |
| | TR0723252 | 06/09/2017 | TMC / CONSORTIA | | 2.52 | 0.00 | 0.34 | 2.86 |
| | | | | Sub Total: | 5,783.18 | 53.39 | 740.99 | 6,577.56 |
| JUL-2017 | 115453 | 07/31/2017 | RETRAINFEE-JUL2017-0 | | 250.00 | 0.00 | 26.02 | 276.02 |
| | 1729966 | 07/18/2017 | GDS & INTERNET BKGS | | 8.55 | 0.00 | 0.94 | 9.49 |
| | 21577911 | 07/22/2017 | WYNREWARDS 5% | | 77.30 | 0.00 | 8.39 | 85.69 |
| | 43899330 | 07/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 70.15 | 699.41 |
| | 43899384 | 07/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 12.60 | 125.73 |
| | 43911099 | 07/31/2017 | Actual-1800A-RESERVATION FEE | | 971.07 | 0.00 | 109.10 | 1,080.17 |
| | 43912210 | 07/31/2017 | Actual-1210A-MARKETING FEE | | 633.31 | 0.00 | 71.17 | 704.48 |
| | 43912357 | 07/31/2017 | Actual-1000A-ROYALTY FEE | | 2,322.13 | 0.00 | 260.91 | 2,583.04 |
| | TA0729966 | 07/18/2017 | T/A COMMISSIONS | | 12.23 | 0.00 | 1.35 | 13.58 |
| | TC0729966 | 07/18/2017 | T/A COMM SERVICE CHG | | 4.75 | 0.00 | 0.51 | 5.26 |
| | TM0729966 | 07/18/2017 | MEMBER BENEFIT COMM | | 19.40 | 0.00 | 2.14 | 21.54 |
| | TV0729966 | 07/18/2017 | GOVERNMENT FEES | | 2.05 | 0.00 | 0.22 | 2.27 |
| | | | | Sub Total: | 4,989.79 | 53.39 | 563.50 | 5,606.68 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2017 | 10967069 | 08/03/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 16.40 | 176.40 |
| | 10967503 | 08/03/2017 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 1.18 | 12.72 |
| | 10872159 | 08/17/2017 | GUEST SATISFACTION | | 54.01 | 0.00 | 5.17 | 59.18 |
| | 10972986 | 08/17/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 15.28 | 175.28 |
| | 115864 | 08/31/2017 | RETRAINFEE-AUG2017-0 | | 250.00 | 0.00 | 22.14 | 272.14 |
| | 1736233 | 08/16/2017 | GDS & INTERNET BKGS | | 6.05 | 0.00 | 0.56 | 6.61 |
| | 21592350 | 08/22/2017 | WYNREWARDS 5% | | 43.54 | 0.00 | 4.03 | 47.57 |
| | 43923056 | 08/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 10.85 | 123.98 |
| | 43924383 | 08/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 60.40 | 689.66 |
| | 43935224 | 08/31/2017 | Actual-1000A-ROYALTY FEE | | 1,192.48 | 0.00 | 113.67 | 1,306.15 |
| | 43935444 | 08/31/2017 | Actual-1800A-RESERVATION FEE | | 498.67 | 0.00 | 47.55 | 546.22 |
| | 43935445 | 08/31/2017 | Actual-1210A-MARKETING FEE | | 325.22 | 0.00 | 31.01 | 356.23 |
| | | | Sub Total: | | 3,390.51 | 53.39 | 328.24 | 3,772.14 |
| SEP-2017 | 10977846 | 09/07/2017 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 0.98 | 12.52 |
| | 10976514 | 09/07/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 13.60 | 173.60 |
| | 116393 | 09/30/2017 | RETRAINFEE-SEP2017-1 | | 250.00 | 0.00 | 18.39 | 268.39 |
| | 21601079 | 09/22/2017 | WYNREWARDS 5% | | 61.80 | 0.00 | 4.80 | 66.60 |
| | 43949333 | 09/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 50.96 | 680.22 |
| | 43950011 | 09/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 9.15 | 122.28 |
| | 43966317 | 09/30/2017 | Actual-1800A-RESERVATION FEE | | 1,062.67 | 0.00 | 85.95 | 1,148.62 |
| | 43966318 | 09/30/2017 | Actual-1210A-MARKETING FEE | | 693.04 | 0.00 | 56.05 | 749.09 |
| | 43966319 | 09/30/2017 | Actual-1000A-ROYALTY FEE | | 2,541.16 | 0.00 | 205.56 | 2,746.72 |
| | | | Sub Total: | | 5,469.21 | 53.39 | 445.44 | 5,968.04 |
| OCT-2017 | 117001 | 10/31/2017 | RETRAINFEE-OCT2017-0 | | 250.00 | 0.00 | 14.51 | 264.51 |
| | 1756050 | 10/20/2017 | GDS & INTERNET BKGS | | 6.05 | 0.00 | 0.37 | 6.42 |
| | 21609720 | 10/22/2017 | WR FREE ENROLLMENTS | | -10.00 | 0.00 | 0.00 | -10.00 |
| | 21610333 | 10/22/2017 | WYNREWARDS 5% | | 34.49 | 0.00 | 2.18 | 36.67 |
| | 31355297 | 10/04/2017 | TRAINING ACCESS FEE | | 60.00 | 0.00 | 4.74 | 64.74 |
| | 31376199 | 10/31/2017 | GLOBAL CONFERENCE | | 1,149.00 | 0.00 | 0.00 | 1,149.00 |
| | 43974399 | 10/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 41.21 | 670.47 |
| | 43975732 | 10/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 7.40 | 120.53 |
| | 43988336 | 10/31/2017 | Actual-1800A-RESERVATION FEE | | 595.69 | 0.00 | 39.01 | 634.70 |
| | 43988446 | 10/31/2017 | Actual-1210A-MARKETING FEE | | 388.49 | 0.00 | 25.44 | 413.93 |
| | 43988447 | 10/31/2017 | Actual-1000A-ROYALTY FEE | | 1,424.48 | 0.00 | 93.30 | 1,517.78 |
| | TG0756050 | 10/20/2017 | GSA FEES | | 2.78 | 0.00 | 0.17 | 2.95 |
| | | | Sub Total: | | 4,590.18 | 53.39 | 228.33 | 4,871.90 |
| NOV-2017 | 117641 | 11/30/2017 | RETRAINFEE-NOV2017-0 | | 250.00 | 0.00 | 10.76 | 260.76 |
| | 21614881 | 11/22/2017 | WYNREWARDS 5% | | 76.22 | 0.00 | 3.58 | 79.80 |
| | 43998941 | 11/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 5.70 | 118.83 |
| | 43999277 | 11/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 31.77 | 661.03 |
| | 44012767 | 11/30/2017 | Actual-1800A-RESERVATION FEE | | 537.53 | 0.00 | 22.15 | 564.68 |
| | 44014463 | 11/30/2017 | Actual-1210A-MARKETING FEE | | 350.57 | 0.00 | 17.70 | 368.27 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| DEC-2017 | 44014484 | 11/30/2017 | Actual-1000A-ROYALTY FEE | | 1,285.41 | 0.00 | 64.91 | 1,350.32 |
| | TM0766903 | 11/09/2017 | MEMBER BENEFIT COMM | | 6.40 | 0.00 | 0.34 | 6.74 |
| | | | Sub Total: | | 3,195.13 | 53.39 | 161.91 | 3,410.43 |
| | 118385 | 12/31/2017 | RETRAINFEE-DEC2017-0 | | 250.00 | 0.00 | 6.88 | 256.88 |
| | 21625341 | 12/22/2017 | WR FREE ENROLLMENTS | | -70.00 | 0.00 | 0.00 | -70.00 |
| | 21625342 | 12/22/2017 | WYNREWARDS 5% | | 256.04 | 0.00 | 8.19 | 264.23 |
| | 44025212 | 12/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 3.95 | 117.08 |
| | 44027736 | 12/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 22.02 | 651.28 |
| | 44039904 | 12/31/2017 | Actual-1800A-RESERVATION FEE | | 929.52 | 0.00 | 32.53 | 962.05 |
| | 44039905 | 12/31/2017 | Actual-1210A-MARKETING FEE | | 606.21 | 0.00 | 21.22 | 627.43 |
| | 44040032 | 12/31/2017 | Actual-1000A-ROYALTY FEE | | 2,222.77 | 0.00 | 77.80 | 2,300.57 |
| | | | Sub Total: | | 4,883.54 | 53.39 | 172.59 | 5,109.52 |
| JAN-2018 | 119462 | 01/31/2018 | RETRAINFEE-JAN2018-1 | | 250.00 | 0.00 | 3.00 | 253.00 |
| | 21628719 | 01/22/2018 | WR FREE ENROLLMENTS | | -7.00 | 0.00 | 0.00 | -7.00 |
| | 21628720 | 01/22/2018 | WYNREWARDS 5% | | 77.52 | 0.00 | 1.28 | 78.80 |
| | 31411369 | 01/05/2018 | WYNREWARDS 5% | | 50.00 | 0.00 | 1.26 | 51.26 |
| | 44051810 | 01/31/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 12.27 | 641.53 |
| | 44053839 | 01/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 2.20 | 115.33 |
| | 44070167 | 01/31/2018 | Accrual-1800A-RESERVATION FEE | * | 877.68 | 0.00 | 17.11 | 894.79 |
| | 44070168 | 01/31/2018 | Accrual-1210A-MARKETING FEE | * | 572.40 | 0.00 | 11.16 | 583.56 |
| | 44070169 | 01/31/2018 | Accrual-1000A-ROYALTY FEE | * | 2,098.80 | 0.00 | 40.93 | 2,139.73 |
| | | | Sub Total: | | 4,608.40 | 53.39 | 89.21 | 4,751.00 |
| FEB-2018 | 11006512 | 02/14/2018 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 0.80 | 160.80 |
| | 11006527 | 02/14/2018 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 0.29 | 57.98 |
| | 119672 | 02/28/2018 | RETRAINFEE-FEB2018-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21633676 | 02/22/2018 | WYNREWARDS 5% | | 248.60 | 0.00 | 0.25 | 248.85 |
| | 31426740 | 02/06/2018 | AHLA FEE | | 246.00 | 0.00 | 0.00 | 246.00 |
| | 31431601 | 02/09/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 0.38 | 50.38 |
| | 44079897 | 02/28/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 3.46 | 632.72 |
| | 44080629 | 02/28/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.62 | 113.75 |
| | 44095697 | 02/28/2018 | Accrual-1800A-RESERVATION FEE | * | 727.74 | 0.00 | 4.00 | 731.74 |
| | 44095702 | 02/28/2018 | Accrual-1210A-MARKETING FEE | * | 474.62 | 0.00 | 2.61 | 477.23 |
| | 44095835 | 02/28/2018 | Accrual-1000A-ROYALTY FEE | * | 1,740.26 | 0.00 | 9.57 | 1,749.83 |
| | | | Sub Total: | | 4,643.91 | 53.39 | 21.98 | 4,719.28 |
| MAR-2018 | 120787 | 03/31/2018 | RETRAINFEE-MAR2018-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21639570 | 03/22/2018 | WYNREWARDS 5% | | 228.53 | 0.00 | 0.00 | 228.53 |
| | 31443813 | 03/09/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 0.00 | 50.00 |
| | 31451703 | 03/29/2018 | OMEGA PROGRAM | | 5.00 | 0.00 | 0.00 | 5.00 |
| | 44105042 | 03/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.00 | 113.13 |
| | 44106304 | 03/31/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 0.00 | 629.26 |
| | 44123067 | 03/31/2018 | Accrual-1000A-ROYALTY FEE | * | 2,787.68 | 0.00 | 0.00 | 2,787.68 |
| | 44123092 | 03/31/2018 | Accrual-1210A-MARKETING FEE | * | 760.28 | 0.00 | 0.00 | 760.28 |
| | 44123759 | 03/31/2018 | Accrual-1800A-RESERVATION FEE | * | 1,165.76 | 0.00 | 0.00 | 1,165.76 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| APR-2018 | 120972 | 04/30/2018 | RETRAINFEE-APR2018-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21646658 | 04/22/2018 | WYNREWARDS 5% | | 77.64 | 0.00 | 0.00 | 77.64 |
| | 31459985 | 04/09/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 0.00 | 50.00 |
| | 44131711 | 04/30/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.00 | 113.13 |
| | 44133144 | 04/30/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 0.00 | 629.26 |
| | 44148379 | 04/30/2018 | Accrual-1800A-RESERVATION FEE | * | 857.95 | 0.00 | 0.00 | 857.95 |
| | 44148383 | 04/30/2018 | Accrual-1210A-MARKETING FEE | * | 559.53 | 0.00 | 0.00 | 559.53 |
| | 44148384 | 04/30/2018 | Accrual-1000A-ROYALTY FEE | * | 2,051.61 | 0.00 | 0.00 | 2,051.61 |
| | TC0900411 | 04/16/2018 | T/A COMM SERVICE CHG | | 1.94 | 0.00 | 0.00 | 1.94 |
| | TM0800411 | 04/16/2018 | MEMBER BENEFIT COMM | | 12.96 | 0.00 | 0.00 | 12.96 |
| | | | Sub Total: | | 5,936.25 | 53.39 | 0.00 | 5,989.64 |
| | | | Sub Total: | | 4,550.63 | 53.39 | 0.00 | 4,604.02 |
| | | | **Grand Total:** | | 77,082.61 | 742.30 | 8,816.64 | 84,641.55 |

Requested By: Yelena Danishevsky

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

# ups Shipment Receipt

| Transaction Date: 09 May 2018 | | Tracking Number: | 1Z22445X0293951099 |
|---|---|---|---|

## ① ADDRESS INFORMATION

**Ship To:**
Krishna Q Investments, LLC
Nimesh Bhagat
17414 Vinwood Lane
YORBA LINDA CA 928861877
Residential

**Ship From:**
Wyndham Hotel Group - 22
Sylvan
Elena Danishevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7236
email elena.danishevsky@wyndham.com

**Return Address:**
Wyndham Hotel Group - 22 Sylvan
Elena Danishevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7236 email elena.danishevsky@wyndham.com

## ② PACKAGE INFORMATION

| | WEIGHT | DIMENSIONS / PACKAGING | DECLARED VALUE | REFERENCE NUMBERS |
|---|---|---|---|---|
| 1. | Letter (Letter billable) | UPS Letter | | Reference # 1 - 006-1696 |

## ③ UPS SHIPPING SERVICE AND SHIPPING OPTIONS

| | |
|---|---|
| Service: | UPS 2nd Day Air |
| Guaranteed By: | End of Day Friday, May 11, 2018 |
| Shipping Fees Subtotal: | 33.65 USD |
| Transportation | 27.04 USD |
| Fuel Surcharge | 2.47 USD |
| Residential Surcharge | 4.16 USD |

## ④ PAYMENT INFORMATION

Bill Shipping Charges to:          Shipper's Account 22445X

| | |
|---|---|
| Shipping Charges: | 33.65 USD |
| A discount has been applied to the Daily rates for this shipment **Negotiated Charges:** | 12.48 USD |
| Subtotal Shipping Charges: | 12.48 USD |
| Total Charges: | 12.48 USD |

Note: This document is not an invoice. Your final invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide ({0}). To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# EXHIBIT G



# WYNDHAM

### HOTELS & RESORTS

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445

August 16, 2018

**VIA 2 DAY DELIVERY METHOD**

Mr. Nimesh Bhagat
Krishna Q Investments, LLC
17414 Vinwood Lane
Yorba Linda, CA 92886

Re:    **NOTICE OF CONTINUING MONETARY DEFAULT relating to Days Inn® by Wyndham Unit #42013-96319-2 located in College Park, GA (the "Facility")**

Dear Mr. Bhagat:

I write on behalf of Days Inns Worldwide, Inc., ("we," "us," or "our") regarding the Franchise Agreement dated September 30, 2011, between Krishna Q Investments, LLC, ("you" or "your") and us (the "Agreement"). You will recall that, on November 10, 2017, February 9, 2018 and May 10, 2018, we sent you default notices because of your failure to meet your financial obligations to us. The notices required you to cure the default within ten (10) days. However, you did not cure your default within the time permitted.

Your failure to cure your default within the time permitted also allows us to terminate the Agreement immediately upon written notice to you. We would prefer, however, to keep our affiliation with you. Accordingly, we will allow you an additional period of ten (10) days from the date of this letter to cure your default. Please be advised that as of August 15, 2018, your account is now past due in the amount of **$103,444.58**. We have enclosed an itemized statement detailing the fees past due. Please understand that we are not waiving this default or any other default under the Agreement by extending your cure period. We are simply giving you a final opportunity to avoid termination.

By copy of this Notice, we are also informing your Guarantors of your default with which we have an Agreement regarding the Facility.




Mr. Nimesh Bhagat
August 16, 2018
Page Two


We hope you will take this opportunity to resolve your monetary default.  If you have any questions regarding your default or how it can be timely cured, please contact Operations Support Desk at (888) 575-4822.

Sincerely yours,


Joe Marda
Director
Contracts Compliance

Enclosure

cc:   Ramesh Bhagat (Guarantor)
      Kaushal Patel (Guarantor)
      Patrick Breen
      Edvin Kolakovic
      Michael Piccola
      Suzanne Fenimore
      Jennifer Constantinou

# ITEMIZED STATEMENT

Report Date: 15-Aug-2018

| As of Date (DD-MMM-YYYY) | : | 15-Aug-2018 |
|---|---|---|
| Customer No | : | 42013-96319-02-DAY |
| Category Set | : | |
| Category Group | : | |
| Group No | : | |
| Bankruptcy | : | No Bankruptcy Sites |
| Disputed | : | No |
| Finance Charges Included | : | Yes |

| Customer No | : | 42013-96319-02-DAY |
|---|---|---|
| Address | : | 2451 Old National Parkway,College Park,GA,30349,US |
| As of Date | : | 15-Aug-2018 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| FEB-2017 | 43785894 | 02/28/2017 | Actual-1000A-ROYALTY FEE | | 105.98 | 0.00 | 133.71 | 239.69 |
| | | | Sub Total: | | 105.98 | 0.00 | 133.71 | 239.69 |
| MAR-2017 | 113065 | 03/31/2017 | RETRAINFEE-MAR2017-5 | | 250.00 | 0.00 | 58.42 | 308.42 |
| | 21547179 | 03/22/2017 | WYNREWARDS 5% | | 188.78 | 0.00 | 33.97 | 222.75 |
| | 21548368 | 03/22/2017 | WR FREE ENROLLMENTS | | -7.00 | 0.00 | 0.00 | -7.00 |
| | 43796229 | 03/31/2017 | 5718A-HughesNet VPN | | 105.00 | 7.35 | 26.24 | 138.59 |
| | 43799609 | 03/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 40.88 | 145.93 | 770.81 |
| | 43812258 | 03/31/2017 | Actual-1800A-RESERVATION FEE | | 1,465.20 | 0.00 | 341.92 | 1,807.12 |
| | 43812259 | 03/31/2017 | Actual-1210A-MARKETING FEE | | 955.56 | 0.00 | 222.97 | 1,178.53 |
| | 43812260 | 03/31/2017 | Actual-1000A-ROYALTY FEE | | 3,503.73 | 0.00 | 817.67 | 4,321.40 |
| | | | Sub Total: | | 7,045.27 | 48.23 | 1,647.12 | 8,740.62 |
| APR-2017 | 113589 | 04/30/2017 | RETRAINFEE-APR2017-3 | | 250.00 | 0.00 | 54.67 | 304.67 |
| | 21555326 | 04/22/2017 | WR FREE ENROLLMENTS | | -49.00 | 0.00 | 0.00 | -49.00 |
| | 21555850 | 04/22/2017 | WYNREWARDS 5% | | 159.49 | 0.00 | 35.46 | 194.95 |
| | 31281544 | 04/11/2017 | WYNREWARDS ADMINFEE | | 100.00 | 0.00 | 22.80 | 122.80 |
| | 31285537 | 04/12/2017 | OMEGA PROGRAM | | 5.00 | 0.00 | 1.18 | 6.18 |
| | 31292843 | 04/30/2017 | Reinspection | | 2,100.00 | 0.00 | 458.85 | 2,558.85 |
| | 43822243 | 04/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 137.47 | 766.73 |
| | 43822442 | 04/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 24.70 | 137.83 |
| | 43830877 | 04/30/2017 | Actual-1800A-RESERVATION FEE | | 1,306.95 | 0.00 | 285.57 | 1,592.52 |
| | 43830878 | 04/30/2017 | Actual-1210A-MARKETING FEE | | 852.36 | 0.00 | 186.25 | 1,038.61 |
| | 43830879 | 04/30/2017 | Actual-1000A-ROYALTY FEE | | 3,125.31 | 0.00 | 682.86 | 3,808.17 |
| | | | Sub Total: | | 8,539.11 | 53.39 | 1,889.81 | 10,482.31 |
| MAY-2017 | 10945827 | 05/04/2017 | GUEST SATISFACTION | | 116.12 | 0.00 | 25.14 | 141.26 |
| | 114601 | 05/31/2017 | RETRAINFEE-MAY2017-2 | | 250.00 | 0.00 | 48.91 | 298.91 |
| | 21559923 | 05/22/2017 | WYNREWARDS GOFREECR | | -36.75 | 0.00 | 0.00 | -36.75 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 21564758 | 05/22/2017 | WR FREE ENROLLMENTS | | -6.32 | 0.00 | 0.00 | -6.32 |
| | 21564757 | 05/22/2017 | WYNREWARDS 5% | | 287.59 | 0.00 | 59.68 | 347.27 |
| | 21565908 | 05/22/2017 | WYNREWARDS BONUS | | 40.00 | 0.00 | 8.30 | 48.30 |
| | 31300008 | 05/25/2017 | WYNREWARDS ADMINFEE | | 100.00 | 0.00 | 20.60 | 120.60 |
| | 31304395 | 05/31/2017 | AUDIT ROYALTY | | 1,195.95 | 0.00 | 242.80 | 1,438.75 |
| | 31304396 | 05/31/2017 | AUDIT MKTG FEE | | 326.17 | 0.00 | 66.23 | 392.40 |
| | 31304397 | 05/31/2017 | AUDIT RESERVATION | | 166.34 | 0.00 | 33.80 | 200.14 |
| | 31304398 | 05/31/2017 | AUDIT INTEREST FEE | | 900.98 | 0.00 | 182.91 | 1,083.89 |
| | 31304399 | 05/31/2017 | LIMITED AUDIT | | 1,000.00 | 0.00 | 203.00 | 1,203.00 |
| | 43848302 | 05/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 22.95 | 136.08 |
| | 43848572 | 05/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 127.72 | 756.98 |
| | 43862250 | 05/31/2017 | Actual-1800A-RESERVATION FEE | | 1,068.99 | 0.00 | 218.38 | 1,287.37 |
| | 43863254 | 05/31/2017 | Actual-1210A-MARKETING FEE | | 697.17 | 0.00 | 142.45 | 839.62 |
| | 43863406 | 05/31/2017 | Actual-1000A-ROYALTY FEE | | 2,556.28 | 0.00 | 522.20 | 3,078.48 |
| | | | **Sub Total:** | | 9,351.52 | 53.39 | 1,925.07 | 11,329.98 |
| JUN-2017 | 10952906 | 06/08/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 30.64 | 190.64 |
| | 10952920 | 06/08/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 30.64 | 190.64 |
| | 10953284 | 06/08/2017 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 11.04 | 68.73 |
| | 10953436 | 06/08/2017 | WR GUEST SATISFACTION | | 34.62 | 0.00 | 6.65 | 41.27 |
| | 114749 | 06/30/2017 | RETRAINFEE-JUN2017-0 | | 250.00 | 0.00 | 45.16 | 295.16 |
| | 1723252 | 06/09/2017 | GDS & INTERNET BKGS | | 24.45 | 0.00 | 4.69 | 29.14 |
| | 21574742 | 06/22/2017 | WR FREE ENROLLMENTS | | -8.00 | 0.00 | 0.00 | -8.00 |
| | 21574743 | 06/22/2017 | WYNREWARDS 5% | | 158.82 | 0.00 | 29.28 | 188.10 |
| | 21577406 | 06/22/2017 | WYNREWARDS BONUS | | 5.00 | 0.00 | 0.96 | 5.96 |
| | 43872523 | 06/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 21.25 | 134.38 |
| | 43873327 | 06/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 118.28 | 747.54 |
| | 43885588 | 06/30/2017 | Actual-1800A-RESERVATION FEE | | 1,044.25 | 0.00 | 196.22 | 1,240.47 |
| | 43885763 | 06/30/2017 | Actual-1210A-MARKETING FEE | | 681.03 | 0.00 | 127.99 | 809.02 |
| | 43885766 | 06/30/2017 | Actual-1000A-ROYALTY FEE | | 2,497.12 | 0.00 | 469.20 | 2,966.32 |
| | TA0723252 | 06/09/2017 | T/A COMMISSIONS | | 7.20 | 0.00 | 1.37 | 8.57 |
| | TC0723252 | 06/09/2017 | T/A COMM SERVICE CHG | | 3.48 | 0.00 | 0.63 | 4.11 |
| | TM0723252 | 06/09/2017 | MEMBER BENEFIT COMM | | 16.00 | 0.00 | 3.07 | 19.07 |
| | TR0723252 | 06/09/2017 | TMC / CONSORTIA | | 2.52 | 0.00 | 0.50 | 3.02 |
| | | | **Sub Total:** | | 5,783.18 | 53.39 | 1,097.57 | 6,934.14 |
| JUL-2017 | 115453 | 07/31/2017 | RETRAINFEE-JUL2017-0 | | 250.00 | 0.00 | 41.28 | 291.28 |
| | 1729966 | 07/18/2017 | GDS & INTERNET BKGS | | 8.55 | 0.00 | 1.46 | 10.01 |
| | 21577911 | 07/22/2017 | WYNREWARDS 5% | | 77.30 | 0.00 | 13.11 | 90.41 |
| | 43899330 | 07/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 108.53 | 737.79 |
| | 43899384 | 07/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 19.50 | 132.63 |
| | 43911099 | 07/31/2017 | Actual-1800A-RESERVATION FEE | | 971.07 | 0.00 | 168.34 | 1,139.41 |
| | 43912210 | 07/31/2017 | Actual-1210A-MARKETING FEE | | 633.31 | 0.00 | 109.81 | 743.12 |
| | 43912549 | 07/31/2017 | Actual-1000A-ROYALTY FEE | | 2,322.13 | 0.00 | 402.55 | 2,724.68 |
| | TA0729966 | 07/18/2017 | T/A COMMISSIONS | | 12.23 | 0.00 | 2.09 | 14.32 |
| | TC0729966 | 07/18/2017 | T/A COMM SERVICE CHG | | 4.75 | 0.00 | 0.79 | 5.54 |
| | TM0729966 | 07/18/2017 | MEMBER BENEFIT COMM | | 19.40 | 0.00 | 3.32 | 22.72 |
| | TV0729966 | 07/18/2017 | GOVERNMENT FEES | | 2.05 | 0.00 | 0.34 | 2.39 |
| | | | **Sub Total:** | | 4,989.79 | 53.39 | 871.12 | 5,914.30 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2017 | 10967069 | 08/03/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 26.16 | 186.16 |
| | 10967503 | 08/03/2017 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 1.88 | 13.42 |
| | 10972159 | 08/17/2017 | GUEST SATISFACTION | | 54.01 | 0.00 | 8.47 | 62.48 |
| | 10972986 | 08/17/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 25.04 | 185.04 |
| | 115864 | 08/31/2017 | RETRAINFEE-AUG2017-0 | | 250.00 | 0.00 | 37.40 | 287.40 |
| | 1736233 | 08/16/2017 | GDS & INTERNET BKGS | | 6.05 | 0.00 | 0.92 | 6.97 |
| | 21592350 | 08/22/2017 | WYNREWARDS 5% | | 43.54 | 0.00 | 6.67 | 50.21 |
| | 43922056 | 08/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 17.75 | 130.88 |
| | 43924363 | 08/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 98.78 | 728.04 |
| | 43935224 | 08/31/2017 | Actual-1000A-ROYALTY FEE | | 1,192.48 | 0.00 | 186.41 | 1,378.89 |
| | 43935444 | 08/31/2017 | Actual-1800A-RESERVATION FEE | | 498.67 | 0.00 | 77.97 | 576.64 |
| | 43935445 | 08/31/2017 | Actual-1210A-MARKETING FEE | | 325.22 | 0.00 | 50.85 | 376.07 |
| | | | Sub Total: | | 3,390.51 | 53.39 | 538.30 | 3,982.20 |
| SEP-2017 | 10977846 | 09/07/2017 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 1.68 | 13.22 |
| | 10978514 | 09/07/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 23.36 | 183.36 |
| | 116393 | 09/30/2017 | RETRAINFEE-SEP2017-1 | | 250.00 | 0.00 | 33.65 | 283.65 |
| | 21601079 | 09/22/2017 | WYNREWARDS 5% | | 61.80 | 0.00 | 8.58 | 70.38 |
| | 43949333 | 09/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 89.34 | 718.60 |
| | 43950011 | 09/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 16.05 | 129.18 |
| | 43966317 | 09/30/2017 | Actual-1800A-RESERVATION FEE | | 1,062.67 | 0.00 | 150.77 | 1,213.44 |
| | 43966318 | 09/30/2017 | Actual-1210A-MARKETING FEE | | 693.04 | 0.00 | 98.33 | 791.37 |
| | 43966319 | 09/30/2017 | Actual-1000A-ROYALTY FEE | | 2,541.16 | 0.00 | 360.58 | 2,901.74 |
| | | | Sub Total: | | 5,469.21 | 53.39 | 782.34 | 6,304.94 |
| OCT-2017 | 117001 | 10/31/2017 | RETRAINFEE-OCT2017-0 | | 250.00 | 0.00 | 29.77 | 279.77 |
| | 1760050 | 10/20/2017 | GDS & INTERNET BKGS | | 6.05 | 0.00 | 0.73 | 6.78 |
| | 21609720 | 10/22/2017 | WR FREE ENROLLMENTS | | -10.00 | 0.00 | 0.00 | -10.00 |
| | 21610333 | 10/22/2017 | WYNREWARDS 5% | | 34.69 | 0.00 | 4.30 | 38.99 |
| | 31335297 | 10/04/2017 | TRAINING ACCESS FEE | | 60.00 | 0.00 | 8.40 | 68.40 |
| | 31376199 | 10/31/2017 | GLOBAL CONFERENCE | | 1,149.00 | 0.00 | 70.10 | 1,219.10 |
| | 43974399 | 10/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 79.59 | 708.85 |
| | 43975732 | 10/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 14.30 | 127.43 |
| | 43988336 | 10/31/2017 | Actual-1800A-RESERVATION FEE | | 595.69 | 0.00 | 75.35 | 671.04 |
| | 43988446 | 10/31/2017 | Actual-1210A-MARKETING FEE | | 388.49 | 0.00 | 49.14 | 437.63 |
| | 43988447 | 10/31/2017 | Actual-1000A-ROYALTY FEE | | 1,424.48 | 0.00 | 180.20 | 1,604.68 |
| | TG07560050 | 10/20/2017 | GSA FEES | | 2.78 | 0.00 | 0.33 | 3.11 |
| | | | Sub Total: | | 4,590.18 | 53.39 | 512.21 | 5,155.78 |
| NOV-2017 | 117641 | 11/30/2017 | RETRAINFEE-NOV2017-0 | | 250.00 | 0.00 | 26.02 | 276.02 |
| | 21614801 | 11/22/2017 | WYNREWARDS 5% | | 76.22 | 0.00 | 8.22 | 84.44 |
| | 43998941 | 11/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 12.60 | 125.73 |
| | 43999277 | 11/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 70.15 | 699.41 |
| | 44012787 | 11/30/2017 | Actual-1800A-RESERVATION FEE | | 537.53 | 0.00 | 59.93 | 597.46 |
| | 44014483 | 11/30/2017 | Actual-1210A-MARKETING FEE | | 350.57 | 0.00 | 39.08 | 389.65 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 44014484 | 11/30/2017 | Actual-1000A-ROYALTY FEE | | 1,285.41 | 0.00 | 143.31 | 1,428.72 |
| | TM0766903 | 11/09/2017 | MEMBER BENEFIT COMM | | 6.40 | 0.00 | 0.74 | 7.14 |
| | | | Sub Total: | | 3,195.13 | 53.39 | 360.05 | 3,608.57 |
| DEC-2017 | 118385 | 12/31/2017 | RETRAINFEE-DEC2017-0 | | 250.00 | 0.00 | 22.14 | 272.14 |
| | 21625341 | 12/22/2017 | WR FREE ENROLLMENTS | | -70.00 | 0.00 | 0.00 | -70.00 |
| | 21625342 | 12/22/2017 | WYNREWARDS 5% | | 256.04 | 0.00 | 23.81 | 279.85 |
| | 44025212 | 12/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 10.85 | 123.98 |
| | 44027736 | 12/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 60.40 | 689.66 |
| | 44039904 | 12/31/2017 | Accrual-1800A-RESERVATION FEE | | 929.52 | 0.00 | 89.23 | 1,018.75 |
| | 44039905 | 12/31/2017 | Actual-1210A-MARKETING FEE | | 606.21 | 0.00 | 58.20 | 664.41 |
| | 44040032 | 12/31/2017 | Actual-1000A-ROYALTY FEE | | 2,222.77 | 0.00 | 213.38 | 2,436.15 |
| | | | Sub Total: | | 4,883.54 | 53.39 | 478.01 | 5,414.94 |
| JAN-2018 | 119462 | 01/31/2018 | RETRAINFEE-JAN2018-1 | | 250.00 | 0.00 | 18.26 | 268.26 |
| | 21628719 | 01/22/2018 | WR FREE ENROLLMENTS | | -7.00 | 0.00 | 0.00 | -7.00 |
| | 21528720 | 01/22/2018 | WYNREWARDS 5% | | 77.52 | 0.00 | 6.00 | 83.52 |
| | 31411369 | 01/05/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 4.32 | 54.32 |
| | 44051810 | 01/31/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 50.65 | 679.91 |
| | 44053839 | 01/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 9.10 | 122.23 |
| | 44070167 | 01/31/2018 | Accrual-1800A-RESERVATION FEE | • | 877.68 | 0.00 | 70.65 | 948.33 |
| | 44070168 | 01/31/2018 | Accrual-1210A-MARKETING FEE | • | 572.40 | 0.00 | 46.08 | 618.48 |
| | 44070169 | 01/31/2018 | Accrual-1000A-ROYALTY FEE | • | 2,098.80 | 0.00 | 168.95 | 2,267.75 |
| | | | Sub Total: | | 4,608.40 | 53.39 | 374.01 | 5,035.80 |
| FEB-2018 | 11006512 | 02/14/2018 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 10.56 | 170.56 |
| | 11006527 | 02/14/2018 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 3.81 | 61.50 |
| | 119672 | 02/28/2018 | RETRAINFEE-FEB2018-0 | | 250.00 | 0.00 | 14.76 | 264.76 |
| | 21633676 | 02/22/2018 | WYNREWARDS 5% | | 248.60 | 0.00 | 15.41 | 264.01 |
| | 31426740 | 02/06/2018 | AHLA FEE | | 246.00 | 0.00 | 0.00 | 246.00 |
| | 31431601 | 02/09/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 3.44 | 53.44 |
| | 44079897 | 02/28/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 41.84 | 671.10 |
| | 44080629 | 02/28/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 7.52 | 120.65 |
| | 44095697 | 02/28/2018 | Accrual-1800A-RESERVATION FEE | • | 727.74 | 0.00 | 48.40 | 776.14 |
| | 44095702 | 02/28/2018 | Accrual-1210A-MARKETING FEE | • | 474.62 | 0.00 | 31.57 | 506.19 |
| | 44095835 | 02/28/2018 | Accrual-1000A-ROYALTY FEE | • | 1,740.26 | 0.00 | 115.71 | 1,855.97 |
| | | | Sub Total: | | 4,643.91 | 53.39 | 293.02 | 4,990.32 |
| MAR-2018 | 120787 | 03/31/2018 | RETRAINFEE-MAR2018-0 | | 250.00 | 0.00 | 10.88 | 260.88 |
| | 21639570 | 03/22/2018 | WYNREWARDS 5% | | 228.53 | 0.00 | 10.97 | 239.50 |
| | 31443813 | 03/09/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 2.74 | 52.74 |
| | 31451703 | 03/29/2018 | OMEGA PROGRAM | | 5.00 | 0.00 | 0.27 | 5.27 |
| | 44105042 | 03/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 5.77 | 118.90 |
| | 44106304 | 03/31/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 32.09 | 661.35 |
| | 44123067 | 03/31/2018 | Accrual-1000A-ROYALTY FEE | • | 2,787.68 | 0.00 | 142.18 | 2,929.86 |
| | 44123092 | 03/31/2018 | Accrual-1210A-MARKETING FEE | • | 760.28 | 0.00 | 38.76 | 799.04 |
| | 44123759 | 03/31/2018 | Accrual-1800A-RESERVATION FEE | • | 1,165.76 | 0.00 | 59.46 | 1,225.22 |

Page 4 of 6

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| APR-2018 | 120972 | 04/30/2018 | RETRAINFEE-APR2018-0 | | 250.00 | 0.00 | 7.13 | 257.13 |
| | 21646658 | 04/22/2018 | WYNREWARDS 5% | | 77.64 | 0.00 | 2.52 | 80.16 |
| | 31459985 | 04/09/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 1.96 | 51.96 |
| | 44131711 | 04/30/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 4.07 | 117.20 |
| | 44133144 | 04/30/2018 | 5338A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 22.65 | 651.91 |
| | 44148379 | 04/30/2018 | Accrual-1800A-RESERVATION FEE | | 857.95 | 0.00 | 30.89 | 888.84 |
| | 44148383 | 04/30/2018 | Accrual-1210A-MARKETING FEE | | 559.53 | 0.00 | 20.14 | 579.67 |
| | 44148384 | 04/30/2018 | Accrual-1000A-ROYALTY FEE | * | 2,051.61 | 0.00 | 73.85 | 2,125.46 |
| | TM0800411 | 04/16/2018 | MEMBER BENEFIT COMM | * | 12.96 | 0.00 | 0.45 | 13.41 |
| | | | Sub Total: | | 5,936.25 | 53.39 | 303.12 | 6,292.76 |
| MAY-2018 | 11024922 | 05/31/2018 | WR GUEST SATISFACTION CHARGE | | 57.69 | 0.00 | 0.75 | 58.44 |
| | 11025211 | 05/31/2018 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 2.08 | 162.08 |
| | 121475 | 05/31/2018 | RETRAINFEE-MAY2018-0 | | 250.00 | 0.00 | 3.25 | 253.25 |
| | 21656055 | 05/22/2018 | WYNREWARDS 5% | | 99.16 | 0.00 | 1.74 | 100.90 |
| | 44157676 | 05/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 2.32 | 115.45 |
| | 44158160 | 05/31/2018 | 5338A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 12.90 | 642.16 |
| | 44175725 | 05/31/2018 | Accrual-1800A-RESERVATION FEE | | 924.60 | 0.00 | 18.95 | 943.55 |
| | 44175728 | 05/31/2018 | Accrual-1210A-MARKETING FEE | | 603.00 | 0.00 | 12.37 | 615.37 |
| | 44175787 | 05/31/2018 | Accrual-1000A-ROYALTY FEE | | 2,211.00 | 0.00 | 45.33 | 2,256.33 |
| | | | Sub Total: | | 4,994.45 | 53.39 | 99.69 | 5,147.53 |
| JUN-2018 | 122149 | 06/30/2018 | RETRAINFEE-JUN2018-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21661530 | 06/22/2018 | WYNREWARDS 5% | | 107.11 | 0.00 | 0.21 | 107.32 |
| | 44185987 | 06/30/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.62 | 113.75 |
| | 44186037 | 06/30/2018 | 5338A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 3.46 | 632.72 |
| | 44200600 | 06/30/2018 | Accrual-1800A-RESERVATION FEE | * | 853.07 | 0.00 | 4.69 | 857.76 |
| | 44200602 | 06/30/2018 | Accrual-1210A-MARKETING FEE | * | 556.35 | 0.00 | 3.06 | 559.41 |
| | 44200917 | 06/30/2018 | Accrual-1000A-ROYALTY FEE | * | 2,039.95 | 0.00 | 11.22 | 2,051.17 |
| | | | Sub Total: | | 4,495.48 | 53.39 | 23.26 | 4,572.13 |
| JUL-2018 | 11032276 | 07/05/2018 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 11032614 | 07/05/2018 | WR GUEST SATISFACTION | | -11.54 | 0.00 | 0.00 | 11.54 |
| | 122793 | 07/31/2018 | RETRAINFEE-JUL2018-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21670569 | 07/22/2018 | WYNREWARDS 5% | | 49.31 | 0.00 | 0.00 | 49.31 |
| | 31549284 | 07/10/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 0.00 | 50.00 |
| | 44210329 | 07/31/2018 | 5338A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 0.00 | 629.28 |
| | 44211160 | 07/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.00 | 113.13 |
| | 44226699 | 07/31/2018 | Accrual-1210A-MARKETING FEE | * | 525.68 | 0.00 | 0.00 | 525.68 |
| | 44226827 | 07/31/2018 | Accrual-1800A-RESERVATION FEE | * | 806.04 | 0.00 | 0.00 | 806.04 |
| | 44227227 | 07/31/2018 | Accrual-1000A-ROYALTY FEE | * | 1,927.48 | 0.00 | 0.00 | 1,927.48 |
| | | | Sub Total: | | 4,469.05 | 53.39 | 0.00 | 4,522.44 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount. Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2018 | 11040617 | 08/09/2018 | GUEST SATISFACTION | | 14.89 | 0.00 | 0.00 | 14.89 |
| | 31604637 | 08/13/2018 | STALE TA COMM CHKS | | -4.50 | 0.00 | 0.00 | -4.50 |
| | | | | Sub Total: | 10.39 | 0.00 | 0.00 | 10.39 |
| | | | | Grand Total: | 91,050.04 | 902.47 | 11,492.07 | 103,444.58 |

Requested By: Yelena Danishevsky

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.

# Shipment Receipt

| Transaction Date: 16 Aug 2018 | | Tracking Number: | 1Z22445X0291438602 |
|---|---|---|---|

## ① ADDRESS INFORMATION

**Ship To:**
Krishna Q Investments, LLC
Nimesh Bhagat
17414 Vinwood Lane
YORBA LINDA CA 928861877
Residential

**Ship From:**
Wyndham Hotel Group - 22 Sylvan
Elena Danishevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone: 973-755-7756
email elena.danishevsky@wyndham.com

**Return Address:**
Wyndham Hotel Group - 22 Sylvan
Elena Danishevsky
22 Sylvan Way
Parsippany NJ 07054
Telephone: 973-755-7756 email elena.danishevsky@wyndham.com

## ② PACKAGE INFORMATION

| | WEIGHT | DIMENSIONS / PACKAGING | DECLARED VALUE | REFERENCE NUMBERS |
|---|---|---|---|---|
| 1. | Letter (Letter billable) | UPS Letter | · | Sender GL Code - 006-1696<br>Sender e-mail - elena.danishevsky@wyndham.com |

## ③ UPS SHIPPING SERVICE AND SHIPPING OPTIONS

**Service:** UPS 2nd Day Air
**Guaranteed By:** End of Day Monday, Aug 20, 2018
**Shipping Fees Subtotal:** 33.73 USD

| | |
|---|---|
| Transportation | 27.08 USD |
| Fuel Surcharge | 2.50 USD |
| Residential Surcharge | 4.15 USD |

## ④ PAYMENT INFORMATION

**Bill Shipping Charges to:** Shipper's Account 72445X

| | |
|---|---|
| Shipping Charges: | 33.73 USD |
| A discount has been applied to the Daily rates for this shipment<br>Negotiated Charges: | 11.78 USD |
| Subtotal Shipping Charges: | 11.78 USD |
| Total Charges: | 11.78 USD |

Note: This document is not an invoice. Your final invoice may vary from the displayed reference rates.

ᵃ For delivery and guarantee information, see the UPS Service Guide ({0}). To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# EXHIBIT H

# WYNDHAM

### HOTELS & RESORTS

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445

September 10, 2018

<u>**VIA OVERNIGHT DELIVERY METHOD**</u>

Mr. Nimesh Bhagat
Krishna Q Investments, LLC
17414 Vinwood Lane
Yorba Linda, CA 92886

Re:   **NOTICE OF TERMINATION** of Franchise Agreement, dated September 30, 2011, (the "Agreement") between Krishna Q Investments, LLC ("you" or "your") and Days Inns Worldwide, Inc. ("we", "our" or "us") for the Days Inn® by Wyndham System Unit #42013-96319-2 located in College Park, GA (the "Facility")

Dear Mr. Bhagat:

We write to give you formal notice of the termination of the Franchise granted under the Agreement to operate the Facility as part of the Days Inn System (the "Notice"). This termination is a result of your failure to cure your default under the Agreement, due to your failure to meet your financial obligations. As you will recall, we provided notice to you on several occasions, most recently August 16, 2018, of your monetary default. The termination of your Agreement is effective as of October 11, 2018 (the "Termination Date").

Because the Agreement has terminated, you must perform your post-termination obligations such as the removal of all items that display or refer to the Days Inn® brand at the Facility. The de-identification procedures are specified in the attachment to this Notice. These de-identification procedures must be completed within ten (10) days from the Termination Date.

You must also pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process. We estimate that, as of the date of this Notice, you owe us $107,230.04 in Recurring Fees. This amount is described in more detail in the attached itemized statement. Additionally, you must pay us Liquidated Damages of $39,775.39 as specified in Section 18.1 of the Agreement.

Please know that, because the Agreement has terminated, you also have lost the right to continue to use the seamless interface version of your property management system. You must now make arrangements with the software vendor for a new license to use the property management system. Please be advised that due to the termination you will have no functionality from the system. If the Facility has a SynXis system installed and you wish to continue using an independent version of the software, please contact Sabre at 877-520-3646. If the Facility has an Opera system installed and you wish to continue using an independent version of the software, please contact Brad Eckensberger at 214-914-8855. If your property is planning to migrate to another property management system, please contact your provider to expedite the installation. If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 506-646-2521 to obtain reporting of that data.

    

Mr. Nimesh Bhagat
September 10, 2018
Page Two

If within the ten (10) day period described above, you do not timely remove the exterior signage which bears the Days Inn name and Marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us. If you object to the removal of the signage by our independent contractor, you must notify us within ten (10) days of the Termination Date.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantors.

If you have any questions regarding your obligations under this Notice, please contact Dayna Shapllo, Manager, Settlements at (973) 753-7143.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

Enclosure

cc:     Ramesh Bhagat (Guarantor)
        Kaushal Patel (Guarantor)
        Patrick Breen
        Dayna Shapllo
        Michael Piccola
        Joe Maida

# ITEMIZED STATEMENT

Report Date: 10-Sep-2018

| | |
|---|---|
| As of Date (DD-MMM-YYYY) | : 10-Sep-2018 |
| Customer No | : 42013-96319-02-DAY |
| Category Set | : |
| Category Group | : |
| Group No | : |
| Bankruptcy | : No Bankruptcy Sites |
| Disputed | : No |
| Finance Charges Included | : Yes |

| | |
|---|---|
| Customer No | : 42013-96319-02-DAY |
| Address | : 2451 Old National Parkway,College Park,GA,30349,US |
| As of Date | : 10-Sep-2018 |

| Month/Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| FEB-2017 | 43785894 | 02/28/2017 | Actual-1000A-ROYALTY FEE | | 105.98 | 0.00 | 133.71 | 239.69 |
| | | | Sub Total: | | 105.98 | 0.00 | 133.71 | 239.69 |
| MAR-2017 | 113065 | 03/31/2017 | RETRAINFEE-MAR2017-5 | | 250.00 | 0.00 | 58.42 | 308.42 |
| | 21547179 | 03/22/2017 | WYNREWARDS 5% | | 188.78 | 0.00 | 33.97 | 222.75 |
| | 21548368 | 03/22/2017 | WR FREE ENROLLMENTS | | -7.00 | 0.00 | 0.00 | -7.00 |
| | 43796229 | 03/31/2017 | 5718A-HughesNet VPN | | 105.00 | 7.35 | 26.24 | 138.59 |
| | 43799609 | 03/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 40.88 | 145.93 | 770.81 |
| | 43812258 | 03/31/2017 | Actual-1800A-RESERVATION FEE | | 1,465.20 | 0.00 | 341.92 | 1,807.12 |
| | 43812259 | 03/31/2017 | Actual-1210A-MARKETING FEE | | 955.56 | 0.00 | 222.97 | 1,178.53 |
| | 43812260 | 03/31/2017 | Actual-1000A-ROYALTY FEE | | 3,503.73 | 0.00 | 817.67 | 4,321.40 |
| | | | Sub Total: | | 7,045.27 | 48.23 | 1,647.12 | 8,740.62 |
| APR-2017 | 113569 | 04/30/2017 | RETRAINFEE-APR2017-3 | | 250.00 | 0.00 | 54.67 | 304.67 |
| | 21555328 | 04/22/2017 | WR FREE ENROLLMENTS | | -49.00 | 0.00 | 0.00 | -49.00 |
| | 21555850 | 04/22/2017 | WYNREWARDS 5% | | 159.49 | 0.00 | 35.46 | 194.95 |
| | 31281544 | 04/11/2017 | WYNREWARDS ADMINFEE | | 100.00 | 0.00 | 22.80 | 122.80 |
| | 31285537 | 04/12/2017 | OMEGA PROGRAM | | 5.00 | 0.00 | 1.18 | 6.18 |
| | 31292843 | 04/30/2017 | Reinspection | | 2,100.00 | 0.00 | 458.85 | 2,558.85 |
| | 43822243 | 04/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 137.47 | 766.73 |
| | 43822442 | 04/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 24.70 | 137.83 |
| | 43830877 | 04/30/2017 | Actual-1800A-RESERVATION FEE | | 1,306.95 | 0.00 | 285.57 | 1,592.52 |
| | 43830878 | 04/30/2017 | Actual-1210A-MARKETING FEE | | 852.36 | 0.00 | 186.25 | 1,038.61 |
| | 43830879 | 04/30/2017 | Actual-1000A-ROYALTY FEE | | 3,125.31 | 0.00 | 682.86 | 3,808.17 |
| | | | Sub Total: | | 8,539.11 | 53.39 | 1,889.81 | 10,482.31 |
| MAY-2017 | 10945827 | 05/04/2017 | GUEST SATISFACTION | | 116.12 | 0.00 | 25.14 | 141.26 |
| | 114601 | 05/31/2017 | RETRAINFEE-MAY2017-2 | | 250.00 | 0.00 | 48.91 | 298.91 |
| | 21559923 | 05/22/2017 | WYNREWARDS GOFREECR | | -36.75 | 0.00 | 0.00 | -36.75 |

Page 1 of 6

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount of Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 21554756 | 05/22/2017 | WR FREE ENROLLMENTS | | -6.32 | 0.00 | 0.00 | -6.32 |
| | 21554757 | 05/22/2017 | WYNREWARDS 5% | | 287.59 | 0.00 | 59.88 | 347.27 |
| | 21555908 | 05/25/2017 | WYNREWARDS BONUS | | 40.00 | 0.00 | 8.30 | 48.30 |
| | 31300008 | 05/26/2017 | WYNREWARDS ADMINFEE | | 100.00 | 0.00 | 20.60 | 120.60 |
| | 31304395 | 05/31/2017 | AUDIT ROYALTY FEE | | 1,195.95 | 0.00 | 242.80 | 1,438.75 |
| | 31304396 | 05/31/2017 | AUDIT MKTG FEE | | 326.17 | 0.00 | 66.23 | 392.40 |
| | 31304397 | 05/31/2017 | AUDIT RESERVATION | | 166.34 | 0.00 | 33.80 | 200.14 |
| | 31304398 | 05/31/2017 | AUDIT INTEREST FEE | | 900.98 | 0.00 | 182.91 | 1,083.89 |
| | 31304399 | 05/31/2017 | LIMITED AUDIT | | 1,000.00 | 0.00 | 203.00 | 1,203.00 |
| | 43848302 | 05/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 22.95 | 136.08 |
| | 43848572 | 05/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.25 | 127.72 | 756.88 |
| | 43853254 | 05/31/2017 | Actual-1800A-RESERVATION FEE | | 1,088.99 | 0.00 | 218.38 | 1,287.37 |
| | 43853254 | 05/31/2017 | Actual-1210A-MARKETING FEE | | 697.17 | 0.00 | 142.45 | 839.62 |
| | 43853406 | 05/31/2017 | Actual-1000A-ROYALTY FEE | | 2,556.28 | 0.00 | 522.20 | 3,078.48 |
| | | | Sub Total: | | 9,351.52 | 63.39 | 1,925.07 | 11,329.98 |
| JUN-2017 | 10952908 | 06/08/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 30.64 | 190.64 |
| | 10952920 | 06/08/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 30.64 | 190.64 |
| | 10653284 | 06/08/2017 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 11.04 | 68.73 |
| | 10952436 | 06/08/2017 | WR GUEST SATISFACTION | | 34.62 | 0.00 | 6.65 | 41.27 |
| | 11049 | 06/09/2017 | RETRAINFEE-JUN2017-0 | | 250.00 | 0.00 | 45.16 | 295.16 |
| | 1723252 | 06/09/2017 | GDS & INTERNET BKGS | | 24.45 | 0.00 | 4.69 | 29.14 |
| | 21574742 | 06/22/2017 | WR FREE ENROLLMENTS | | -8.00 | 0.00 | 0.00 | -8.00 |
| | 21574743 | 06/22/2017 | WYNREWARDS 5% | | 158.82 | 0.00 | 29.28 | 188.10 |
| | 21574705 | 06/22/2017 | WYNREWARDS BONUS | | 5.00 | 0.00 | 0.96 | 5.96 |
| | 43875523 | 06/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 21.25 | 134.38 |
| | 43873327 | 06/30/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.25 | 118.29 | 747.54 |
| | 43865588 | 06/30/2017 | Actual-1800A-RESERVATION FEE | | 1,044.25 | 0.00 | 196.22 | 1,240.47 |
| | 43865763 | 06/30/2017 | Actual-1210A-MARKETING FEE | | 681.03 | 0.00 | 127.99 | 809.02 |
| | 43865788 | 06/30/2017 | Actual-1000A-ROYALTY FEE | | 2,497.12 | 0.00 | 469.20 | 2,966.32 |
| | TA0723252 | 06/09/2017 | T/A COMMISSIONS | | 7.20 | 0.00 | 1.37 | 8.57 |
| | TC0723252 | 06/09/2017 | T/A COMM SERVICE CHG | | 3.48 | 0.00 | 0.63 | 4.11 |
| | TM0723252 | 06/09/2017 | MEMBER BENEFIT COMM | | 16.00 | 0.00 | 3.07 | 19.07 |
| | TR0723252 | 06/09/2017 | TMC / CONSORTIA | | 2.52 | 0.00 | 0.50 | 3.02 |
| | | | Sub Total: | | 5,783.18 | 53.39 | 1,097.57 | 6,934.14 |
| JUL-2017 | 115453 | 07/31/2017 | RETRAINFEE-JUL2017-0 | | 250.00 | 0.00 | 41.28 | 291.28 |
| | 1729968 | 07/18/2017 | GDS & INTERNET BKGS | | 8.55 | 0.00 | 1.46 | 10.01 |
| | 21579911 | 07/22/2017 | WYNREWARDS 5% | | 77.30 | 0.00 | 13.11 | 90.41 |
| | 43890330 | 07/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.28 | 108.53 | 737.79 |
| | 43889334 | 07/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 19.50 | 132.63 |
| | 43911099 | 07/31/2017 | Actual-1800A-RESERVATION FEE | | 977.07 | 0.00 | 188.34 | 1,139.41 |
| | 43912210 | 07/31/2017 | Actual-1210A-MARKETING FEE | | 633.31 | 0.00 | 109.81 | 743.12 |
| | 43912357 | 07/31/2017 | Actual-1000A-ROYALTY FEE | | 2,322.13 | 0.00 | 402.55 | 2,724.68 |
| | TA0729966 | 07/18/2017 | T/A COMMISSIONS | | 12.23 | 0.00 | 2.09 | 14.32 |
| | TC0729966 | 07/18/2017 | T/A COMM SERVICE CHG | | 4.75 | 0.00 | 0.79 | 5.54 |
| | TM0729966 | 07/18/2017 | MEMBER BENEFIT COMM | | 19.40 | 0.00 | 3.32 | 22.72 |
| | TV0729966 | 07/18/2017 | GOVERNMENT FEES | | 2.05 | 0.00 | 0.34 | 2.39 |
| | | | Sub Total: | | 4,989.79 | 53.39 | 871.12 | 5,914.30 |

| Mon/Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2017 | 10967069 | 08/03/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 28.16 | 188.16 |
| | 10967603 | 08/03/2017 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 1.88 | 13.42 |
| | 10972159 | 08/17/2017 | GUEST SATISFACTION | | 54.01 | 0.00 | 8.47 | 62.48 |
| | 10972986 | 08/17/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 25.04 | 185.04 |
| | 115884 | 08/31/2017 | RETRAINFEE-AUG2017-0 | | 250.00 | 0.00 | 37.40 | 287.40 |
| | 1736233 | 08/16/2017 | GDS & INTERNET BKGS | | 6.05 | 0.00 | 0.92 | 6.97 |
| | 21592350 | 08/22/2017 | WYNREWARDS 5% | | 43.54 | 0.00 | 6.67 | 50.21 |
| | 43923056 | 08/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 17.75 | 130.88 |
| | 43924383 | 08/31/2017 | 5536A-SYNXIS PM GRACE PD | | 584.00 | 45.28 | 98.78 | 728.04 |
| | 43935224 | 08/31/2017 | Actual-1000A-ROYALTY FEE | | 1,192.48 | 0.00 | 186.41 | 1,378.89 |
| | 43935444 | 08/31/2017 | Actual-1800A-RESERVATION FEE | | 498.67 | 0.00 | 77.97 | 576.64 |
| | 43935445 | 08/31/2017 | Actual-1210A-MARKETING FEE | | 325.22 | 0.00 | 50.85 | 376.07 |
| | | | Sub Total: | | 3,390.51 | 53.39 | 538.30 | 3,982.20 |
| SEP-2017 | 10977846 | 09/07/2017 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 1.68 | 13.22 |
| | 10978514 | 09/07/2017 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 23.36 | 183.36 |
| | 115393 | 09/30/2017 | RETRAINFEE-SEP2017-1 | | 250.00 | 0.00 | 33.65 | 283.65 |
| | 21601079 | 09/22/2017 | WYNREWARDS 5% | | 61.80 | 0.00 | 8.58 | 70.38 |
| | 43949333 | 09/30/2017 | 5536A-SYNXIS PM GRACE PD | | 584.00 | 45.28 | 89.34 | 718.60 |
| | 43950011 | 09/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 16.05 | 129.18 |
| | 43958317 | 09/30/2017 | Actual-1800A-RESERVATION FEE | | 1,062.67 | 0.00 | 150.77 | 1,213.44 |
| | 43958318 | 09/30/2017 | Actual-1210A-MARKETING FEE | | 693.04 | 0.00 | 98.33 | 791.37 |
| | 43958319 | 09/30/2017 | Actual-1000A-ROYALTY FEE | | 2,541.16 | 0.00 | 360.58 | 2,901.74 |
| | | | Sub Total: | | 5,469.21 | 53.39 | 782.34 | 6,304.94 |
| OCT-2017 | 117001 | 10/31/2017 | RETRAINFEE-OCT2017-0 | | 250.00 | 0.00 | 29.77 | 279.77 |
| | 1756050 | 10/20/2017 | GDS & INTERNET BKGS | | 6.05 | 0.00 | 0.73 | 6.78 |
| | 21609720 | 10/22/2017 | WR FREE ENROLLMENTS | | -10.00 | 0.00 | 0.00 | -10.00 |
| | 21610333 | 10/22/2017 | WYNREWARDS 5% | | 34.69 | 0.00 | 4.30 | 38.99 |
| | 31355297 | 10/04/2017 | TRAINING ACCESS FEE | | 60.00 | 0.00 | 8.40 | 68.40 |
| | 31376199 | 10/31/2017 | GLOBAL CONFERENCE | | 1,149.00 | 0.00 | 70.10 | 1,219.10 |
| | 43974399 | 10/31/2017 | 5536A-SYNXIS PM GRACE PD | | 584.00 | 45.28 | 79.69 | 708.85 |
| | 43975732 | 10/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 14.30 | 127.43 |
| | 43988336 | 10/31/2017 | Actual-1800A-RESERVATION FEE | | 595.69 | 0.00 | 75.35 | 671.04 |
| | 43988446 | 10/31/2017 | Actual-1210A-MARKETING FEE | | 388.49 | 0.00 | 49.14 | 437.63 |
| | 43988447 | 10/31/2017 | Actual-1000A-ROYALTY FEE | | 1,424.48 | 0.00 | 180.20 | 1,604.68 |
| | TG0756050 | 10/20/2017 | GSA FEES | | 2.78 | 0.00 | 0.33 | 3.11 |
| | | | Sub Total: | | 4,590.18 | 53.39 | 512.21 | 5,155.78 |
| NOV-2017 | 117641 | 11/30/2017 | RETRAINFEE-NOV2017-0 | | 250.00 | 0.00 | 26.02 | 276.02 |
| | 21614881 | 11/22/2017 | WYNREWARDS 5% | | 76.22 | 0.00 | 8.22 | 84.44 |
| | 43986941 | 11/30/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 12.60 | 125.73 |
| | 43999277 | 11/30/2017 | 5536A-SYNXIS PM GRACE PD | | 584.00 | 45.28 | 70.15 | 699.41 |
| | 44012787 | 11/30/2017 | Actual-1800A-RESERVATION FEE | | 537.53 | 0.00 | 59.93 | 597.46 |
| | 44014483 | 11/30/2017 | Actual-1210A-MARKETING FEE | | 350.57 | 0.00 | 39.08 | 389.65 |

| Mon.Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 44014484 | 11/30/2017 | Actual-1000A-ROYALTY FEE | | 1,285.41 | 0.00 | 143.31 | 1,428.72 |
| | TM0766903 | 11/09/2017 | MEMBER BENEFIT COMM | | 6.40 | 0.00 | 0.74 | 7.14 |
| | | | Sub Total: | | 3,195.13 | 53.39 | 360.05 | 3,608.57 |
| DEC-2017 | 118385 | 12/31/2017 | RETRAINFEE-DEC2017-0 | | 250.00 | 0.00 | 22.14 | 272.14 |
| | 21625341 | 12/22/2017 | WR FREE ENROLLMENTS | | -70.00 | 0.00 | 0.00 | -70.00 |
| | 21625342 | 12/22/2017 | WYNREWARDS 5% | | 256.04 | 0.00 | 23.81 | 279.85 |
| | 44025212 | 12/31/2017 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 10.85 | 123.98 |
| | 44027736 | 12/31/2017 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 60.40 | 689.66 |
| | 44039904 | 12/31/2017 | Actual-1800A-RESERVATION FEE | | 929.52 | 0.00 | 89.23 | 1,018.75 |
| | 44039905 | 12/31/2017 | Actual-1210A-MARKETING FEE | | 606.21 | 0.00 | 58.20 | 664.41 |
| | 44040032 | 12/31/2017 | Actual-1000A-ROYALTY FEE | | 2,222.77 | 0.00 | 213.38 | 2,436.15 |
| | | | Sub Total: | | 4,883.54 | 53.39 | 478.01 | 5,414.94 |
| JAN-2018 | 119462 | 01/31/2018 | RETRAINFEE-JAN2018-1 | | 250.00 | 0.00 | 18.26 | 268.26 |
| | 21628719 | 01/22/2018 | WR FREE ENROLLMENTS | | -7.00 | 0.00 | 0.00 | -7.00 |
| | 21628720 | 01/22/2018 | WYNREWARDS 5% | | 77.52 | 0.00 | 6.00 | 83.52 |
| | 31411369 | 01/05/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 4.32 | 54.32 |
| | 44051810 | 01/31/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 50.65 | 679.91 |
| | 44053839 | 01/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 9.10 | 122.23 |
| | 44070167 | 01/31/2018 | Accrual-1800A-RESERVATION FEE | | 877.68 | 0.00 | 70.65 | 948.33 |
| | 44070168 | 01/31/2018 | Accrual-1210A-MARKETING FEE | | 572.40 | 0.00 | 46.08 | 618.48 |
| | 44070169 | 01/31/2018 | Accrual-1000A-ROYALTY FEE | | 2,098.80 | 0.00 | 188.95 | 2,287.75 |
| | | | Sub Total: | | 4,608.40 | 53.39 | 374.01 | 5,035.80 |
| FEB-2018 | 11006512 | 02/14/2018 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 10.56 | 170.56 |
| | 11006527 | 02/14/2018 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 3.81 | 61.50 |
| | 119672 | 02/28/2018 | RETRAINFEE-FEB2018-0 | | 250.00 | 0.00 | 14.76 | 264.76 |
| | 21633676 | 02/22/2018 | WYNREWARDS 5% | | 248.80 | 0.00 | 15.41 | 264.01 |
| | 31426740 | 02/06/2018 | AHLA FEE | | 246.00 | 0.00 | 0.00 | 246.00 |
| | 44079897 | 02/09/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 3.44 | 53.44 |
| | 44080629 | 02/28/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 41.84 | 671.10 |
| | 44095697 | 02/28/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 7.52 | 120.65 |
| | 44095702 | 02/28/2018 | Accrual-1800A-RESERVATION FEE | | 727.74 | 0.00 | 48.40 | 776.14 |
| | 44095835 | 02/28/2018 | Accrual-1210A-MARKETING FEE | | 474.62 | 0.00 | 31.57 | 506.19 |
| | | 02/28/2018 | Accrual-1000A-ROYALTY FEE | | 1,740.26 | 0.00 | 115.71 | 1,855.97 |
| | | | Sub Total: | | 4,643.91 | 53.39 | 293.02 | 4,990.32 |
| MAR-2018 | 120787 | 03/31/2018 | RETRAINFEE-MAR2018-0 | | 250.00 | 0.00 | 10.88 | 260.88 |
| | 21639570 | 03/22/2018 | WYNREWARDS 5% | | 228.53 | 0.00 | 10.97 | 239.50 |
| | 31443813 | 03/09/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 2.74 | 52.74 |
| | 31451703 | 03/29/2018 | OMEGA PROGRAM | | 5.00 | 0.00 | 0.27 | 5.27 |
| | 44105042 | 03/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 5.77 | 118.90 |
| | 44106304 | 03/31/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 32.09 | 661.35 |
| | 44123067 | 03/31/2018 | Accrual-1000A-ROYALTY FEE | | 2,787.68 | 0.00 | 142.18 | 2,929.86 |
| | 44123092 | 03/31/2018 | Accrual-1210A-MARKETING FEE | | 760.28 | 0.00 | 38.76 | 799.04 |
| | 44123759 | 03/31/2018 | Accrual-1800A-RESERVATION FEE | | 1,165.76 | 0.00 | 59.46 | 1,225.22 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | Sub Total: | | 5,935.25 | 53.39 | 303.12 | 6,292.76 |
| APR-2018 | 120972 | 04/30/2018 | RETRAINFEE-APR2018-0 | | 250.00 | 0.00 | 7.13 | 257.13 |
| | 21646858 | 04/22/2018 | WYNREWARDS 5% | | 77.64 | 0.00 | 2.52 | 80.16 |
| | 31456985 | 04/09/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 1.96 | 51.96 |
| | 44151711 | 04/30/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 4.07 | 117.20 |
| | 44133144 | 04/30/2018 | 5338A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 22.65 | 651.91 |
| | 44148379 | 04/30/2018 | Accrual-1800A-RESERVATION FEE | | 857.95 | 0.00 | 30.89 | 888.84 |
| | 44148383 | 04/30/2018 | Accrual-1210A-MARKETING FEE | | 559.53 | 0.00 | 20.14 | 579.67 |
| | 44148364 | 04/30/2018 | Accrual-1000A-ROYALTY FEE | | 2,051.61 | 0.00 | 73.85 | 2,125.46 |
| | TMD800411 | 04/16/2018 | MEMBER BENEFIT COMM | | 12.96 | 0.00 | 0.45 | 13.41 |
| | | | Sub Total: | | 4,548.69 | 53.39 | 163.66 | 4,785.74 |
| MAY-2018 | 11024922 | 05/31/2018 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 0.75 | 58.44 |
| | 11025211 | 05/31/2018 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 2.08 | 162.08 |
| | 121475 | 05/31/2018 | RETRAINFEE-MAY2018-0 | | 250.00 | 0.00 | 3.25 | 253.25 |
| | 21856055 | 05/22/2018 | WYNREWARDS 5% | | 99.16 | 0.00 | 1.74 | 100.90 |
| | 44157676 | 05/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 2.32 | 115.45 |
| | 44158160 | 05/31/2018 | 5338A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 12.90 | 642.16 |
| | 44175725 | 05/31/2018 | Accrual-1800A-RESERVATION FEE | | 924.60 | 0.00 | 18.95 | 943.55 |
| | 44175726 | 05/31/2018 | Accrual-1210A-MARKETING FEE | | 603.00 | 0.00 | 12.37 | 615.37 |
| | 44175787 | 05/31/2018 | Accrual-1000A-ROYALTY FEE | | 2,211.00 | 0.00 | 45.33 | 2,256.33 |
| | | | Sub Total: | | 4,994.45 | 53.39 | 99.69 | 5,147.53 |
| JUN-2018 | 122149 | 06/30/2018 | RETRAINFEE-JUN2018-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21661530 | 06/22/2018 | WYNREWARDS 5% | | 107.11 | 0.00 | 0.21 | 107.32 |
| | 44185987 | 06/30/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.62 | 113.75 |
| | 44186037 | 06/30/2018 | 5338A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 3.46 | 632.72 |
| | 44200600 | 06/30/2018 | Accrual-1800A-RESERVATION FEE | | 853.07 | 0.00 | 4.69 | 857.76 |
| | 44200602 | 06/30/2018 | Accrual-1210A-MARKETING FEE | | 556.35 | 0.00 | 3.06 | 559.41 |
| | 44200917 | 06/30/2018 | Accrual-1000A-ROYALTY FEE | | 2,039.95 | 0.00 | 11.22 | 2,051.17 |
| | | | Sub Total: | | 4,495.48 | 53.39 | 23.26 | 4,572.13 |
| JUL-2018 | 11032276 | 07/05/2018 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 11032614 | 07/05/2018 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 0.00 | 11.54 |
| | 122793 | 07/31/2018 | RETRAINFEE-JUL2018-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21670569 | 07/22/2018 | WYNREWARDS 5% | | 49.31 | 0.00 | 0.00 | 49.31 |
| | 31549284 | 07/10/2018 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 0.00 | 50.00 |
| | 44210329 | 07/31/2018 | 5338A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 0.00 | 629.28 |
| | 44211160 | 07/31/2018 | 5718A-HughesNet VPN | | 105.00 | 8.13 | 0.00 | 113.13 |
| | 44226699 | 07/31/2018 | Accrual-1210A-MARKETING FEE | | 525.68 | 0.00 | 0.00 | 525.68 |
| | 44226827 | 07/31/2018 | Accrual-1800A-RESERVATION FEE | | 806.04 | 0.00 | 0.00 | 806.04 |
| | 44227227 | 07/31/2018 | Accrual-1000A-ROYALTY FEE | | 1,927.48 | 0.00 | 0.00 | 1,927.48 |
| | | | Sub Total: | | 4,469.05 | 53.39 | 0.00 | 4,522.44 |

| Mon-Year | Invoice No. & # | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2018 | 11040817 | 08/09/2018 | GUEST SATISFACTION | | 14.89 | 0.00 | 0.00 | 14.89 |
| | 11044267 | 08/23/2018 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 11045209 | 08/23/2018 | WR GUEST SATISFACTION | | 11.54 | 0.00 | 0.00 | 11.54 |
| | 123209 | 08/31/2018 | RETRAINFEE-AUG2018-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 21675333 | 08/22/2018 | WYNREWARDS 5% A | | 204.73 | 0.00 | 0.00 | 204.73 |
| | 31804837 | 08/13/2018 | STALE TA COMM CHKS | | -4.50 | 0.00 | 0.00 | -4.50 |
| | 44237303 | 08/31/2018 | 5710A-HighesNet VPN | | 105.00 | 8.13 | 0.00 | 113.13 |
| | 44238288 | 08/31/2018 | 5336A-SYNXIS PM GRACE PD | | 584.00 | 45.26 | 0.00 | 629.26 |
| | 44252497 | 08/31/2018 | Accrual-1800A-RESERVATION FEE | * | 583.58 | 0.00 | 0.00 | 583.58 |
| | 44252498 | 08/31/2018 | Accrual-1210A-MARKETING FEE | * | 380.60 | 0.00 | 0.00 | 380.60 |
| | 44252544 | 08/31/2018 | Accrual-1000A-ROYALTY FEE | * | 1,395.52 | 0.00 | 0.00 | 1,395.52 |
| | | | | Sub Total: | 3,685.36 | 53.39 | 0.00 | 3,738.76 |
| SEP-2018 | 31622235 | 09/06/2018 | TRAINING ACCESS FEE | | 60.00 | 0.00 | 0.00 | 60.00 |
| | 31638646 | 09/07/2018 | WYNREWARDS 5% ADJ | | -2.90 | 0.00 | 0.00 | -2.90 |
| | | | | Sub Total: | 57.10 | 0.00 | 0.00 | 57.10 |
| | | | | Grand Total: | 94,782.11 | 955.86 | 11,492.07 | 107,230.04 |

Requested By:  Kanyelle Barrino

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following within 10 days after the Termination Date:**

1.     Remove, replace or cover with an opaque cover the primary Facility signage and all other exterior signage bearing the Days Inn Marks.

2.     Remove all interior signage that contains Days Inn Marks.

3.     Change advertising billboards to remove Days Inn Marks, including any department of transportation or other highway signage.

4.     Stop answering Facility telephone as a Days Inn facility.

5.     Remove Days Inn name and Marks from any domain name, advertising and brochures.

6.     Return to us or destroy all confidential operations and training manuals.

7.     Remove the Days Inn name and Marks from the following items:

   - Guestroom supplies including door signage, ice buckets, cups etc.
   - Bathroom supplies including soap, shampoo, conditioner, etc.
   - Business cards and letterhead
   - Registration cards, folios, guest receipts, including electronic copies
   - Guestroom keys
   - Uniforms and name badges

8.     Paint over or remove any distinctive Days Inn trade dress, paint schemes or architectural features.

9.     Remove Days Inn  name from the Facility's listing on TripAdvisor or any other online traveler review site.

10.    It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Days Inn facility.

11.    We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.



# Shipment Receipt

Transaction Date: 10 Sep 2018                              Tracking Number:        1Z208E370194110241

## ① ADDRESS INFORMATION

**Ship To:**
Krishna Q Investments, Inc.
Nemesh Bhagat
17414 Vinwood Lane
YORBA LINDA CA 928861877
Telephone:9737557256
Residential

**Ship From:**
Wyndham Worldwide - 22
Sylvan
Kanyelle Banno
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7787
email:kanyelle.banno@wyn.com

**Return Address:**
Wyndham Worldwide - 22 Sylvan
Kanyelle Banno
22 Sylvan Way
Parsippany NJ 07054
Telephone:973-753-7787 / email:kanyelle.banno@wyndhamcom

## ② PACKAGE INFORMATION

| | WEIGHT | DIMENSIONS / PACKAGING | DECLARED VALUE | REFERENCE NUMBERS |
|---|---|---|---|---|
| 1. | Letter (Letter billable) | UPS Letter | | Sender GL Code - 006-1696 Sender e-mail - kanyelle.barrino@wyndham.com |

## ③ UPS SHIPPING SERVICE AND SHIPPING OPTIONS

| | |
|---|---|
| Service: | UPS Next Day Air |
| Guaranteed By: | 10:30 AM Tuesday, Sep 11, 2018 |
| Shipping Fees Subtotal: | 51.11 USD |
| Transportation | 45.17 USD |
| Fuel Surcharge | 3.79 USD |
| Residential Surcharge | 4.15 USD |

## ④ PAYMENT INFORMATION

Bill Shipping Charges to:            Shipper's Account 208E37

| | |
|---|---|
| Shipping Charges: | 51.11 USD |
| A discount has been applied to the Daily rates for this shipment | |
| Negotiated Charges: | 12.48 USD |
| Subtotal Shipping Charges: | 12.48 USD |
| Total Charges: | 12.48 USD |

Note: This document is not an invoice. Your final invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide ((0)). To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# EXHIBIT I



CONNELL
FOLEY
A TRADITION OF LEGAL EXCELLENCE SINCE 1938

Connell Foley LLP
One Newark Center
1085 Raymond Blvd., 19th Floor
Newark, New Jersey 07102
P 973.436.5800  F 973.436.5801

Bryan P. Couch
Partner
Direct Dial 973-436-5703
BCouch@connellfoley.com

January 15, 2019

**VIA FEDERAL EXPRESS**
Krishna Q. Investments, LLC
Kaushal Patel
2451 Old National Parkway
College Park, GA 30349

Ramesh Bhagat
Nimesh Bhagat
17414 Vinwood Lane
Yorba Linda, CA 92886

Re:   **Demand to Cease and Desist Ongoing Infringement of Days Inns Worldwide, Inc.'s Trade Name and Service Marks at Facility located at 2451 Old National Parkway, College Park, Georgia 30349, Former Days Inn® Site No. 42013-96319-02**

Dear Sir or Madam:

We represent Days Inns Worldwide, Inc. ("DIW") relative to issues relating to the guest lodging facility located at 2451 Old National Parkway, College Park, Georgia 30349, former Days Inn® Site No. 42013-96319-02 (the "Facility"). We write to demand that you cease and desist from using the Days Inn® trade name, trademarks or service marks (collectively, the "Days Inn® Marks"), and/or names and marks that are confusingly similar to the Days Inn® Marks.

The Franchise Agreement between Krishna Q. Investments, LLC and DIW terminated effective October 11, 2018. Thus, the Facility is no longer authorized to operate as a Days Inn® facility. Pursuant to the Franchise Agreement, the Facility was required to immediately cease using all of the Days Inn® Marks. Since the termination of the Franchise Agreement, the Facility has used the Days Inn® Marks without authorization to rent rooms through, among other things, failure to remove the Days Inn® signage and continuing to utilize the Days Inn® Marks throughout the Facility. Specifically, by way of example and not limitation, signage bearing the Days Inn® Marks is located at the Facility and in the Facility's public areas, all within view of the traveling public.

4867126-1

January 15, 2019
Page 2

As you know, DIW is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.  DIW owns and has the exclusive right to license the use of the Days Inn® Marks, as well as the distinctive Days Inn® System, which provides hotel services to the public under the Days Inn® name and certain services to its franchisees, including a centralized reservation system, advertising, publicity, and training services.  DIW or its predecessors have continuously used each of the Days Inn® Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

DIW prides itself on the quality of its services, and its reputation for quality, and the very substantial good will that has become attributable to it.  DIW has spent substantial sums in development, and promotion of the good will associated with the Days Inn® Marks and views them as substantial proprietary assets.  The value of Days Inn's good will exceeds hundreds of millions of dollars.

The Facility's continued use of the Days Inn® Marks constitutes an infringement of DIW's rights.  This infringement is: 1) causing confusion among the public as to the affiliation of the Facility with the Days Inn® System; and 2) damaging contractual relations between DIW and its legitimate franchisees.  This has caused dilution and disparagement of the distinctive quality of the Days Inn® Marks, and lessened the capacity of the Days Inn® Marks to identify and distinguish the goods and services of DIW, all in violation of Section 43(c) of the Lanham Act.

Please be advised that if the Facility does not cease and desist from (1) using all Days Inn® Marks; (2) displaying signage confusingly similar to the Days Inn® Marks; and (3) otherwise identifying the Facility as a Days Inn® by the close of business on Tuesday, January 22, 2019, DIW will immediately move for injunctive relief and seek to recover damages which, under the Lanham Act, may include an award of treble damages and attorneys' fees.  See 15 U.S.C. § 1114, et seq.

Finally, Krishna Q. Investments, LLC has also failed to satisfy its financial obligations to DIW.  Liquidated damages in the amount $39,775.39 and outstanding Recurring Fees, which now total $140,555.63 remain due and owing under the Franchise Agreement.  Krishna Q. Investments, LLC is responsible for the payment of the past due amounts.  Ramesh Bhagat, Kaushal Patel, and Nimesh Bhagat are also responsible for payment of these amounts as personal guarantors of Krishna Q. Investments, LLC's obligations under the Franchise Agreement.

We are hopeful that we can reach an amicable resolution to the current problem.  However, while DIW generally is desirous of avoiding litigation, it will vigorously enforce its proprietary rights where it believes that infringement is occurring and that litigation cannot otherwise be avoided.  **This letter will be our sole attempt to resolve this matter prior to the institution of legal proceedings seeking all available relief on behalf of our client.**

The foregoing is not intended, nor shall it be construed, as a complete recitation of the facts and events concerning the above-referenced matter or the law or claims of DIW in the event of filings with respect thereto, nor shall it be construed as a complete recitation of any of your rights, claims, damages or remedies, legal or equitable.  Nothing hereinabove stated or

4867126-1

January 15, 2019
Page 3

omitted shall be deemed a waiver or limitation of any right, remedy, claim, or cause of action of any kind whatsoever, all of which are hereby expressly reserved.  This letter is written without prejudice to any claims which DIW may have against you and/or related entities, including but not limited to injunctive relief and money damages, should action against you prove necessary.

　　　　Please do not hesitate to contact me if you have any questions about this matter.

　　　　　　　　　　　　　　　　Very truly yours,

　　　　　　　　　　　　　　　　Bryan P. Couch

BPC/KAK

4867126-1